1  CLEMENT ROBERTS (CSBA # 209203)
2  DANIEL S. GUERRA (CSBA # 267559)
   KOUROSH JAHANSOUZ (CSBA # 292559)
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
   San Francisco, CA 94105
4  Telephone:    (415) 773-5700
   Facsimile:    (415) 773-5759
5  croberts@orrick.com
   dguerra@orrick.com
6  kjahansouz@orrick.com

7

8  *Attorneys for Plaintiff*

9                UNITED STATES DISTRICT COURT
10             NORTHERN DISTRICT OF CALIFORNIA
                     OAKLAND DIVISION
11

12  ANIMAL LEGAL DEFENSE FUND,          Case No.

13              Plaintiff,              **COMPLAINT FOR DECLARATORY
                                        AND INJUNCTIVE RELIEF**
14       v.
                                        (Administrative Procedure Act, 5 U.S.C.
15  DAVID BERNHARDT, U.S. Secretary of the   § 551, et seq.)
    Interior; U.S. FISH AND WILDLIFE
16  SERVICE; WILBUR ROSS, U.S. Secretary of
    Commerce; and NATIONAL MARINE
17  FISHERIES SERVICE,

18              Defendants.

19

20

21

22

23

24

25

26

27

28

INTRODUCTION

1.     Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in 1973 to provide a program for the conservation of the nation's endangered and threatened species, and their ecosystems.  Congress defined "conservation" expansively to include the use of all methods and procedures necessary to recover threatened and endangered species to the point that their survival is not reliant upon the ESA's protections.  16 U.S.C. § 1532(3).  The ESA promotes conservation by prioritizing the survival and recovery of these species and their habitats.

2.     For over 40 years, the Department of the Interior and the Department of Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"), have administered the ESA through duly promulgated joint regulations, and to great success:  their efforts have effectively conserved 99% of species listed under the law.

3.     This action challenges recent regulatory revisions promulgated by FWS and NMFS on August 12, 2019, which amend the regulations that implement ESA Sections 4 and 7, 16 U.S.C. §§ 1533, 1536.  The rules were published in the Federal Register on August 27, 2019 and became effective on September 26, 2019.  *See* Regulations for Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019); Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27, 2019); Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44753 (Aug. 27, 2019) (collectively, the "2019 Revised ESA Regulations").

4.     Defendants issued the challenged regulatory revisions to deregulate protections for threatened and endangered species in several key respects.  One of the rules repeals the long-established FWS regulation implementing ESA Section 4(d), often referred to as the "Blanket 4(d) Rule," which automatically extended certain protections to threatened animals and plants upon listing, 50 C.F.R. §§ 17.31, 17.71.  Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44753 (Aug. 27, 2019).  Another rule makes several

1   fundamental changes to Section 4 review, severely restricting its scope and, for the first time,

2   subjugating conservation to economic considerations.  Regulations for Listing Species and

3   Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27, 2019).  And the remaining rule

4   similarly cabins Section 7 review to a degree that wholly thwarts its purpose.  Regulations for

5   Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019).

6           5.      The Services claim that revising these longstanding and fundamental regulations

7   increases clarity and encourages transparency; on the contrary, the regulatory revisions are

8   contrary to the plain language of the ESA, lack any reasoned basis, and are arbitrary and

9   capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

10          6.      The regulatory revisions also contradict the clear conservation mandate of the

11  ESA, which is "to provide a means whereby the ecosystems upon which endangered species and

12  threatened species depend may be conserved, [and] to provide a program for the conservation of

13  such endangered species and threatened species ...."  16 U.S.C. § 1531(b).  Without the Blanket

14  4(d) Rule, for example, animals listed as "threatened" will not be extended protection upon

15  listing, but instead will have to wait for an indeterminate and historically lengthy amount of time

16  for the Services to issue species-specific protections—if the Services choose to act, at all.

17  Animals downgraded from endangered to threatened status will lose their protections against

18  "take" and will be subject to the same delay in regaining their protections, as well.  This change

19  does nothing to promote clarity or transparency—it just makes it easier to "take" threatened

20  wildlife for longer periods of time, thereby undermining the very purpose of the ESA.  The same

21  is true for the two accompanying regulations.

22          7.      In enacting the regulatory revisions, the Services also failed to consider and

23  disclose the significant environmental impacts of the proposed revisions, thereby violating the

24  National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  The final regulatory

25  revisions require NEPA review as they constitute major federal action that does not qualify for a

26  categorical exclusion.

27

28

8.      For these violations of law, Plaintiff seeks an order (1) declaring the revised ESA regulations invalid, (2) vacating the revised ESA regulations, (3) enjoining reliance on the revised ESA regulations, and (4) reinstating the prior ESA regulations.

JURISDICTION AND VENUE

9.      This action is brought pursuant to the APA, 5 U.S.C. §§ 702, 706.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e), as the Plaintiff resides in this district, Plaintiff has members and offices in this district, and many of the consequences of the Defendants' violations of the law giving rise to the claims occurred or will occur in this district.  For example, as set forth more fully below, Defendants' action injures the aesthetic, conservation, recreational, and organizational interests of Plaintiff and its members residing in this district because it subjects imperiled species to "take" as prohibited by Section 9 of the ESA.

INTRADISTRICT ASSIGNMENT

11.     This case is properly assigned to the Oakland Division under Civil L.R. 3-2(c) because the Plaintiff and many of its members are located in counties within this district.

PARTIES

12.     Plaintiff Animal Legal Defense Fund ("ALDF") is a national nonprofit organization headquartered in Cotati, California, with over 200,000 members and supporters nationwide.  ALDF pursues its mission of protecting the lives and advancing the interests of animals through the legal system by persistently advocating for the protection of animals used and sold in commercial enterprises, as well as their wild counterparts.

13.     One of ALDF's cornerstone issues is protecting members of threatened and endangered species from illegally inadequate housing, treatment, and conditions at commercial facilities such as fur farms and roadside zoos.  Using the ESA, ALDF regularly engages in significant advocacy and public education efforts to raise awareness about the conditions in which threatened and endangered species are held in captivity, to improve their physical and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   mental well-being, and to relocate animals to sanctuaries where they can recover and flourish.

2   ALDF also regularly uses the standards for threatened and endangered animals set forth in the

3   ESA to inform civil cruelty and nuisance suits against captive animal facilities that fail to

4   adequately care for the threatened and endangered animals they exhibit.  ALDF's legal advocacy

5   and ability to carry out its mission relies extensively upon the ESA to ensure imperiled species

6   receive the protections they need to thrive, and thus is impeded by the Services' action.

