1    CLEMENT ROBERTS (CSBA # 209203)
     DANIEL S. GUERRA (CSBA # 267559)
2    KOUROSH JAHANSOUZ (CSBA # 292559)
     ORRICK, HERRINGTON & SUTCLIFFE LLP
3    405 Howard Street
     San Francisco, CA 94105
4    Telephone:    (415) 773-5700
     Facsimile:    (415) 773-5759
5    croberts@orrick.com
     dguerra@orrick.com
6    kjahansouz@orrick.com

7    *Attorneys for Plaintiff*

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                          OAKLAND DIVISION

10

11   ANIMAL LEGAL DEFENSE FUND,              Case No. 4:19-cv-06812-JST

12                   Plaintiff,              Related Cases:  No. 4:19-cv-06013-JST
                                                            No. 4:19-cv-06812-JST
13            v.

14   DAVID BERNHARDT, U.S. Secretary of the  **ALDF'S OPPOSITION TO FEDERAL
     Interior; U.S. FISH AND WILDLIFE        DEFENDANTS' MOTION TO DISMISS**
15   SERVICE; WILBUR ROSS, U.S. Secretary of
     Commerce; and NATIONAL MARINE
16   FISHERIES SERVICE,

17                   Defendants.

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
   SUTCLIFFE LLP
  ATTORNEYS AT LAW
   SAN FRANCISCO

# <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

      A.     The Parties............................................................................................2

      B.     The Blanket 4(d) Rule Furthered The Conservation Mandate Of The ESA For The Past 40 Years And Mitigated The Historical Delays And Backlogs In Listing Decisions And Species-Specific Rules. ...............................4

      C.     Federal Defendants Rescind The Blanket 4(d) Rule, Abandoning 40 Years Of Protections For Threatened Animals. .................................................5

      D.     The Rules Governing Listing And Critical Habitat And Interagency Cooperation Similarly Reverse The Services' Long-Standing Practices..............6

      E.     In Promulgating These Rules, The Services Did Not Undertake An Environmental Impact Statement Or Environmental Assessment. .......................8

      F.     Procedural History .................................................................................9

STANDARD OF REVIEW ...........................................................................................9

ARGUMENT .............................................................................................................10

I.     ALDF HAS STANDING...............................................................................10

      A.     Injury-In-Fact......................................................................................10

            1.     The Revised Regulations Have Already Harmed ALDF's Members...................................................................................11

            2.     Courts Have Held On Numerous Occasions That An Increase In Future Environmental Harm Is Sufficient For Injury-In-Fact.................12

            3.     A Showing Of An Increased Likelihood Of Delay In The Future Is Sufficient To Show Injury-In-Fact. .........................................15

            4.     The Services' Intention To Create Species-Specific Rules Concurrently With Listing Is An Inappropriate Merits Argument. .........16

      B.     ALDF Also Has Standing To Bring Claims Of Procedural Injuries...................17

            1.     ALDF Has Standing To Bring Its APA Claim.....................................188

            2.     ALDF Has Standing To Bring Its NEPA Violation Claim. ....................20

II.    ALDF'S CLAIMS ARE RIPE ......................................................................21

CONCLUSION.........................................................................................................24

1

2

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
273 F.3d 1229 (9th Cir. 2001)...................................................................................19

*Ass'n of Data Processing Serv. Orgs. v. Camp*,
397 U.S. 150 (1970)..................................................................................................18

*State ex rel. Becerra v. Sessions*,
284 F. Supp. 3d 1015 (N.D. Cal. 2018) ....................................................................21

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................................10

*Bishop Paiute Tribe v. Inyo Cty.*,
863 F.3d 1144 (9th Cir. 2017)...................................................................................21

*CBD v. Kempthrone*,
588 F.3d 701 (9th Cir. 2009)...............................................................................22, 24

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002).........................................................................10, 13, 14

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ..................................................................................................18

*Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 107 (9th Cir. 2015).....................................................................................23

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..................................................................................................18

*Fowler v. Guerin*,
899 F.3d 1112 (9th Cir. 2018)...................................................................................21

*Freedom From Religion Found., Inc. v. Weber*,
No. CV 12-19-M-DLC, 2012 WL 5931899 (D. Mont. Nov. 27, 2012) .....................9

*Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..................................................................................................10

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*,
816 F.3d 1241 (9th Cir. 2016)...................................................................................23

*Harris v. Bd. of Supervisors, L.A. Cty.*,
    366 F.3d 754 (9th Cir. 2004)..................................................................... 10, 15, 16

*Judulang v. Holder*,
    565 U.S. 42 (2011) ................................................................................................ 18

*Krottner v. Starbucks Corp.*,
    628 F. 3d 1139 (9th Cir. 2010) ............................................................................. 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .............................................................................................. 18

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
    575 F.3d 999 (9th Cir. 2009).......................................................................... 22, 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .............................................................................................. 18

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .............................................................................. 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 18

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ....................................................................... 15, 16

*Nat. Res. Def. Council v. EPA*,
    526 F.3d 591 (9th Cir. 2008)................................................................................. 19

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002)................................................................................. 22

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    117 F.3d 1520 (9th Cir. 1997)................................................................................. 9

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005)................................................................................. 13

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ...................................................................................21, 22, 23

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .............................................................................................. 20

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)................................................................................. 9

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Safer Chems., Healthy Families v. EPA*,
    943 F.3d 397 (9th Cir. 2019)................................................................................21

*Salmon Spawning & Recovery Al. v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008)..............................................................................17

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't. of Interior*,
    905 F. Supp. 2d 1158 (E.D. Cal. Oct. 17, 2012) ................................................14

*Save Our Heritage, Inc. v. FAA*,
    269 F.3d 49 (1st Cir. 2001) ...........................................................................16, 17

*Seldovia Native Ass'n, Inc. v. Lujan*,
    904 F.2d 1335 (9th Cir. 1990)..............................................................................19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .............................................................................................21

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ...............................................................................................4

*US Citrus Sci. Council v. U.S. Dep't of Agric.*,
    No. 1:17-cv-680-LJO-SAB, 2017 WL 4844376 (E.D. Cal. Oct. 24, 2017) ..............12, 13, 17

*Village of Elk Grove Village v. Evans*,
    997 F.2d 328 (7th Cir. 1993)................................................................................14

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011)..............................................................20, 22, 23

*Wolfe v. Strankman*,
    392 F.3d 358 (9th Cir. 2004)............................................................................9, 23

**Statutes**

5 U.S.C. § 702 ..............................................................................................................18

5 U.S.C. § 706 ..............................................................................................................18

16 U.S.C. § 1531 .............................................................................................................4

16 U.S.C. § 1532 .............................................................................................................4

16 U.S.C. § 1533 ......................................................................................................4, 5, 7

16 U.S.C. § 1536 .............................................................................................................8

16 U.S.C. § 1538 .............................................................................................................4

42 U.S.C. § 4332 ...........................................................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Other Authorities**

40 C.F.R. § 1500.1(a) .................................................................................................. 20

43 C.F.R. § 46.210(i) ..................................................................................................... 8

50 C.F.R. § 424.11(b) .................................................................................................... 7

42 Fed. Reg. 46539 (Sept. 16, 1977) ............................................................................. 4

83 Fed. Reg. 35174 (July 25, 2018) ............................................................................... 5

83 Fed. Reg. 35175 (July 25, 2018) ............................................................................... 5

84 Fed. Reg. 17768 (Apr. 26, 2019) .............................................................................. 3

84 Fed. Reg. 44976 (Aug. 27, 2019) .............................................................................. 8

84 Fed. Reg. 45020 (Aug. 27, 2019) .............................................................................. 7

Fed. R. Civ. P. 12 .......................................................................................................... 9