7          14.    ALDF also advocates for threatened and endangered species in the wild,

8   promotes the humane treatment of wildlife, and campaigns for the preservation of wilderness

9   and wildlife habitat, including by persistently advocating for government adherence to wildlife

10   protection laws such as the ESA and NEPA.  ALDF has successfully used legal action to protect

11   threatened and endangered species in California by forcing county governments to halt their

12   wildlife killing programs unless or until they study their environmental impacts.  ALDF also

13   engages on the federal level, bringing lawsuits against the United States Department of

14   Agriculture's ("USDA") Wildlife Services to compel study of the impacts of its regional wildlife

15   killing programs; to protect and conserve wild lands, specifically from the effects of climate

16   change; and to force federal agencies to consider threatened and endangered species, as well as

17   the impacts of climate change, in their decision making.  ALDF further advocates for threatened

18   and endangered species directly to government agencies.  ALDF recently submitted comments to

19   the FWS opposing the delisting of the grey wolf, for example, and, in addition to submitting its

20   own comments, was part of the coalition that delivered over 800,000 comments to the Services

21   opposing the regulations at issue here.

22          15.    ALDF and its members are concerned about protecting threatened and

23   endangered captive species from exploitation and extinction.  ALDF and its members derive

24   recreational, aesthetic, and conservation benefits and enjoyment from the proper treatment and

25   conservation of threatened and endangered species and species that may be listed as threatened

26   or endangered.  ALDF also has members who reside near and visit facilities that exhibit

27   members of threatened and endangered species and species that may be listed as threatened or

28

endangered species.  ALDF and its members have been, are being, and will continue to be irreparably harmed by defendants' disregard of their statutory duties and by the unlawful injuries imposed on imperiled species and their critical habitat by the defendants' actions.

16.     ALDF's members, staff, and supporters also frequent natural areas for the purposes of observing threatened and endangered species and other recreational and professional pursuits.  Plaintiffs' members and staff enjoy observing, attempting to observe, photographing, and studying these species, including signs of the species' presence in the areas.  The opportunity to possibly view these species or signs of species in these areas is of significant interest and value to Plaintiffs' members and staff and increases the use and enjoyment of public lands and ecosystems in the United States.  Plaintiff's members also derive recreational, aesthetic, and conservation benefits and enjoyment from the conservation of threatened and endangered species and species that may be listed as threatened or endangered, as well as their critical habitat; they have an interest in the health and humane treatment of wild animals.

17.     The aesthetic, conservation, and recreational interests of plaintiff and its members in the continued vitality of threatened and endangered species, species that may be listed as threatened or endangered species, and their critical habitat is directly and adversely affected by the Services' action.  Among other things, the Services' action will result in a smaller number of threatened and endangered species being protected, making it increasingly difficult to observe these species in the wild and to ensure they are protected when in captivity.

18.     Finally, Plaintiffs' members, staff, and supporters have a procedural interest in ensuring that the Services comply with all applicable federal statutes and regulations, as well as procedural right to participate in the public processes such statutes and regulations require.  ALDF is entitled to have its concerns addressed by the Services in their final rules, and to participate in a public NEPA process for the significant federal actions the Services undertook here.  Plaintiff and its members, staff, and supporters have suffered a procedural injury by the Services' failure to address these concerns and to provide for a public NEPA process.  The relief requested in this litigation would redress this injury.

19.     Defendant David Bernhardt, U.S. Secretary of the Interior, is sued in his professional capacity.  Mr. Bernhardt has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species. Mr. Bernhardt signed the final revised ESA regulation at issue.

20.     Defendant U.S. Fish and Wildlife Service is an agency of the U.S. Department of the Interior, charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

21.     Defendant Wilbur Ross, U.S. Secretary of Commerce, is sued in his professional capacity.  Mr. Ross has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to threatened and endangered marine species and anadromous fish species.  Mr. Ross signed the final revised ESA regulation at issue; and

22.     Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce, responsible for administering the ESA with regard to threatened and endangered marine species and anadromous fish species.

BACKGROUND

I.     THE CONSERVATION, PROTECTION, AND RECOVERY OF BOTH WILD AND CAPTIVE ENDANGERED AND THREATENED SPECIES IS A NATIONAL PRIORITY UNDER THE ENDANGERED SPECIES ACT.

23.     Congress passed the ESA in 1973 in recognition of a then-ongoing extinction crisis and the belief that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," and that, through various treaties and covenants, the United States had pledged to the international community "to conserve to the extent practicable various species of fish or wildlife and plants facing extinction."  16 U.S.C. § 1531(a)(3)-(4).

24.     Congress intended the ESA "to provide a program for the conservation of such endangered species and threatened species …."  16 U.S.C. § 1531(b).  The ESA defined

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"conservation" as "the use of all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided pursuant to this act are no longer necessary." 16 U.S.C. § 1532(3).

25.     The ESA seeks to conserve, protect, and recover imperiled species by using the "best scientific and commercial data available," 16 U.S.C. § 1533(b), to determine, based on enumerated statutory factors, the suitability of species for listing as threatened or endangered. 16 U.S.C. §§ 1533(a)(1)(A)-(E).

26.     The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The ESA defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

27.     Section 7 of the ESA elevates the mandate of species protection over the primary missions of federal agencies. In adopting this section, Congress effectively charged all federal agencies with the affirmative duty to further the conservation of imperiled species. 16 U.S.C. § 1536(a).

28.     Section 7 of the ESA further requires every federal agency to consult with FWS or NMFS to obtain review and clearance for activities that may affect listed species or their habitat. If "any action authorized, funded, or carried out by" a federal agency may affect a listed species or its designated critical habitat, that activity cannot go forward until consultation ensures that it will not "jeopardize" the species or result in the "destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

29.     Much like their wild brethren, endangered or threatened animals bred or kept in captivity also benefit from the protections afforded by and the prohibitions enumerated in the ESA. *See, e.g.*, Final Rule, 80 Fed. Reg. 7380, 7388 (Feb. 10, 2015) ("On its face the ESA does not treat captives differently …. Section 9(a)(1)(A)-(G) of the ESA applies to endangered

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

species regardless of their captive status."); 50 C.F.R. § 17.3 (defining the "take" definition's term "harass" in the context of captive animals).

30. The listing of a species as endangered under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take" of species, which is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 17.3 (harass "means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering[.]").

31. Section 9 of the ESA also prohibits the "incidental take" of endangered species, *i.e.*, a take that is not a direct goal of the proposed action. FWS or NMFS may issue an "Incidental Take Statement" if, during Section 7 consultation, the agency concludes that the incidental take will not jeopardize the species. The Incidental Take Statement outlines the impacts of the incidental taking on the species, necessary mitigation measures, and any other terms and conditions with which the action agency must comply (including reporting requirements). 16 U.S.C. § 1536(b)(4)(C).