Fed. R. Civ. P. 56 ........................................................................................................ 23

Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife
  and Plants, *available at* https://bit.ly/2lY29kh (Aug. 12, 2019) ............................. 6

Lisa Friedman, *U.S. Significantly Weakens Endangered Species Act*, THE NEW
  YORK TIMES (Aug. 12, 2019) ..................................................................................... 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The revised regulations at issue in this case gave opponents of the Endangered Species Act ("ESA") their "biggest victory in decades."  Lisa Friedman, *U.S. Significantly Weakens Endangered Species Act*, THE NEW YORK TIMES (Aug. 12, 2019).  Notwithstanding 800,000 comments in opposition – from Plaintiff Animal Legal Defense Fund ("ALDF") and its coalition partners, among others – Defendants U.S. Fish and Wildlife Services ("FWS"), National Marine Fisheries Service ("NMFS"; together, the "Services"), David Bernhardt (U.S. Secretary of the Interior), and Wilbur Ross (U.S. Secretary of Commerce) (together, the "Federal Defendants") pushed the revised regulations through pursuant to President Trump's deregulatory agenda without due regard for their substantive and procedural obligations under the Administrative Procedure Act ("APA") and National Environmental Policy Act ("NEPA").  The revised regulations plainly benefit the timber companies, construction companies, oil companies, meat producers, and landowners that have moved in droves, through various interest groups, to intervene in this case to protect their economic boon—all at the expense of the animals that the ESA is supposed to conserve and recover.  ECF Nos. 24, 29.  By stripping animals newly listed or downgraded to "threatened" of protections they would have enjoyed for the last 40 years, injecting economic considerations into previously science-driven listing decisions, restricting the Services' ability to consider the effects of climate change, and otherwise reversing course on decades of effective regulatory rules and practices, the revised regulations violate the ESA. They also lack any reasoned basis, violate notice and comment procedures, and are arbitrary and capricious under the APA.  The regulations should be vacated on procedural grounds as well because the Services violated NEPA in failing to assess the environmental impact of the rules.

Federal Defendants, however, ask that the Court not reach any of these issues by moving to dismiss on the grounds that ALDF allegedly lacks Article III standing for lack of injury-in-fact and its claims are not ripe.  These contentions lack merit.  First, the revised regulations have presently injured ALDF's members by making it less likely that species listed as threatened will receive the same scope of protections they previously received under prior regulations.  Further, under the revised regulations, species newly listed or reclassified as threatened will not receive

any protections unless and until the Federal Defendants issue a species-specific rule.  Yet, the Federal Defendants are not obligated to issue such a rule at listing or any specific time thereafter, increasing the risk of harm to these animals in the interim.  To the extent the Federal Defendants truly intend to issue special rules concurrently with listing decisions, that framework introduces delays in an already backlogged system, further endangering these animals and harming the interests of ALDF and its members.  Second, the Services' violation of the APA and NEPA during the concluded rulemaking injured the procedural rights of ALDF and its members created to protect interests that are at the core of ALDF's mission.  The violation of these rights independently provides ALDF with standing.  Finally, ALDF's claims are constitutionally ripe for the same reasons ALDF suffered injury-in-fact.  And to the extent the Court reaches prudential ripeness, ALDF's claims satisfy that doctrine because they present facial and procedural challenges to final regulations, which do not require factual development and would not interfere with further administrative action.  Federal Defendants' motion should be denied.

## BACKGROUND

### A.    The Parties

ALDF is a national nonprofit organization headquartered in Cotati, California, with over 200,000 members and supporters nationwide.  Compl. ¶ 12.  Its mission is to protect the lives and advance the interests of animals through the legal system.  *Id.*  One of ALDF's cornerstone issues is protecting threatened and endangered captive animals used and sold in commercial enterprises such as fur farms and roadside zoos from illegally inadequate housing, treatment, and conditions.  *Id.* ¶¶ 12-13.  ALDF regularly uses the ESA in these endeavors, which include civil cruelty and nuisance lawsuits and significant advocacy and public education efforts, to improve captive animals' physical and mental well-being and to relocate them to sanctuaries where they can recover and flourish.  *Id.* ¶ 13.  ALDF also advocates for wild threatened and endangered species, promotes the humane treatment of wildlife, and campaigns for the preservation of wilderness and wildlife habitat—also in reliance on wildlife protection laws such as the ESA and NEPA.  *Id.* ¶ 14.  ALDF has successfully taken legal action at both the state and federal levels to compel environmental impact studies for various wildlife-centered government programs.  *Id.*

ALDF also advocates for threatened and endangered species directly to government agencies, including through the submission of comments to the FWS opposing delisting decisions and the very regulations at issue here.  *Id.* ¶¶ 14, 18; Declaration of Mark Walden ¶¶ 5-12.

ALDF's members, staff, and supporters also frequent zoos and natural areas to observe threatened and endangered animals, as well as animals proposed to be listed as threatened or endangered, and to engage in other recreational and professional pursuits.  Compl. ¶ 18; Declaration of Ashley Fetters ¶ 4 (frequents zoos in Nebraska and Iowa housing threatened and endangered species such as certain tigers, pandas, elephants, and rhinos, as well as giraffes, which are proposed to be listed as threatened or endangered[1]); Declaration of Leslie Patten ¶¶ 3-6 (observes gray wolves, grizzly bears, Canada lynx (endangered) and frequents habitat of North American Wolverine (proposed) and pikas (vulnerable to loss of habitat due to climate change) in and around Yellowstone National Park; published wildlife book including trail photography and stories); Declaration of Lisa Garner ¶¶ 3-4 (observes lemurs and mandrills (endangered) and giraffes (proposed) at zoo in Florida); Declaration of Mary Delmoro ¶¶ 4-6 (observes giraffes (proposed) daily at zoo in New York).  These individuals derive significant recreational, aesthetic, conservation, and other benefits from the proper treatment and conservation of these animals, and are directly injured by the promulgation of the revised regulations, which make it easier to harm these animals, destroy their habitat or areas to which they may be displaced due to climate change, and remove protections from these animals without running afoul of the ESA.  Compl. ¶¶ 10, 15; Fetters Decl. ¶¶ 9-11; Patten Decl. ¶¶ 8-14; Garner Decl. ¶¶ 10-12; Delmoro Decl. ¶¶ 7-14.

Defendants are the Services, Mr. Bernhardt, and Mr. Ross.  Compl. ¶¶ 19-22.  FWS administers the ESA with respect to terrestrial and freshwater plant and animal species; NMFS administers the ESA with respect to marine species and anadromous fish species.  *Id.* ¶¶ 20, 22. Messrs. Bernhardt and Ross signed the final revised ESA regulations at issue.  *Id.* ¶¶ 19, 21.

---

[1] FWS is currently determining whether to list giraffes as endangered or threatened.  84 Fed. Reg. 17768 (Apr. 26, 2019).