32. Section 10 of the ESA extends the regulation of incidental take to cover the actions of private entities. FWS or NMFS may permit "any taking otherwise prohibited by [Section 9(a)(1)(B)] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). If FWS or NMFS finds that the "taking will not appreciably reduce the likelihood of the survival and recovery of the species[,]" the agency may issue an Incidental Take Permit. 16 U.S.C. § 1539(a)(2)(B)(iv).

II. THE CONSERVATION, PROTECTION, AND RECOVERY OF BOTH WILD AND CAPTIVE ENDANGERED AND THREATENED SPECIES WERE FURTHERED BY THE SERVICES' BLANKET 4(D) RULE.

33. Pursuant to the Congressional command that implementing agencies promulgate regulations they deem "necessary and advisable to provide for the conservation of [threatened] species," 16 U.S.C. § 1533(d), FWS utilized the Blanket 4(d) Rule to prohibit the taking of

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    species listed as threatened under the ESA for the last 40 years.  Until it was recently rescinded,

2    the protections of the Blanket 4(d) Rule remained in effect unless and until FWS finalized a

3    species-specific rule.  *See* 50 C.F.R. § 17.31(a) (2018).

4        34.    The Blanket 4(d) Rule has enabled the Services to focus their resources on listing

5    species without taking additional time and resources to develop simultaneous species-specific

6    regulations, which would further delay listing decisions.

7        35.    The ESA's protections can only go into effect once a species is listed.  Delay in a

8    listing determination can cause irreparable harm to a species' chances for survival and reduce the

9    species' population and density.  According to a 2016 study of the amount of time listed species

10   spent undergoing review between 1973 and 2014, the Services wait a median of 12.1 years to

11   provide proposed species with ESA protection.  Puckett, E. E., Kesler, D. C., and Greenwald, D.

12   N., *Taxa, petitioning agency, and lawsuits affect time spent awaiting listing under the US

13   Endangered Species Act*, BIOL. CONSERV. 201, 220-229, 225 (2016).

14       36.    The Services currently have a backlog of imperiled species that are awaiting a

15   listing decision.  FWS's Environmental Conservation Online System ("ECOS") shows that there

16   are currently 61 ESA listing petitions pending with FWS that are either awaiting findings or have

17   been found to be "warranted" and "not precluded."  *See* 16 U.S.C. § 1533(b)(3).  The oldest of

18   these pending petitions was filed in 2008.  *Endangered Species Act Petitions Received by Fish

19   and Wildlife Service*, U.S. Fish & Wildlife Service Environmental Conservation Online System,

20   *available at* https://bit.ly/2kjTCI2 (last visited Sept. 23, 2019).  Despite this, only 19 species are

21   currently proposed for listing.  *Species Proposed for Listing*, U.S. Fish & Wildlife Service

22   Environmental Conservation Online System, *available at* https://bit.ly/2kQc7Ej (last visited

23   Sept. 23, 2019).  Since the start of 2017, FWS has only listed a total of 17 species as threatened

24   or endangered; specifically, 11 in 2017, five in 2018, and one so far in 2019.  *U.S. Federal

25   Endangered and Threatened Species by Calendar Year*, U.S. Fish & Wildlife Service

26   Environmental Conservation Online System, *available at* https://bit.ly/2ko9rgW (last visited

27   Sept. 23, 2019).

28

37.     NMFS similarly has 13 candidate species that it is currently reviewing to determine whether listing is warranted under the ESA.  The oldest of these candidate species is the cusk, whose potential listing has been under review since 2007.  *Candidate Species Under the Endangered Species Act*, National Oceanic and Atmospheric Administration, *available at* https://bit.ly/2krhs4T (last visited Sep. 23, 2019).

38.     The delay in listing decisions and the existing backlog are a threat to imperiled species awaiting the protections of being listed as endangered or threatened.  The time it takes for making a listing determination already falls outside the two-year timeframe Congress mandated when it revised the ESA in 1982.  16 U.S.C. §§ 1533(b)(3), (6).  In fact, the Services have failed to act in the absence of litigation to compel decisions on listing petitions.  *See, e.g.,* United States Government Accountability Office, Environmental Litigation:  Information on Endangered Species Act Deadline Suits, Feb. 2017, available at https://www.gao.gov/assets/690/683058.pdf.

39.     Any agency action that increases the analysis to be made at the time of the listing determination will further dilute the already limited and insufficient resources the Services have available to make listing decisions, and will further thwart Congress's conservational intent when enacting the ESA.

40.     This is especially so given the Services' existing delay and/or failure in issuing species-specific regulations.  FWS has issued special rules for only half (116) of the 238 of the animal species it has listed as threatened, NMFS has issued only 43 rules for 71 animal species, and over 500 species are under consideration for protection.  *See* Defenders of Wildlife White Paper Series, Section 4(d) Rules:  The Peril and the Promise (2017), at 5-6, https://defenders.org/sites/default/files/publications/section-4d-rules-the-peril-and-the-promise-white-paper.pdf.

III.    IN FURTHERANCE OF ITS CONSERVATION MANDATE, FWS PROMULGATED THE BLANKET 4(d) RULE OVER 40 YEARS AGO TO PROTECT THREATENED SPECIES FROM BECOMING ENDANGERED SPECIES.

41.     Pursuant to Section 4(d) of the ESA, Congress required FWS "to provide for the *conservation*" of threatened species through the issuance of regulations.  16 U.S.C. § 1533(d) (emphasis added); *see also* 16 U.S.C. § 1531(c)(1) ("It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.").

42.     In 1975, two years after the ESA was enacted, FWS exercised its authority under Section 4(d) to issue a regulation extending the "take" prohibitions in Section 9 of the ESA applicable to endangered species, 16 U.S.C. § 1538(a)(1), to all threatened species.  50 C.F.R. § 17.31(a) (2018); Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44411, 44425 (Sept. 26, 1975) ("Except as provided in Subpart A of this Part, or in a permit issued under this Subpart, all of the provisions in § 17.21 shall apply to threatened wildlife."); *see* 50 C.F.R. § 17.21 (setting forth prohibited activities in respect of "endangered wildlife").

43.     This regulation, the Blanket 4(d) Rule, provided significant protections to threatened species, furthering FWS's conservation efforts, as it provided threatened species with the same "take" protections applicable to endangered species, unless and until FWS modified those protections through a species-specific rule.  *See, e.g.*, Protection for Threatened Species of Wildlife, 42 Fed. Reg. 46539 (Sept. 16, 1977) (stating that, under the Blanket 4(d) Rule, FWS "determined that as a general rule, all of the prohibitions applying to endangered species would apply to threatened species, unless otherwise provided for in a special rule.").  These protections allowed FWS to work towards its conservation mandate by applying a well-defined set of default protections to threatened species while FWS considered species-specific regulations.

44.     FWS itself stated that the status quo created by the Blanket 4(d) Rule of complete and presumptive protection, and FWS's ability to tailor species-specific protections at a later date if necessary, constituted "the cornerstone of the system for regulating threatened wildlife."  40 Fed. Reg. 44414.