1

2

**B.      The Blanket 4(d) Rule Furthered The Conservation Mandate Of The ESA For The Past 40 Years And Mitigated The Historical Delays And Backlogs In Listing Decisions And Species-Specific Rules.**

3      Congress passed the ESA in 1973 in recognition of an extinction crisis.  *Tenn. Valley*

4  *Auth. v. Hill*, 437 U.S. 153, 184 (1978).  In so doing, Congress recognized that imperiled species

5  "are of esthetic, ecological, educational, historical, recreational, and scientific value to the

6  Nation and its people."  16 U.S.C. § 1531(a)(3).  Congress intended the ESA "to provide a

7  program for the ***conservation*** of such endangered species and threatened species …."  *Id.*

8  § 1531(b) (emphasis added).  The ESA seeks to conserve, protect, and recover such species, in

9  part, by using the "best scientific and commercial data available," *id.* § 1533(b), to determine the

10  suitability of species for listing as "threatened" or "endangered."  *Id.* §§ 1533(a)(1)(A)-(E).  The

11  listing of a species, in turn, triggers protections under Section 9 of the ESA, *id.* § 1538, including

12  prohibition on "take," which is defined as "to harass, harm, pursue, hunt, shoot, wound, kill,

13  trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  Such

14  protections apply equally to captive and wild animals.  Compl. ¶¶ 29, 47.  Captive animals are

15  particularly vulnerable to take; they are subjected to abuse across the country in settings such as

16  roadside zoos, fur farms, and "canned hunting" ranches.  *Id.* ¶ 49.

17      In 1977, FWS promulgated the "Blanket 4(d) Rule" to "further protect threatened species

18  of wildlife."  42 Fed. Reg. 46539 (Sept. 16, 1977).  Through this rule, FWS determined that "all

19  of the prohibitions applying to endangered species would apply to threatened species, unless

20  otherwise provided for in a special rule."  *Id.*  Until rescinded just months ago, the FWS abided

21  by the Blanket 4(d) Rule for over 40 years.  During this time, FWS listed over 300 species as

22  "threatened," providing each of them with the same take protections as endangered species.

23  Compl. ¶ 46.  The rule gave organizations like ALDF means to protect animals from

24  mistreatment—or worse—through enforcement actions.  *Id.* ¶ 50.  FWS has modified these

25  protections with species-specific rules for fewer than a quarter of these animals, at a historical

26  pace of two special rules per year, despite adding about four species to the threatened list per

27  year.  *Id.* ¶ 46.

28      From the time it was promulgated, the Blanket 4(d) Rule enabled the Services to focus

limited resources on listing species without devoting additional time to developing simultaneous species-specific regulations.  *Id.* ¶ 34.  According to a 2016 study of the amount of time listed species spent undergoing review between 1973 and 2014, the Services wait a median of 12.1 years to provide proposed species with ESA protection.  *Id.* ¶ 35.

The Services currently have a backlog of imperiled species that are awaiting a listing decision.  *Id.* ¶ 36.  FWS's website shows that there are 61 ESA listing petitions pending with FWS.  *Id.*  The oldest of these pending petitions was filed in 2008.  *Id.*  Despite this, only 19 species are currently proposed for listing.  *Id.*  Since the start of 2017, FWS has only listed a total of 17 species as threatened or endangered at a declining pace of 11 in 2017, five in 2018, and one in 2019.  *Id.*  NMFS similarly has 13 candidate species that it is currently reviewing to determine whether listing is warranted.  *Id.* ¶ 37.  These present and historical delays and backlogs underscore an already inefficient listing system where listing determinations regularly fall outside the two-year timeframe Congress mandated when it revised the ESA in 1982.  *Id.* ¶ 38 (citing 16 U.S.C. §§ 1533(b)(3), (6)).  Indeed, the Services have historically failed to act on listing petitions in the absence of litigation to compel such decisions.  *Id.*

C.   **Federal Defendants Rescind The Blanket 4(d) Rule, Abandoning 40 Years Of Protections For Threatened Animals.**

On July 25, 2018, FWS proposed the three rules at issue to carry out President Trump's deregulatory agenda.  *See* 83 Fed. Reg. 35174, 35175 (July 25, 2018).  In the proposed rule eliminating the Blanket 4(d) Rule, FWS sought to limit the rule's protections "only to species listed as threatened species on or before the effective date of this rule."  *Id.*  FWS thus proposed to eliminate the protections against take for newly listed threatened species and those downgraded from endangered to threatened.  Under the proposal, such animals "would have protective regulations only if the Service promulgates a species-specific rule" at some time in the future.  *Id.*  This proposal flipped the regulatory framework on its head, exposing threatened animals to conduct that would be prohibited as to endangered animals unless and until FWS issued a species-specific regulation.  In proposing this precedent-breaking rule, FWS solicited public comment on a barely defined swath of over two dozen regulations.  *Id.* at 35194, 35179.

On August 12, 2019, FWS issued the final rule eliminating the Blanket 4(d) Rule.  Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, *available at* https://bit.ly/2lY29kh, at 20 (Aug. 12, 2019).  As a result, FWS created a new status quo contrary to the ESA's conservation mandate, exposing captive and wild animals that may be listed or reclassified as "threatened" to harm (*e.g.*, hunting, trapping, killing) otherwise prohibited under the ESA.  Significantly, the final rule is not accompanied by any requirement that FWS promulgate any species-specific rule.  Rather, FWS maintains in the rule that it has "discretion to revise or promulgate species-specific rules at any time after the final listing or reclassification determination." *Id.* at 3.  FWS also expressly refuses in the rule to impose a timetable for finalizing species-specific rules. *Id.* at 18 ("We considered including a regulatory timeframe … , but ultimately determined that creating a binding requirement was not needed.").  Thus, whereas for the last 40 years, a threatened species would enjoy protections against take under the ESA immediately upon listing, all newly listed or reclassified species will now enjoy ***no such protections*** until FWS finalizes a species-specific rule at some indeterminate date.  The elimination of the Blanket 4(d) Rule therefore accelerates a threatened species' descent into endangered status, instead of promoting its conservation.  FWS suggests it may draft species-specific rules concurrently with a listing or reclassification decision, introducing further lag into an already backlogged system and delaying the time at which an animal could be listed as threatened in the first place. *Id.* at 3.  Critically, however, FWS qualifies its purported intention, rendering it hollow: "***[W]e do not read the Act to require that we promulgate a 4(d) rule whenever we list a species as a threatened species***." *Id.* at 16 (emphasis added).

In the final rule, FWS also confirms that, despite several requests, it did not hold any public hearings or extend the public comment period. *Id.* at 7.  In justifying the rule, FWS mentions reducing permitting requirements nearly a dozen times. *See, e.g.*, *id.* at 5, 11, 13-15.

### D.   The Rules Governing Listing And Critical Habitat And Interagency Cooperation Similarly Reverse The Services' Long-Standing Practices.

Concurrent with eliminating the Blanket 4(d) Rule, the Services promulgated two other rules that reverse the Services' long-standing practices in contravention of the ESA.  As for the

new "Listing and Designating Critical Habitat" rule, the ESA requires that endangered and threatened listing decisions be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).  Under the Services' prior regulations, listing decisions were made "solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b).  The revised rule removes the phrase "without reference to possible economic or other impacts of such determination." 84 Fed. Reg. 45020 (Aug. 27, 2019).  Now the government can consider whether the decision to list a species as endangered will hurt a company's bottom line—which flies in the face of the ESA.  Compl. ¶ 68.

Similarly, the Services' original regulations provided that "recovery" of the species should be considered in determining whether a species should continue to be listed.  Yet recovery is not a criteria for consideration in the new regulations, meaning a species could be delisted even if it is not recovering.  The new rule also eliminates the requirement that the scientific and commercial data "substantiate" a species' delisting, putting species at risk of premature delisting.  Further, it is now more difficult to designate an area as "critical habitat," which is crucial to protect imperiled species.  Now the government may decline to designate a habitat as critical if threats to the habitat are ones that the agency cannot address, like the climate crisis.  As made clear to the Services during the comment period, this ignores that the climate crisis is the biggest long-term threat facing animals—and that habitat loss, fueled by human development and the climate crisis, is the primary cause of species extinction.  *Id.* ¶¶ 69-70.