45.     Indeed, FWS and the Secretary of the Interior *defended* the Blanket 4(d) Rule in a lawsuit challenging the rule as contrary to the language in Section 4(d), *ultra vires*, and violative of the ESA—and won.  In 1993, the Court of Appeals for the D.C. Circuit held that the rule constituted a "reasonable interpretation of [Section 4(d) of the ESA]."  *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 1 F.3d 1, 6 (D.C. Cir. 1993), *altered on other grounds in reh'g*, 17 F.3d 1463 (D.C. Cir. 1994); *id.* at 7 ("[Section 4(d)] arguably grants the FWS the discretion to extend maximum protection to all threatened species at once if, guided by its expertise in the field of wildlife protection, it finds it expeditious to do so.").

46.     Since promulgating the Blanket 4(d) Rule in 1975, FWS has listed over 300 species as "threatened," providing each of them with the same "take" protections applicable to endangered species as a default.  FWS has modified these protections with species-specific rules for fewer than a quarter of these animals.  Historically, FWS has "finalized an average of 2 species-specific 4(d) rules per year," despite adding approximately four species to the threatened list per year.  Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, *available at* https://bit.ly/2lY29kh, at 10 (Aug. 12, 2019).

IV.     THE BLANKET 4(d) RULE PROVIDED CRITICAL PROTECTIONS TO THREATENED CAPTIVE ANIMALS.

47.     The prohibitions of the ESA apply to endangered or threatened animals bred and kept in captivity as well as those found in the wild.  *See, e.g.*, Listing Endangered or Threatened Species, 79 Fed. Reg. 4313, 4317 (Jan. 24, 2017) ("On its face the ESA does not treat captives differently …. Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."); Listing Endangered or Threatened Species, 80 Fed. Reg. 7380, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status"); Final Interpretation, 79 Fed. Reg. 37578, 37597 (July 1, 2014) ("Captive members have the same legal

1   status as the species as a whole."); *see also* 50 C.F.R. § 17.3 (defining prohibited act of

2   "harass[ment]" under ESA in context of captive animals).

3       48.     Accordingly, the Blanket 4(d) Rule served to protect threatened captive animals

4   by providing them with the same protections against "take" under Section 9 of the ESA as

5   endangered animals.

6       49.     Captive animals are subjected to abuse across the country in numerous settings,

7   including at roadside and other types of zoos, fur farms, and "canned hunting" ranches.  For

8   example, in *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845

9   (8th Cir. 2018), the court held that zoo owners violated the "take" prohibitions of the ESA due to

10  their mistreatment of threatened and endangered tigers and lemurs through, *inter alia*, inadequate

11  veterinary care, inadequate sanitation, social isolation, and lack of environmental enrichment.

12  *Id.* at 718.  Pursuant to the ESA, the court ordered the zoo owners to transfer the animals to a

13  USDA-licensed facility capable of meeting the animals' needs.  *Id.*; *see also, e.g.*, *Graham*

14  *v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 751-52 (W.D. Tex. 2017) (holding there

15  was genuine issue of material fact as to whether ground surface in endangered elephant's zoo

16  enclosure caused the elephant foot injuries).

17      50.     The Blanket 4(d) Rule protections were critical in ensuring the protection of

18  threatened captive animals and in giving government agencies, as well as organizations such as

19  ALDF, means to protect such animals from mistreatment—or worse—through enforcement

20  actions.  *See, e.g.*, *Animal Legal Defense Fund v. Olympic Game Farm, Inc.*, No. 3:18-cv-06025,

21  Dkt. 1 (W.D. Wash. Dec. 18, 2018) (alleging inhumane treatment and confinement of

22  endangered gray wolves, lions, and tigers, and threatened brown bears and Canada lynx at

23  roadside zoo, and seeking injunctive relief under the ESA); *Animal Legal Defense Fund*

24  *v. Lucas*, No. 2:19-cv-40, Dkt. 37 (W.D. Penn. Mar. 20, 2019) (alleging inhumane and

25  unsanitary conditions for endangered ring-tailed lemur, black leopard, and gray wolf, and

26  threatened hyacinth macaw at so-called "wildlife zoo" and "petting zoo," and seeking injunctive

27  relief under the ESA).

28

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 14 -

V.   THE ELIMINATION OF THE BLANKET 4(d) RULE ABANDONS 40 YEARS OF PROTECTIONS FOR THREATENED ANIMALS.

51.   On January 30, 2017, President Donald J. Trump signed Executive Order 13771, which states "that for every one new regulation issued, at least two prior regulations be identified for elimination."  Executive Order 13711 § 1 (Jan. 30, 2017); *see also id.* § 2(a) ("Unless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed.").  The stated purpose of this Executive Order was to eliminate allegedly "unnecessary regulatory burdens."  Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12285 (Mar. 1, 2017).

52.   On July 25, 2018, FWS proposed the three rules at issue here to carry out the Executive Order.  *See* Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, 83 Fed. Reg. 35174, 35175 (July 25, 2018).  In the proposed rule eliminating the Blanket 4(d) Rule, FWS proposed to amend 50 C.F.R. § 17.31 to limit its application "only to species listed as threatened species on or before the effective date of this rule."  *Id.*  Stated differently, FWS proposed to eliminate the presumptive protections against "take" for all newly listed threatened species and those downgraded from endangered to threatened species.  Under the proposed rule, such animals "would have protective regulations ***only if*** the Service promulgates a species-specific rule" at some time in the future.  *Id.* (emphasis added).  Thus, the proposal flipped the regulatory framework on its head, exposing threatened animals—wild and captive alike—to conduct that would be prohibited as to endangered animals unless and until FWS both chose to and got around to creating a species-specific regulation.

53.   In proposing to eliminate the Blanket 4(d) Rule prospectively, FWS acknowledged that the prior rule constituted a "reasonable approach" to fulfilling its regulatory duties, citing the D.C. Circuit's opinion in *Sweet Home, supra.*  83 Fed. Reg. 35175.  Nevertheless, FWS proposed to reverse its prior position.

54.     Embedded within the revised regulations, FWS solicited public comment on a barely defined and unfocused swath of over two dozen regulations, not including subparts.  *See* 83 Fed. Reg. 35194 (seeking comment on "any provisions in part 424 of the regulations"); 83 Fed. Reg. 35179 (seeking comment on "any provisions in part 402 of the regulations").  The Services also indicated that the final rules "may include" additional, undefined revisions to "any provisions in part 424 [and 402]"; though FWS failed to provide notice of such revisions as required by the APA, it nonetheless assured the public that any such revisions would meet the APA's legal standard of being "a logical outgrowth of [these] proposed rule[s]."  83 Fed Reg. at 35179, 35194.