The new rule also limits the designation of habitats that have features a species needs to thrive if the species does not *currently* live there.  However, as pointed out to the Services during the comment period, many animals will need to expand or shift their ranges to survive as their original habitats are destroyed or fundamentally altered by the climate crisis.  *Id.* ¶ 71.

The rule further severely restricts the Services' ability to consider the effects of climate change by limiting the meaning of "foreseeable future." 84 Fed. Reg. 45020 (Aug. 27, 2019).  When deciding whether a species is threatened, the government considers whether the animal is likely to become endangered within the "foreseeable future."  The new rule limits "foreseeable

future" to "only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely." *Id.*  This allows the Services to ignore the longer-term impacts of the climate crisis when making decisions.  Compl. ¶ 72; Fetters Decl. ¶ 9 (removal of climate change as consideration makes it more difficult for species such as the giraffe to be listed under ESA).

The new "Interagency Cooperation Rule" also violates the ESA.  Section 7(a)(2) requires federal agencies to consult with the Services to "insure" that their actions are not likely "to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of critical habitat.  16 U.S.C. § 1536(a)(2).  The Services' original rules implementing this requirement broadly defined relevant agency action to include "all activities or programs of any kind authorized, funded or carried out … by federal agencies," including the granting of permits and "actions directly or indirectly causing modifications to the land, water or air."  Compl. ¶ 74.  The new rule undoes this regulatory scheme.  84 Fed. Reg. 44976 (Aug. 27, 2019).  It exempts ongoing effects of federal projects from consideration during consultation; limits consultation to those actions within the agency's jurisdiction; ignores harm from "global processes" (climate change); fails to ensure mitigation measures will be put in place; and imposes a hasty deadline on informal consultation.  Compl. ¶ 75.

During the comment period, ALDF and its partners alerted the Services of these issues.  Indeed, the three proposed rules sparked tremendous controversy and led to over 800,000 opposition comments.  *Id.* ¶¶ 14, 56.  Without meaningfully addressing public comments, the Services codified these changes in final rules on August 27, 2019.  *Id.* ¶ 76.

**E.      In Promulgating These Rules, The Services Did Not Undertake An Environmental Impact Statement Or Environmental Assessment.**

In addition, the Services failed to undertake either an environmental assessment ("EA") or environmental impact statement ("EIS") in connection with their revised regulations.  Rather, the Services invoked two exclusions under 43 C.F.R. § 46.210(i), arguing that because the revisions were legal, technical, or procedural in nature, and because their potential impacts were too broad and speculative, the revised regulations were exempt from NEPA consultation

1   requirements.  Compl. ¶ 82.  These revisions, however, are anything but "legal, technical, or

2   procedural in nature," and their impacts are not speculative; they reverse key protections and

3   practices for listed species, leaving them in great peril and without any meaningful protections.

4   The revised regulations will have a direct and immediate impact on all future species designated

5   as threatened or endangered, as well as the habitats in which they do or will reside.  *Id.*

6        **F.    Procedural History**

7        On October 21, 2019, ALDF filed a Complaint asserting two claims arising from the

8   revised regulations: (1) Violation of the APA: Issuance of Regulations that are Arbitrary,

9   Capricious, and Not in Accordance with Law, and (2) Violation of the NEPA and APA: Failure

10  to Prepare an Adequate Environmental Impact Statement.  Compl. ¶¶ 83-103.  On November 5,

11  2019, this Court related this case to *Center For Biological Diversity v. Bernhardt*, No. 19-cv-

12  05206-JST (ECF No. 16), which the Court had already related to *State of California v.*

13  *Bernhardt*, No. 19-cv-06013-JST.  On December 6, 2019, Federal Defendants filed an identical

14  motion to dismiss in all three cases arguing that all plaintiffs lack Article III standing and that

15  their claims are not ripe.  ECF No. 21 ("Mot.").

16        **STANDARD OF REVIEW**

17        Federal Defendants move to dismiss the Complaint for lack of subject-matter

18  jurisdiction.  Mot. at 14.  Where, as here, a Rule 12(b)(1) motion raises a facial, as opposed to

19  factual, challenge, "the challenger asserts that the allegations contained in a complaint are

20  insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373

21  F.3d 1035, 1039 (9th Cir. 2004).  On a facial challenge, the court "assume[s] [the plaintiff's]

22  allegations to be true and draw[s] all reasonable inferences in [its] favor."  *Wolfe v. Strankman*,

23  392 F.3d 358, 362 (9th Cir. 2004).  For purposes of determining standing and ripeness, the Court

24  may consider extra-record evidence, such as declarations.  *Nw. Envtl. Def. Ctr. v. Bonneville*

25  *Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997); *Freedom From Religion Found., Inc. v.*

26  *Weber*, No. CV 12-19-M-DLC, 2012 WL 5931899, at *2-3 (D. Mont. Nov. 27, 2012).

27

28

1

## ARGUMENT

2

## I.   ALDF HAS STANDING

3        To satisfy Article III's standing requirements, a plaintiff must show "(1) it has suffered

4 an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

5 conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

6 defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

7 by a favorable decision." *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

8 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)

9 ("*Lujan*")).  At the motion to dismiss stage, however, "*general factual allegations of injury*

10 *resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court]*

11 *presume[s] that general allegations embrace those specific facts that are necessary to support*

12 *the claim*." *Lujan*, 504 U.S. at 561 (emphasis added); *Maya v. Centex Corp.*, 658 F.3d 1060,

13 1068 (9th Cir. 2011) (same).

14        ### A.   Injury-In-Fact

15        The Federal Defendants fail to address either causation or redressability in their Motion

16 to Dismiss.  Rather, the Federal Defendants simply argue that ALDF has failed to sufficiently

17 plead an injury-in-fact.  The Federal Defendants are wrong.  To show injury-in-fact, a plaintiff

18 must prove "an invasion of a judicially cognizable interest which is (a) concrete and

19 particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear*,

20 520 U.S. 154, 167 (1997).  Even if harm is not presently or actually occurring, a "credible

21 threat" or "concrete risk" of harm is sufficient to satisfy the injury-in-fact prong.  *Cent. Delta*

22 *Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002); *Harris v. Bd. of Supervisors,*

23 *L.A. Cty.*, 366 F.3d 754, 761 (9th Cir. 2004).  As addressed below, the Federal Defendants'

24 argument fails for three reasons.  First, the Federal Defendants ignore that ALDF's members

25 have, in fact, been injured today due to the revised regulations.  Second, an increased risk of

26 future environmental harm, plainly present here, is sufficient to plead an injury-in-fact.  Third, a

27 showing of an increased likelihood of delay in protecting animals in the future, also present here,

28 is also sufficient to show injury-in-fact.  Finally, the Federal Defendants' purported intention to

1    create species-specific 4(d) rules concurrently with listing is a merits-based argument that is

2    inappropriate at the motion to dismiss stage.