55.     The Services further stated they likely would not undertake any environmental assessment or draft any environmental impact statement under NEPA in connection with the elimination of the Blanket 4(d) Rule, due to their conclusion that the proposed elimination "would not … have a significant effect on the human environment" and would be "categorically excluded" from such requirements due to being merely "of an administrative, financial, legal, technical or procedural nature."  83 Fed. Reg. 35177.

56.     The Services accepted comments on each of their proposed revisions to ESA regulations, including elimination of the Blanket 4(d) Rule, through September 24, 2018.  The proposed revisions sparked tremendous concern and controversy:  over 800,000 comments were submitted to the Services opposing the revisions.

VI.     FWS REPEALED THE BLANKET 4(d) RULE ON AUGUST 12, 2019.

57.     On August 12, 2019, FWS issued a final rule amending 50 C.F.R. §§ 17.31 and 17.71, eliminating the Blanket 4(d) Rule as an "Executive Order 13771 deregulatory action." *See* Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, at 20, *available at* https://bit.ly/2lY29kh; *see also* http://www.regulations.gov (Docket ID. FWS-HQ-ES-2018-0007).  As a result, for the first time in over 40 years, FWS has exposed all captive and wild animals (and plants) that may, now or in the future, be listed or reclassified as "threatened" species to harm in the form of "take" prohibited by Section 9 of the ESA, creating a

new status quo utterly contrary to the ESA's conservation mandate.

58.     The final rule states:  "We, the [FWS], revise our regulations related to threatened species to remove the prior default extension of most of the prohibitions for activities involving endangered species to threatened species."  *Id.* at 1.  It continues:  "Species listed or reclassified as threatened species after the effective date of this rule would have protective regulations ***only if*** the Service promulgates a species-specific rule."  *Id.* at 3 (emphasis added); *id.* at 8-9.

59.     The final rule, however, is not accompanied by any requirement that FWS promulgate any such species-specific rule, let alone any semblance of a timetable for doing so. Rather, in the final rule, FWS maintains it has "discretion to revise or promulgate species-specific rules ***at any time*** after the final listing or reclassification determination."  *Id.* at 3 (emphasis added).  FWS also expressly refuses in the final rule to impose any timetable on itself for finalizing any species-specific rule.  *Id.* at 18 ("We considered including a regulatory timeframe to reflect our intention to promulgate 4(d) rules at the time of listing, but ultimately determined that creating a binding requirement was not needed.").  Thus, whereas for the last 40 years, a threatened species would enjoy the protections against "take" under Section 9 of the ESA unless and until FWS finalized a species-specific rule, all newly listed species will now enjoy no such protections unless and until FWS finalizes a species-specific rule.  The elimination of the Blanket 4(d) Rule therefore accelerates a threatened species' descent into endangered status, and leaves the most vulnerable of captive animals at further risk, instead of promoting their conservation.

60.     FWS suggests it may draft and finalize species-specific 4(d) rules concurrently with determining whether to list or reclassify an animal as "threatened," introducing further lag into an already backlogged system that would delay the time at which an animal could be classified as "threatened" in the first place.  *Id.* at 3.  FWS, however, qualifies its purported intention to follow through on this idea by stating, "we do not read the Act to require that we promulgate a 4(d) rule whenever we listed a species as a threatened species," ultimately rendering any redeeming qualities of the proposal hollow.  *Id.* at 16.

61.     In the final rule, FWS also confirms that, despite several requests, it did not hold any public hearings or extend the public comment period.  *Id.* at 7.

62.     FWS also confirms that it did not undertake any environmental assessment or environmental impact statement in connection with the rule change due to its conclusion that the change was "fundamentally administrative, technical, or procedural in nature."  *Id.* at 27 (invoking two categorical exclusions under 43 C.F.R. § 46.210(i)).

63.     In justifying the elimination of the Blanket 4(d) Rule, FWS mentions reducing permitting requirements nearly a dozen times in its first 15 pages.  *See, e.g.*, *id.* at 5 ("removing redundant permitting requirements"), 11 ("reducing the need for section 10 permits"), 13 ("reduce unneeded permitting"), 14 ("do not require an incidental take permit"); 15 ("would not require a Federal permit").  FWS's congressional mandate under Section 4 of the ESA, of course, is to conserve threatened and endangered species—not to cater to its leadership's constituents that stand to profit from adversely impacting animals and the environment without government permits.[1]

64.     FWS also provides pretextual justifications for eliminating the Blanket 4(d) Rule. First, it states that eliminating the Blanket 4(d) Rule better aligns it with NMFS, which has never had a comparable rule.  *Id.* at 4.  However, nowhere does FWS explain why NMFS is a model agency in this regard and should be emulated.  Indeed, despite designating 20 species of coral as threatened in 2014, NMFS has not issued a 4(d) rule to protect any of them from harm. Moreover, FWS omits that NMFS manages far fewer threatened species than FWS—67 species as opposed to 328 species—which materially distinguishes NMFS from FWS.

_____

[1] *See, e.g.*, Lisa Friedman, *U.S. Significantly Weakens Endangered Species Act*, THE NEW YORK TIMES, *available at* https://www.nytimes.com/2019/08/12/climate/endangered-species-act-changes.html (Aug. 12, 2019) ("Republicans have long sought to narrow the scope of the [ESA], saying that it burdens landowners, hampers industry and hinders economic growth.  [Defendant Interior Secretary David] Bernhardt, *a former oil and gas lobbyist*, wrote in an op-ed last summer that the act places an 'unnecessary regulatory burden' on companies. … The Trump administration's revisions to the [ESA] regulations that guide the implementation of the [ESA], … mean opponents of the [ESA] are … poised to claim their biggest victory in decades." (emphasis added)).

65.     Second, FWS cites its supposed "considerable experience in developing species-specific rules over the years," and suggests that it can speed up the process of finalizing species-specific rules—not by allocating additional funding or staffing to the process—but by "review[ing] existing species-specific 4(d) rules that could be used as a model or applied to the species in question." *Id.* at 5, 12.  The ability to look to prior species-specific 4(d) rules, however, is not a novel invention.  Nor is it an option that has been unavailable to prior FWS administrations, which have managed to finalize only two species-specific rules per year on average. *See id.* at 10; *see also id.* at 13 ("The Service has finalized 22 species-specific 4(d) rules in the last decade (2009-2018) … [and] 13 species-specific rules in the 12 years prior (1997-2008).").  Furthermore, the notion that existing species-specific 4(d) rules will serve as useful precedent going forward assumes without any factual basis that newly listed or reclassified threatened species will be sufficiently similar to the few threatened species that already have species-specific 4(d) rules.  More fundamentally, however, a naked assertion that FWS can probably churn out species-specific rules more quickly than its predecessors is not a sufficient reason to eliminate a 40-year-old rule that plainly furthered FWS's conservational mandate by protecting threatened species from becoming endangered species.