3              **1.      The Revised Regulations Have Already Harmed ALDF's Members.**

4              As a preliminary matter, the Federal Defendants seem to argue that ALDF and its

5    members only have recreational, aesthetic, and conservation benefits and enjoyment from

6    currently listed endangered and threatened species.  On the contrary, ALDF alleged that its

7    members also receive such benefits from species that may be listed as threatened or endangered

8    in the future.  Compl. ¶ 15.  ALDF has members who reside near and visit facilities that exhibit

9    members of threatened and endangered species, as well as species that may be listed as

10   threatened or endangered, and their critical habitat.  *Id.* at ¶¶ 15-16; attached Declarations,

11   summarized *supra*.  These interests are directly and adversely affected by the Federal

12   Defendants' actions right now because, whenever a species is downgraded from endangered to

13   threatened, they will no longer have any of the Section 4(d) blanket protections unless and until

14   the Federal Defendants issue species-specific 4(d) rules.  This means that the Federal Defendants

15   have created (at a minimum) a "credible threat" that ALL species currently listed as endangered

16   will have a more challenging recovery insofar as they are able to recover from endangered to

17   threatened.  At the very least, the fact that near-threatened species, once listed as threatened, will

18   have no protections qualifies as a "concrete risk" of harm to the ALDF and its members.

19             In addition, the Federal Defendants ignore the fact that the injury to ALDF and its

20   members occurred immediately when the unlawfully revised regulations went into effect because

21   they unlawfully create delays in the process whereby animals are listed as endangered or

22   threatened.  Delays in a listing determination can cause irreparable harm to a species' chances

23   for survival and reduce the species' population and density.  Compl. ¶ 35.  The Federal

24   Defendants already had a backlog of imperiled species that are awaiting a listing decision.  *Id.*

25   ¶ 36.  On average, the amount of time a listed species spent undergoing a review was 12.1 years

26   to receive ESA protections.  *Id.* ¶ 35.  With the revised regulations, the Federal Defendants state

27   they intend to provide species-specific rules concurrently with the listing of these species.  As

28   ALDF alleges in the Complaint, this additional agency action will delay an already backlogged

system even further, causing harm to ALDF and its members. *Id.* ¶¶ 35-40. Any agency action that increases the analysis to be made at the time the Services decide to list a new species further dilutes the already limited and insufficient resources the Federal Defendants have available to make listing decisions, harming ALDF's and its members' concrete conservational interests. *Id.* ¶¶ 38-39.

Further, in addition to creating greater delays, the new criteria for listing/delisting and setting critical habitats also make species less likely to receive the same scope of protections they previously received under the previous rules. Specifically, the new regulations eliminate the requirement that the scientific and commercial data "substantiate" a species' delisting. *Id.* ¶ 69. In addition, the revised rules state the government may decline to designate a habitat as critical if the threats to the habitat are ones that the agency cannot address, like the climate crisis. *Id.* ¶¶ 70, 72. The new rule also limits the designation of habitats that have features a species needs to thrive if the species does not *currently* live there. *Id.* ¶ 71. Consequently, these are changes that all directly harm ALDF's members today as they reduce vital protections of endangered and threatened species, and species awaiting listing.

### **2. Courts Have Held On Numerous Occasions That An Increase In Future Environmental Harm Is Sufficient For Injury-In-Fact.**

Assuming *arguendo* that the Federal Defendants are correct that no harm has yet to occur, the Federal Defendants' analysis of the risk of ALDF's future harm is wrong. The Federal Defendants erroneously argue that ALDF's injuries are premised on speculation, conjecture, and possible future harm. Mot. at 16. Moreover, the Federal Defendants appear to argue that ALDF cannot have standing until the Federal Defendants implement the revised regulation "in a specific context resulting in harm to their stated interests." *Id.* at 2. ALDF's allegations are anything but conclusory; the Complaint explains the risk of harm in detail. More importantly, the Federal Defendants fail to properly describe what is needed to show an injury-in-fact in the context of environmental cases.

Courts have recognized that an increased risk of future environmental injury constitutes an injury-in-fact for purposes of standing. *US Citrus Sci. Council v. U.S. Dep't of Agric.*, No.

1   1:17-cv-680-LJO-SAB, 2017 WL 4844376 at *7 (E.D. Cal. Oct. 24, 2017).  Further, "there is no

2   requirement that the risk of future injury satisfy any particular threshold." *Id.* (citation omitted).

3   Plaintiffs need not prove that they are already suffering an environmental harm.  *Ocean*

4   *Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005).  "If a plaintiff faces

5   a credible threat of harm, and that harm is both real and immediate, not conjectural or

6   hypothetical, the plaintiff has met the injury-in-fact requirement for standing under Article III."

7   *Krottner v. Starbucks Corp.*, 628 F. 3d 1139, 1143 (9th Cir. 2010) (internal citations omitted).

8         In *Central Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002), the court explicitly

9   stated that environmental plaintiffs "need not wait until the natural resources are despoiled

10  before challenging the government action leading to the potential destruction." *Id*. at 950.

11  There, the plaintiffs contended that they suffered an injury-in-fact because the defendants' new

12  regulation increased the likelihood of salinity levels in water increasing in the future.  *Id.* at 947.

13  Plaintiffs contended that their ability to grow crops in the future would thus be severely

14  hampered.  *Id.*  Despite the fact that environmental injury had yet to occur, the court held that the

15  plaintiffs had standing because of an increased risk that plaintiffs' future crops will be damaged.

16  *Id.* at 948.  The court also specifically noted that environmental injuries such as the extinction of

17  species and the destruction of a wilderness habitat are frequently difficult or impossible to

18  remedy, and thus plaintiffs "need not wait until the Bureau violates the Act, which requires the

19  Bureau's compliance with applicable state regulations." *Id.*

20         Here, the Federal Defendants argue that ALDF must wait until a specific species is listed

21  as threatened without concurrently receiving similar 4(d) protections.  This argument ignores the

22  very nature of the revised regulations, which on their face were designed to make it easier to

23  afford threatened species with less protections and make it more difficult to protect their critical

24  habitats.  The Federal Defendants also ignore the fact that under the new regulations, they are

25  not required to promulgate any such species-specific rule at listing or by any specific date.

26  Rather, the final rule gives FWS "discretion to revise or promulgate species-specific rules *at any*

27  *time* after the final listing or reclassification determination."  Compl. ¶ 59 (emphasis added).

28  FWS also expressly refused in the final rule to impose any deadline on itself for finalizing any

species-specific rule.  *Id.*  The defendants in *Central Delta* similarly attempted to argue that it may adopt some other plan in the future that would prevent the injuries from occurring.  306 F.3d at 950.  The court rejected this argument, stating that "the possibility that defendants may change their course of conduct is not [a] type of [acceptable] contingency….  It would be inequitable in the extreme for us to permit one party to create a significantly increased risk of harm to another, and then avoid the aggrieved party from trying to prevent the potential harm because the party that created the risk promises that it will ensure that the harm is avoided, yet offers no specific or concrete plan of action for doing so."  *Id.* at 950.  The Court here should likewise reject the Federal Defendants' alleged future plans to reduce the risk of injury to future threatened species.

Likewise, in *Village of Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993), the Seventh Circuit held that the plaintiff, a town located on a flood plain, suffered threatened injury conferring standing as a result of a planned construction of a radio tower that, if built would have increased the risk of flooding in the town.  *Id*. at 329.  Despite the fact that no injury had yet occurred, the court held that "even a small probability of injury is sufficient to create a case or controversy – to take a suit out of the category of the hypothetical – provided of course that the relief sought would, if granted, reduce the probability."  *Id.*  Similarly, in *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't. of Interior*, 905 F. Supp. 2d 1158 (E.D. Cal. Oct. 17, 2012), the plaintiffs argued that a change order threatened to cause future harm to the plaintiffs by increasing the risk that water allocation would be reduced.  *Id*. at 1171.  Although it was not guaranteed that reduced allocations would occur, the court stated that the threat was "certainly real, not conjectural or hypothetical."  *Id.*  Consequently, the court held that the plaintiffs had met their burden at the motion to dismiss stage.  *Id.*

Just as the courts held in *Central Delta*, *Village of Elk Grove*, and *San Luis*, this Court should reject the Federal Defendants' arguments that ALDF failed to show an increased risk in future harm due to the revised regulations.  The risk of additional delays in the listing of species as threatened in the future is very real, especially considering the Federal Defendants' track record.  According to a 2016 study of the amount of time listed species spent undergoing review

between 1973 and 2014, the Federal Defendants wait a median of 12.1 years to provide proposed species with ESA protection.  Compl. ¶ 35.  By concurrently promulgating species-specific 4(d) rules at the time of listing, such a delay will only get worse.