66.     Indeed, FWS's action is even less justifiable given its context; FWS must provide more than a logical explanation when reversing a prior position.  Because the consistency of an agency's interpretation of a statute is relevant to the determination of whether its interpretation is permissible, FWS's position here is entitled to considerably less deference. *Natural Resources Defense Council v. Envtl. Protection Agency*, 526 F.3d 591, 602 (9th Cir. 2008).  For its regulations to stand, FWS must show not only that new rule itself is reasonable, but also that there is a reasonable rationale to support its departure from prior practice. *Seldovia Native Assoc., Inc. v. Lujan*, 904 F.2d 1335, 1345 (9th Cir. 1990).

67.     More than just reversing long-established agency practice, the regulatory revisions promulgated by the Services directly contradict the conservation goals of the ESA by further jeopardizing imperiled species.  Under the new rule, FWS will either (1) continue acting

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   on listing petitions at its current rate without issuing species-specific regulations, leaving listed

2   species just as unprotected as if they had not been listed; or (2) delay its listing decisions until it

3   has also created species-specific protections to promulgate simultaneously with the listing.

4   Under either scenario, imperiled species are at an increased risk of take.  This contradicts the

5   conservation principles mandated by the ESA.

6   VII.   THE RULES GOVERNING LISTING AND CRITICAL HABITAT AND
       INTERAGENCY COOPERATION SIMILARLY REVERSE THE SERVICES'
7       LONG-STANDING PRACTICE WITH REGARD TO CLIMATE CHANGE.

8       68.    The "Listing Species and Designating Critical Habitat" rule suffers the same

9   critical conflicts with the language and purpose of the ESA.  The ESA requires that listing

10  decisions be made "*solely* on the basis of the best scientific and commercial data available."  16

11  U.S.C. § 1533(b)(1)(A).  And under the Services' original regulations, decisions about whether a

12  species should be listed as endangered or threatened were made "solely on the basis of the best

13  available scientific and commercial information regarding a species' status, without reference to

14  possible economic or other impacts of such determination."  50 C.F.R. § 424.11(b).  Put

15  differently, listing determinations were driven by scientific analysis.  The revised rule removes

16  the phrase "without reference to possible economic or other impacts of such determination."

17  Now the government can consider whether the decision to list a species as endangered will hurt a

18  company's bottom line—which is not permitted by, and directly contravenes, the plain language

19  of the ESA.

20      69.    Similarly, the Services' original regulations provided that "recovery" of the

21  species should be considered in determining whether a species should continue to be listed.  Yet

22  recovery is not a criteria for consideration in the new regulations, meaning a species could be

23  delisted even if it is not recovering.  The new rule also eliminates the requirement that the

24  scientific and commercial data "substantiate" a species' delisting.  This puts species at risk of

25  premature delisting.

26      70.    Further, it is now more difficult to designate an area as "critical habitat," which is

27  crucial to protect a threatened or endangered species.  The revised rules state the government

28

1   may decline to designate a habitat as critical if the threats to the habitat are ones that the agency

2   cannot address, like the climate crisis.  As was made clear to the Services during the comment

3   period, this wholly ignores that the climate crisis is the biggest long-term threat facing animals—

4   and that habitat loss, fueled by human development and the climate crisis, is the primary cause

5   of species extinction.

6          71.     The new rule also limits the designation of habitats that have features a species

7   needs to thrive if the species does not *currently* live there.  However, as was pointed out to the

8   Services during the comment period, many animals will need to expand or shift their ranges in

9   order to survive as their original habitats are destroyed or fundamentally altered by the climate

10  crisis.  For example, the plight of the Key deer, a subspecies of the North American white-tailed

11  deer, underscores the importance of protecting habitats threatened by climate change beyond

12  where a species currently lives.  Key deer (currently classified as endangered, though the

13  government recently stated it intends to delist the species) live on only a few dozen islands in the

14  Florida Keys.  They face numerous threats, including disease and human encroachment.  But

15  rising sea levels and hurricanes—which are becoming increasingly destructive due to the climate

16  crisis—are two of their biggest threats.  As sea levels continue to rise, their habitat will shrink.

17  Their extinction is almost certain unless both their remaining habitat and new habitats that they

18  don't currently occupy are protected.

19         72.     The rule further severely restricts the Services' ability to consider the effects of

20  climate change by limiting the meaning of "foreseeable future."  H.R. Rep. No. 96-697, at 12

21  (1979) (Conf. Rep.), reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  When deciding whether a

22  species is threatened, the government considers whether the animal is likely to become

23  endangered within the "foreseeable future."  The new rule limits "foreseeable future" to "only so

24  far into the future as the Services can reasonably determine that both the future threats and the

25  species' responses to those threats are likely."  H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.),

26  reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  This allows the Services to ignore the longer-term

27

28

impacts of the climate crisis when making decisions, especially when predicting events that may not occur until years or decades into the future.

73.     For example, the pika (a small furry animal related to rabbits) lives in cool and moist mountainous areas.  Pikas need snowpack in the winter and mild summers to survive.  Frustratingly, the FWS has declined to list the pika twice in the last ten years despite scientists' warnings that pikas will likely be extinct within the next 100 years due to warming temperatures.  The new rule makes it even harder to list species like the pika moving forward.

74.     The new "Interagency Cooperation Rule" fares no better.  Section 7(a)(2) of the ESA requires every federal agency to consult with the Services to "insure" that the agency's actions are not likely "to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of critical habitat.  The Services' original rules implementing this requirement were congruent with the language of the statute.  They broadly defined agency action to include "all activities or programs of any kind authorized, funded or carried out … by federal agencies," including the granting of permits and "actions directly *or indirectly* causing modifications to the land, water or air."

75.     The new rule again undoes this regulatory scheme in several respects.  It exempts ongoing effects of federal projects from consideration during consultation; limits consultation to only those actions within the agency's jurisdiction; ignores harm from "global processes," i.e. climate change; fails to ensure mitigation measures will be put in place; and imposes a hasty deadline on informal consultation.

76.     During the comment period on these proposed rules, ALDF and its coalition partners alerted the Services to the above issues with the Services' proposal to enact these changes.  Despite this, and without meaningfully addressing public comments, the Services codified these changes in final rules on August 27, 2019.