**3.      A Showing Of An Increased Likelihood Of Delay In The Future Is Sufficient To Show Injury-In-Fact.**

The Federal Defendants also argue that ALDF must show that every application of the regulations will result in a different outcome than under the prior status quo.  This is not the law.  In fact, ALDF need only show that the revised regulations create an incremental risk of future harm.  In *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996), plaintiffs challenged a Forest Service decision to select a logging plan that created a slightly greater likelihood of wildfires.  *Id*. at 1234.  The Forest Service selected a logging plan that reduced potential wildfire fuels by 5.4% rather than plaintiffs' preferred plan, which reduced the fuels by 14.2%.  *Id.*  Despite the fact that no present injury was found, the court held that "the incremental risk is enough of a threat of injury to entitle plaintiffs to be heard."  *Id.* at 1235.

Similarly, in *Harris*, the Ninth Circuit found injury sufficient to support standing based on an action that increased the risk of harm to the plaintiffs.  366 F.3d at 764.  *Harris* involved a challenge to a county's plan to close a rehabilitation center and to reduce the number of hospital beds at a medical center.  *Id.* at 756-57.  The plaintiffs were "eight indigent and uninsured county residents with serious health problems who regularly rel[ied] upon the county health care system for routine, rehabilitative, and emergency care."  *Id.* at 758.  The Ninth Circuit found "unpersuasive" the county's contention that the plaintiffs' injuries were "too speculative" to support standing.  *Id.* at 762.  The court concluded that the "threat of delayed treatment arising out of the County's decision to pare down its healthcare system … present[ed] the proverbial accident waiting to happen."  *Id.*  The plaintiffs had introduced evidence showing that "they rely on the county health care system" and that the county was already having "difficulty providing them access to timely care."  *Id.*  Even though the county had not yet even implemented the reductions in services, the court explained that "demanding that plaintiffs wait until they suffer physical harm to sue would eliminate the claims of those most directly threatened but not yet

[damaged] ….  Article III does not bar such concrete disputes from court."  *Id.*

Similar to both *Mountain State* and *Harris*, ALDF and its members rely extensively upon the ESA to ensure imperiled species receive the protections they need to thrive.  Compl. ¶ 13; Walden Decl. ¶¶ 5-12.  Threatened species already had difficulty getting ESA protections due to a backlog of imperiled species awaiting a listing decision.  Compl. ¶¶ 36-37.  Delays in a listing determination can cause irreparable harm to a species' chances for survival and reduce the species' population and density.  *Id.* ¶ 35.  Now, with the Federal Defendants "intention" to create specific 4(d) rules concurrently with the listing of threatened species, the added analysis made at the time of listing will cause further delays to the already-backlogged system.  Any agency action that increases the analysis to be made at the time the Services decide to list a new species will further dilute the already limited and insufficient resources the Federal Defendants have available to make listing decisions.  Even if such a delay is an "incremental risk" to these species, under *Mountain State* and *Harris*, such a showing is sufficient to assert standing.

### 4.  The Services' Intention To Create Species-Specific Rules Concurrently With Listing Is An Inappropriate Merits Argument.

The Federal Defendants allege that any increased risk of future harm presented by the revised regulations is negated by the Federal Defendants' intention to create species-specific 4(d) rules concurrently with the listing of species as threatened.  As support, the Federal Defendants note that on November 21, 2019, the FWS provided species-specific 4(d) protections concurrently with the listing of two species of stoneflies.  Mot. at 19-20.  As a preliminary matter, one specific action by the Federal Defendants (taken ***after*** the Complaint was filed) does not diminish the substantial risk that other threatened species will not receive such 4(d) protections.  Further, this is a merits argument inappropriate at the motion to dismiss stage.

It is black-letter law that merits arguments are inappropriate in a motion to dismiss.  For example, in *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49 (1st Cir. 2001), plaintiffs challenged the FAA's decision to allow additional airline flights, claiming "the agency did not adequately consider the adverse effects of the additional ... flights on historic and natural resources."  *Id.* at 53.  The FAA objected on standing grounds, arguing the "flights will have no significant

environmental impact." *Id.* at 56.  The court held that such arguments "appear[] to be a question of the merits rather than one of standing; the petitioners certainly allege substantial effects and challenge both the FAA's contrary findings and the procedures used to reach them." *Id.*  The court held that the "likelihood and extent of impact are properly addressed in connection with the merits." *Id.*  The same is true here: ALDF has alleged that the revised regulations create significant environmental risks for threatened species.  That is sufficient for standing.

Likewise, in *US Citrus*, the plaintiffs challenged a rule allowing the importation of lemons from Argentina because it increased the risk of certain diseases.  2017 WL 4844376 at \*1.  The defendants moved to dismiss on the grounds that the plaintiffs lacked standing, arguing that the plaintiffs must map out exactly how the disease will spread in excruciating detail to allege a significant risk.  *Id.* at \*8.  Further, to the extent that such risks existed, the defendants argued that certain safeguards adequately addressed the plaintiffs' concerns such that the risk was not significant.  *Id.*  The court rejected both arguments, noting that the "'likelihood and extent of impact' of the alleged environmental harm are questions [that] should be addressed with the merits." *Id.*  Here, the Federal Defendants attempt to make similar arguments as the defendants in *US Citrus*.  Consequently, as in *Save Our Heritage* and *US Citrus*, for purposes of standing at the motion to dismiss stage, this Court should ignore the Federal Defendants' argument that they intend to reduce the risk to future threatened species by concurrently promulgating species-specific 4(d) rules upon listing, particularly given that the rule does not require it.  Such an argument is merits-based and should be addressed at a later stage.

**B.**     **ALDF Also Has Standing To Bring Claims Of Procedural Injuries.**

ALDF independently has standing for another reason; its procedural rights and those of its members are being abridged as a result of the Services' issuance of the final rules without compliance with the APA or NEPA.  Compl. ¶¶ 84-92, 94-103.  "Plaintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised, *could* protect their concrete interests.'" *Salmon Spawning & Recovery Al. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008).  Put differently, for procedural violations standing arises *at the time of the violation*, and ALDF need not wait for future events to have standing as to its procedural claims.

1

### 1.    ALDF Has Standing To Bring Its APA Claim.

2    The APA provides judicial review to a person "aggrieved by agency action within the

3    meaning of the relevant statute."  5 U.S.C. § 702.  In defining whether a plaintiff's interest is

4    encompassed "within the meaning of the relevant statute," such interest "may reflect aesthetic,

5    conservational, and recreational … values."  *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397

6    U.S. 150, 153-54 (1970).  The Supreme Court's articulation of this zone-of-interests test was

7    part of a "trend … toward enlargement of the class of people who may protest administrative

8    action."  *Id.* at 154.  In keeping with the Supreme Court's view that the congressional intent

9    behind the APA was to make agency action reviewable, the test is not "especially demanding."