VIII.  THE SERVICES FAILED TO COMPLY WITH NEPA CONSULTATION
REQUIREMENTS.

77.  NEPA requires federal agencies to analyze the environmental impacts of a
particular action before the proposed action may proceed.  42 U.S.C. § 4332(2)(C).  Federal
agencies must notify the public of proposed actions and allow the public to comment on the fully
disclosed environmental impacts of the proposed project.  Thus, NEPA is action-forcing in that it
requires "agencies to consider all environmental consequences of choosing one course of action
over another *before making a final decision*."  *Nat'l Park and Conservation Ass'n v. Stanton*,
54 F. Supp. 2d 7, 24 (D.D.C. 1999) (emphasis added); *Marsh v. Oregon Natural Resources
Council*, 490 U.S. 360, 371 (1989) ("NEPA ensures that the agency will not act on incomplete
information, only to regret its decision after it is too late to correct").  This ensures that the
public is made aware of all environmental effects of an agency's actions and thus allows the
public to participate in the process of preparing environmental reviews.  42 U.S.C. §§ 4321-
4332; 40 C.F.R. §§ 1502.1, 1503.1.

78.  An Environmental Impact Statement ("EIS") is required under NEPA for all
"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.
§ 4332(2)(C).  "The primary purpose of an environmental impact statement is to serve as an
action-forcing device to ensure that the policies and goals defined in [NEPA] are infused into the
ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.  An EIS must
"provide full and fair discussion of significant environmental impacts and [must] inform
decisionmakers and the public of the reasonable alternatives which would avoid or minimize
adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

79.  The trigger for NEPA compliance and use of the NEPA process to "prevent or
eliminate damage" to the environment is a "federal action."  42 U.S.C. § 4332(2)(C).  "Major
Federal Actions" include, among other things, "adoption of formal plans, such as official
documents prepared or approved by federal agencies which guide or prescribe alternative uses of
federal resources, upon which future agency actions will be based," 40 C.F.R. § 1508.18(b)(2);

and "actions with effects that may be major and which are potentially subject to Federal control and responsibility" and "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 C.F.R. § 1508.18.  The "human environment" to be analyzed "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment….  When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment."  40 C.F.R. § 1508.14.

80.    Accordingly, an EIS must analyze:  "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action (including no action), (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332(2)(C).

81.    When an EIS is not prepared, or the agency is uncertain whether or not the significance threshold has been met, an Environmental Assessment ("EA") is the NEPA process that must be used.  40 C.F.R. § 1508.27.  This inquiry must include an analysis "in several contexts, such as a whole (human, national), the affected region, the affected interests and the locality."  40 C.F.R. § 1508.27(a).  In addition, the agency must analyze the severity of the action, such as whether impacts "may be both beneficial and adverse," "the degree to which the proposed action affects public health or safety," "unique characteristics of the geographic area," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. §§ 1508.27(b)(1)-(5).

82.    Here, the Services wholly failed to provide either an EIS or an EA in connection with their revised regulations.  Rather, the Services invoked two categorical exclusions under

43 C.F.R. § 46.210(i).  In essence, the Services argued that because the revisions were legal, technical, or procedural in nature, and because the revised regulations' potential impacts were too broad and speculative for a meaningful analysis, the revised regulations were exempt from NEPA consultation requirements.  These revisions, however, are anything but "legal, technical, or procedural in nature."  As addressed above, the revocation and/or reversal of key protections and practices for listed species leaves these species in great peril and without any meaningful protections.  The revised regulations will have a direct and immediate impact on all future species designated as threatened or endangered, as well as the habitats in which they do or will reside.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act:**
**Issuance of Regulations that are Arbitrary, Capricious, and Not in Accordance With Law**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or not in accordance with law.  This includes actions that are "contrary to governing law."  *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007)

85.     Each of the three rules is contrary to the explicit requirements and conservation mandates of the ESA, *see, e.g.,* 16 U.S.C. §§ 1531(b) & (c), 1533(b)(1)(A), 1536(a)(1), which governs the Services' regulatory actions.  Each of the rules further imperils—rather than protects and conserves—vulnerable species.

86.     Each of the three rules comprising the Services' regulatory revisions also constitute arbitrary and capricious agency action insofar as the Services:  (1) relied on factors which Congress has not intended them to consider, including economic interests that are not within the Services' purview under the ESA; (2) entirely failed to consider important aspects of

the problem, including the substantial concerns raised in the numerous comments to the Services on its proposal; and (3) offered an explanation for its decision that runs counter to the evidence before the agency, and indeed finds no reasonable or rational connection to the facts presented in the rulemaking record. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

87.     The Regulations for Prohibitions to Threatened Wildlife and Plants indefinitely deprive proposed or newly-designated threatened species from the ESA's protections against take.

88.     The Regulations for Listing Species and Designating Critical Habitat impermissibly allow for consideration of economic impacts; limit the term "foreseeable future"; remove the requirement for data that "substantiate[s]" delisting determinations and eliminate "recovery" as a consideration in delisting; and limit the designation of critical habitat by automatically exempting some habitats from designation, ignoring indirect threats, and limiting designation of unoccupied habitat.

89.     The Regulations for Interagency Cooperation exempt ongoing effects of federal projects from consideration during consultation; limits consultation to only those actions within the agency's jurisdiction; ignores harm from "global processes," i.e., climate change; fails to ensure mitigation measures will be put in place; and imposes a hasty deadline on informal consultation.

90.     In finalizing these actions, the Services failed to consider and justify their actions in light of FWS's history of delay or failure to issue species-specific rules; the established significance of the threat that climate change poses to threatened and endangered species; the efficacy of the Services' previous regulations; and numerous other issues raised to the Services during the comment period on the proposed rules.  FWS further wholly failed to respond to ALDF's concerns about the effects of repealing the Blanket 4(d) Rule on captive animals.

91.     The Services also failed to supply reasoned explanations for their actions, especially insofar as they reverse long-standing agency positions.

92.     Finally, the Services' rulemaking process violated APA requirements by failing to provide notice of further potential revisions, beyond a simple assertion that any such revisions would meet the APA's legal standard of being "a logical outgrowth of [these] proposed rule[s]."

**SECOND CLAIM FOR RELIEF**

**Violation of the National Environmental Policy Act**
**and the Administrative Procedure Act:**
**Failure to Prepare an Adequate Environmental Impact Statement**

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     Congress enacted the NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331. The NEPA ensures that federal agencies properly consider the environmental impacts of, and the alternatives to, their activities. 42 U.S.C. § 4332. Today, NEPA is the Nation's "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a).

95.     NEPA and its implementing regulations, including well-settled NEPA caselaw, require federal agencies to take a "hard look" at environmental impacts of proposed projects, measures to mitigate these environmental impacts, the purpose and need for the proposed action, alternatives to a proposal, including a "no action alternative," and the environmental and social impacts of a reasonable range of alternatives, including no action. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989). NEPA further requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of their analysis. 40 C.F.R. §§ 1500.1(b), 1502.24. Accordingly, they must take a hard look at the direct, indirect, and cumulative effects of their actions on the environment and disclose those effects for informed public comment. *See* 40 C.F.R. §§ 1508.7, 1508.8, 1508.25. An adequate EIS must analyze the proposed agency action in different contexts. *See* 40 C.F.R. § 1508.27. Specifically, "context" means that "the significance of an action must be analyzed in several contexts such as society as

1    a whole (human, national), the affected region, the affected interests, and the locality …. Both

2    short- and long-term effects are relevant." 40 C.F.R. § 1508.27(a).