10
11
12
> [W]e have always conspicuously included the word 'arguably' in the test to
> indicate that the benefit of any doubt goes to the plaintiff.  The test forecloses suit
> only when a plaintiff's interests are so marginally related to or inconsistent with
> the purposes implicit in the statute that it cannot reasonably be assumed that
> Congress intended to permit the suit.

13

14    *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

15    The breadth of the standard is particularly ample as applied to plaintiffs who bring suit under the

16    "generous review provisions" of the APA.  *Lexmark Int'l, Inc. v. Static Control Components,*

17    *Inc.*, 572 U.S. 118, 130 (2014).  Thus, "there need be no indication of congressional purpose to

18    benefit the would-be plaintiff" for the court to find that the plaintiff falls within the statute's

19    zone of interests.  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).  The environmental

20    interests protected by the ESA and NEPA are at the core of ALDF's organizational mission,

21    including the protection of imperiled species and the habitat critical for their survival.  Thus,

22    ALDF's interests fall squarely within the zone of interest of the "relevant statutes."

23    An agency may not make a choice that is "arbitrary, capricious, [or] an abuse of

24    discretion."  5 U.S.C. § 706(2)(A).  Under the APA, the court is tasked with "ensuring that

25    agencies have engaged in reasoned decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53-54

26    (2011).  Reasoned decision-making requires there to be a "rational connection between the facts

27    found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto*

28    *Ins. Co.*, 463 U.S. 29, 43 (1983).  As part of this inquiry, the court should examine the reasons—

1   or conversely, the absence of reasons—for agency decisions.  *Judulang*, 565 U.S. at 53 (citing

2   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) for "the requirement that an

3   agency provide reasoned explanation for its action").  A court must not "rubber-stamp …

4   administrative decisions … that frustrate the congressional policy underlying a statute."  *Ariz.*

5   *Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001).

6       In the instant case, the Services failed to provide the reasoned explanation required by the

7   APA for the changes adopted in the final rules which frustrate the congressional policy

8   underlying the ESA.  Compl. ¶ 91.  Specifically, during the rulemaking, the Services relied on

9   factors Congress did not intend for them to consider (*e.g.*, relaxing permitting requirements),

10  failed to consider concerns raised by public comments, and offered explanations for its decisions

11  that have no reasonable or rational connection to the facts in the record.  *Id*. ¶¶ 86-91.  Notably,

12  "the Services failed to consider and justify their actions in light of FWS's history of delay or

13  failure to issue species-specific rules; the established significance of the threat that climate

14  change poses to threatened and endangered species; the efficacy of the Services' previous

15  regulations."  *Id*. ¶ 90.

16      The consistency of an agency's interpretation of a statute is relevant to the determination

17  of whether its interpretation is permissible.  FWS's position here is entitled to considerably less

18  deference because it must provide more than a logical explanation when reversing a prior

19  position.  *Nat. Res. Def. Council v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008).  For its regulations

20  to stand, FWS must show not only that new rule itself is reasonable, but also that there is a

21  reasonable rationale to support its departure from prior practice.  *Seldovia Native Ass'n., Inc. v.*

22  *Lujan*, 904 F.2d 1335, 1345 (9th Cir. 1990).

23      Further, the Services violated the APA by failing to provide adequate notice of further

24  potential revisions to the proposed rules thereby short circuiting ALDF's ability to comment on

25  sections of the final rules that were not "a logical outgrowth of [these] proposed rule[s]."

26  Compl. ¶ 92.   Where ALDF and the related plaintiffs were able to comment as part of the

27  rulemaking process, FWS wholly failed to respond to their concerns.  The final rule and its

28  preamble are also utterly devoid of reference to the effects of repealing the Blanket 4(d) Rule on

1   captive animals, which ALDF submitted a separate set of comments to highlight.  *Id.* ¶ 90;

2   Walden Decl. ¶ 10.

3        The Services have not provided a reasonable explanation for their actions—especially

4   insofar as they reverse long-standing agency positions—and thus their promulgation of the final

5   rules constitute a final agency action that is arbitrary, capricious, and an abuse of discretion,

6   which ALDF has standing to challenge.

7            **2.      ALDF Has Standing To Bring Its NEPA Violation Claim.**

8        NEPA is the nation's "basic national charter for protection of the environment."  40

9   C.F.R. § 1500.1(a).  NEPA is an "action-forcing" law that requires agencies to prepare an EIS on

10  major Federal actions "significantly affecting the quality of the human environment."  *Robertson*

11  *v. Methow Valley Citizens Council*, 490 U.S. 332, 348-49 (1989); 42 U.S.C. § 4332(2)(C).

12       ALDF has standing for its procedural injuries due to the Services' failure to comply with

13  NEPA.  As discussed *supra*, the Services' failure to prepare an EIS as required under NEPA

14  threatens ALDF's core interests and results in an injury sufficient to convey standing.  *See W.*

15  *Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485, 494-95 (9th Cir. 2011) (finding

16  agency's EIS conclusions arbitrary and capricious under APA after applying procedural standing

17  analysis to claims that agency failed to take "hard look" at regulations' impacts under NEPA).

18  The Services' failure to follow NEPA also deprived ALDF and its members of both the

19  opportunity to influence the content of the final rules and the right to have the significant

20  environmental impacts of the proposed rules assessed, addressed, and mitigated prior to the

21  Services' adoption of the final rules.  *See, e.g.*, Walden Decl. ¶ 10; Patten Decl. ¶ 14.  This is

22  sufficient to confer standing.  *W. Watersheds Project*, 632 F.3d at 485.

23       The Services' characterization of the environmental impacts of the final rules as

24  "fundamentally administrative, legal, technical, or procedural in nature" that "would not

25  individually or cumulatively have a significant effect on the human environment" and therefore

26  exempt from the requirements of NEPA is not availing.  Compl. ¶¶ 100-01.  To the contrary, the

27  final rules—especially the revised 4(d) rule—turned on its head over 40 years of FWS

28  interpretation of its statutory mandate under the ESA to conserve imperiled species.  Thus, the

1  Services' professed positions are nothing more than a red herring: as ALDF alleges, the

2  challenged final rules are highly controversial, have a profound impact on the environment, are

3  significant rulemakings with impacts that required the Services to comply with NEPA's EIS

4  requirements, and are ineligible for categorical exclusion from NEPA's requirements.  *Id.* ¶ 102.

5         The Services' failure to conduct a lawful NEPA process based on the significant impacts

6  of the revised regulations violated NEPA and its implementing regulations, was arbitrary and

7  capricious, an abuse of discretion, and a failure to act in accordance with the law, and, therefore,

8  violated the APA, NEPA, and the FWS and NMFS guidelines implementing NEPA.  ALDF has

9  standing to bring a claim seeking to remedy this violation.

10 **II.      ALDF'S CLAIMS ARE RIPE**

11        In another effort to evade review, Federal Defendants incorrectly argue that ALDF's

12 claims are not ripe.  Mot. at 24-28.  The ripeness inquiry, which is designed to prevent courts

13 from prematurely adjudicating disputes, often involves "both a constitutional and prudential

14 component."  *Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019).

15 Constitutional ripeness "coincides squarely with standing's injury in fact prong."  *Id.*  Prudential

16 ripeness looks to "the fitness of the issues for judicial decision and the hardship to the parties of

17 withholding court consideration."  *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1154 (9th

18 Cir. 2017).  Such prudential considerations are "discretionary."  *Id.*  Indeed, the Supreme Court

19 has recognized that the prudential ripeness doctrine is "in some tension with … a federal court's

20 obligation to hear and decide cases within its jurisdiction."  *Susan B. Anthony List v. Driehaus*,

21 573 U.S. 149, 167 (2014) (quotation marks and citation omitted); *see also Fowler v. Guerin*, 899

22 F.3d 1112, 1116 n.1 (9th Cir. 2018) ("[P]rudential ripeness is a disfavored judge-made

23 doctrine").  Furthermore, "[t]he Ninth Circuit has previously declined to reach prudential

24 ripeness when constitutional ripeness is satisfied," and courts within this District have followed

25 suit.  *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018).