3          96.    An EIS must analyze the intensity, or the "severity" of the impacts of the

4    proposed agency action. 40 C.F.R. § 1508.27(b). This requires an agency to consider "[t]he

5    degree to which the effects on the quality of the human environment are likely to be highly

6    controversial." 40 C.F.R. § 1508.27(b)(4). An agency must also discuss "[t]he degree to which

7    the possible effects on the human environment are highly uncertain or involve unique or

8    unknown risks," 40 C.F.R. § 1508.27(b)(5), and "[w]hether the action is related to other actions

9    with individually insignificant but cumulatively significant impacts," 40 C.F.R. § 1508.27(b)(7).

10   Analysis of the intensity of the proposed action must also discuss the extent to which the

11   proposed agency action "may cause loss or destruction of significant scientific, cultural or

12   historical resources," 40 C.F.R. § 1508.27(b)(8), and "[t]he degree to which the action may

13   adversely affect an endangered or threatened species or its habitat that has been determined to be

14   critical under the Endangered Species Act of 1973," 40 C.F.R. § 1508.27(b)(9).

15         97.    NEPA also requires agencies to disclose and analyze measures to mitigate the

16   impacts of proposed actions. 40 C.F.R. §§ 1502.14(f), 1502.16(h). Mitigation must "be

17   discussed in sufficient detail to ensure that environmental consequences have been fairly

18   evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

19         98.    Finally, NEPA requires that an EIS contain a thorough discussion of the

20   "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii), (E). The discussion of

21   alternatives is "the heart" of the NEPA process and is intended to provide a "clear basis for

22   choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; *see also*

23   42 U.S.C. § 4332(2)(C)(iii), (E). The agency must "[r]igorously explore and objectively

24   evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). As such, "[a]n agency may not

25   define the objectives of its action in terms so unreasonably narrow that only one alternative from

26   among the environmentally benign ones in the agency's power would accomplish the goals of

27

28

1    the agency's action, and the EIS would become a foreordained formality." *Citizens Against*

2    *Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir.1991) (citation omitted).

3         99.    The Council on Environmental Quality ("CEQ") provides that each federal

4    agency shall identify in its NEPA procedures those classes of actions that normally do not

5    require either an EIS or an EAS.  40 C.F.R. § 1507.3(b)(2)(ii).  These "categorical exclusions"

6    are actions that do not individually or cumulatively have a significant effect on the human

7    environment.  If an agency action falls within one of the defined categorical exclusions, then no

8    EIS or EA is required, unless one or more exceptions apply, which are also defined by the

9    agency's NEPA procedures.  FWS defines categorical exclusions as "policies, directives,

10   regulations, and guidelines:  that are an administrative, financial, legal, technical, or procedural

11   nature; or whose environmental effects are too broad, speculative, or conjectural to lend

12   themselves to meaningful analysis and will later be subject to the NEPA process, either

13   collectively or case-by-case."  43 C.F.R. § 46.210(i).  Similarly, NMFS defines categorical

14   exclusions in NOAA Administrative Order 216-6A and Companion Manual, Policy and

15   Procedures for Compliance with the National Environmental Policy Act and Related Authorities

16   (Jan. 13, 2017), Appendix E.

17        100.   In promulgating the revised regulations, the Services failed to undertake either an

18   EIS or an EA, in direct violation of NEPA.  In fact, the Services did not issue a draft

19   environmental assessment or draft environmental impact statement for the proposed rules.  The

20   Services also did not propose any alternatives to their proposed actions.  Rather, they

21   erroneously argued that the regulatory revisions were categorically excluded from NEPA.  Both

22   FWS and NMFS have stated that the regulatory revisions are categorically excluded from NEPA

23   review because the revisions' environmental impacts are "fundamentally administrative, legal,

24   technical, or procedural in nature" that "would not individually or cumulatively have a

25   significant effect on the human environment."

26        101.   This is incorrect.  The Services' regulatory revisions substantively alter the

27   protections afforded to vulnerable species under the law, and have individually and cumulatively

28

1  significant effects on the human environment.  Both individually and taken as a whole, the rules

2  have the purpose and effect of leaving threatened and endangered species vulnerable to take

3  under the ESA—namely by reducing their available habitat, leaving them susceptible to climate

4  change, removing blanket protections, and severely restricting the scope of agency review.

5        102.    Even if the revisions could be covered by a categorical exclusion, extraordinary

6  circumstances require the preparation of an EIS or an EA.  The revised regulations will

7  adversely affect threatened species and their habitats pursuant to 40 C.F.R. § 1508.27(b)(9).  The

8  effects of the revised ESA regulations on the quality of the human environment are clearly

9  "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4), as indicated by the

10  public outcry and volume of public comments received in response to the proposed rules.  The

11  possible effects on the human environment involve "unique [and] unknown risks" within the

12  meaning of 40 C.F.R. § 1508.27(b)(5).  The revisions "may establish a precedent for future

13  actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6).  Finally, the

14  revisions threaten a violation of federal law imposed for the protection of the environment,

15  namely the ESA, within the meaning of 40 C.F.R. § 1508.27(b)(10).

16        103.    As a result, the Services' failure to conduct a lawful NEPA process based on the

17  significant impacts of the revised regulations violated NEPA and its implementing regulations,

18  was arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the

19  law, and, therefore, violated the NEPA, the CEQ regulations, and the FWS and NMFS

20  guidelines implementing NEPA.

21                        **REQUEST FOR RELIEF**

22        WHEREFORE, Plaintiffs request this Court to find for Plaintiffs and to enter a judgment

23  and order:

24        a.  Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to the

25            ESA, in violation of the APA;

26

27        b.  Hold unlawful and vacate the 2019 Revised ESA Regulations;

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

   c.  Enjoin the FWS from applying or otherwise relying upon the 2019 Revised ESA Regulations;

   d.  Reinstate the predecessors to the 2019 Revised ESA Regulations;

   e.  Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees; and

   f.  Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Dated: October 21, 2019          ORRICK, HERRINGTON & SUTCLIFFE LLP

By: ___s/_____
    CLEMENT ROBERTS (CSBA # 209203)
    DANIEL S. GUERRA (CSBA # 267559)
    KOUROSH JAHANSOUZ (CSBA # 292559)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
    405 Howard Street
    San Francisco, CA 94105
    Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
    croberts@orrick.com
    dguerra@orrick.com
    kjahansouz@orrick.com

    *Attorneys for Plaintiff*
    *ANIMAL LEGAL DEFENSE FUND*