26        ALDF's claims are constitutionally ripe for the same reasons they have Article III

27 standing.  *See supra.*  This is so for ALDF's substantive and procedural claims.  *See Ohio*

28 *Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("[A] person with standing who is

1    injured by a failure to comply with the NEPA procedure may complain of that failure at the time

2    the failure takes places, ***for the claim can never get riper***." (emphasis added)).

3          To the extent the Court reaches prudential ripeness, ALDF's claims also satisfy that

4    doctrine.  First, ALDF's claims are fit for judicial resolution now because they present "purely

5    legal facial challenges" to final regulations and procedural injuries, none of which require further

6    factual development or call for the Court to interfere in further administrative action.  *See CBD*

7    *v. Kempthrone*, 588 F.3d 701, 708 (9th Cir. 2009).  Here, ALDF alleges that each of the three

8    rules, on their face, is "contrary to the explicit requirements and conservation mandates of the

9    ESA" and "imperils—rather than protects and conserves—vulnerable species."  Compl. ¶ 85.

10   ALDF further alleges that the three rules constitute "arbitrary and capricious agency action"

11   because the Services relied on factors which Congress did not intend them to consider, including

12   economic interests outside of the Services' purview; failed to consider important aspects of the

13   problems purportedly addressed, including substantial concerns raised by the ALDF, among

14   numerous other interested parties, during the comment period; and offered an explanation for the

15   rules that runs counter to the evidence in the rulemaking record.  *Id.* ¶¶ 86-91.  ALDF also

16   challenges the Services' rulemaking process as violating the APA and NEPA due to their

17   inadequate notice of revisions and failure to undertake an EA or EIS.  *Id.* ¶¶ 92-103.

18         Where, as here, a plaintiff challenges final regulations as "arbitrary and capricious" on

19   their face, "based on the administrative record as it existed when the regulations were adopted,"

20   the Court is presented with a legal question ripe for review "that would not benefit from further

21   factual development."  *CBD*, 588 F.3d at 708; *see also Cal. ex rel. Lockyer v. U.S. Dep't of*

22   *Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009) ("Nor is additional factual development required

23   under the plaintiff's theory of the case, which is that the promulgation of the State Petitions Rule

24   improperly removed the substantive protections afforded to inventoried roadless areas under the

25   Roadless Rule."); *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856-57 (9th Cir. 2002)

26   (holding that "more specific facts surrounding possible actions to enforce [a] statute [would] not

27   aid resolution of the [plaintiffs'] constitutional and statutory challenges").  Additionally,

28   procedural injuries, such as those alleged here, do not require any further factual development

1   because the "procedural injury has already occurred."  *Cottonwood Envt'l Law Ctr. v. U.S.*

2   *Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015).

3          Relatedly, ALDF's facial and procedural claims do not interfere with any further

4   administrative action because they challenge final agency actions: the publication of the three

5   final rules on the Federal Register.  *See Kraayenbrink*, 632 F.3d at 486 ("[T]he dispute would

6   not interfere with further administrative action because both the EIS and the 2006 Regulations

7   are final."); *U.S. Dep't of Agric.*, 575 F.3d at 1011 ("Judicial consideration of this dispute would

8   not interfere with further administrative action with respect to the State Petitions Rule, which is a

9   final rule that has been published in the Federal Register.").

10         Federal Defendants mischaracterize ALDF's claims as ones for "pre-enforcement

11  review" through a strained analogy to *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d

12  1241 (9th Cir. 2016), a ***summary judgment*** case pertaining to regulations establishing a process

13  for certifying the adequacy of state mechanisms for providing counsel to indigent capital

14  prisoners.  Mot. at 25-26.  Federal Defendants' reliance on the pre-enforcement review concept

15  and *Habeas Corpus* is misplaced.  As an initial matter, Federal Defendants' argument ignores

16  entirely ALDF's claims of procedural injuries, which "can never get riper" than the time at

17  which the failure to comply with required procedures occurs.  *Ohio Forestry*, 523 U.S. at 737.

18  No analogous procedural injuries were at issue in *Habeas Corpus*, where the plaintiffs

19  challenged regulations on vagueness grounds.  816 F.3d at 1243-44.  Moreover, a litigant seeks

20  pre-enforcement review where it "challenges regulations anticipating that an administrative

21  agency will, in the near future, apply those regulations in a manner that will harm the litigant's

22  interests."  *Id.* at 1252.  ALDF, however, brings facial and procedural challenges to the three

23  new rules *themselves*, and such challenges persist regardless of future applications.  Compl.

24  ¶¶ 83-103; *see W. Watersheds Project*, 632 F.3d at 486 (rejecting argument that claims were not

25  ripe because regulations had not been applied and holding that challenge to agency regulations

26  "on a nationwide, programmatic basis" was ripe).  Finally, Federal Defendants ignore that

27  *Habeas Corpus* was an appeal of a summary judgment opinion where the court was not

28  required—as it is on a motion to dismiss—to accept the plaintiff's factual allegations as true.

1    *See* Fed. R. Civ. P. 56(e).  To the extent the Court determines future applications of the rules

2    matter, at this stage, the Court must accept ALDF's allegations as true that the Services' later

3    applications of the rules will injure ALDF and its members and supporters, particularly where

4    those allegations are grounded in historical practices and patterns of backlogs and delays,

5    Compl. ¶¶ 35-40, 65—not speculation and legal conclusion as Federal Defendants posit.  *See*

6    *Wolfe*, 392 F.2d at 362.

7    Second, ALDF would suffer hardship if the Court withheld review at this time because,

8    as discussed *supra*, ALDF has suffered and will continue to suffer harm as a result of the

9    Services' *promulgation* of the regulations.  *See CBD*, 588 F.3d at 708 (finding hardship where

10   challenged agency action "authorizes incidental take that is contrary to [plaintiffs'] interest").

11   Federal Defendants' focus on whether the regulations "apply only to the Services and other

12   federal agencies" misses the mark given the harm they inflict on ALDF and its members.  Mot.

13   at 25-26.  And Federal Defendants' contention that the new regulations create mere

14   "uncertainty" rather than inflict present injury is wrong for the reasons set forth *supra*.  ALDF's

15   claims are ripe.

16                                         **<u>CONCLUSION</u>**

17   For the foregoing reasons, Federal Defendants' motion to dismiss should be denied.

18

19

20

21

22

23

24

25

26

27

28

1  Dated: January 7, 2020                    ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                            By:  s/ Clement Roberts
                                                 CLEMENT ROBERTS (CSBA # 209203)
4                                                DANIEL S. GUERRA (CSBA # 267559)
                                                 KOUROSH JAHANSOUZ (CSBA #
5                                                292559)
                                                 ORRICK, HERRINGTON & SUTCLIFFE
6                                                LLP
                                                 405 Howard Street
7                                                San Francisco, CA 94105
                                                 Telephone:      (415) 773-5700
8                                                Facsimile:      (415) 773-5759
                                                 croberts@orrick.com
9                                                dguerra@orrick.com
                                                 kjahansouz@orrick.com
10
                                                 *Attorneys for Plaintiff*
11                                               *ANIMAL LEGAL DEFENSE FUND*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO