1  CLEMENT ROBERTS (CSBA # 209203)
   DANIEL S. GUERRA (CSBA # 267559)
2  KOUROSH JAHANSOUZ (CSBA # 292559)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
3  405 Howard Street
   San Francisco, CA 94105
4  Telephone:    (415) 773-5700
   Facsimile:    (415) 773-5759
5  croberts@orrick.com
   dguerra@orrick.com
6  kjahansouz@orrick.com

7  EMMANUEL FUA (CSBA # 284563)
   ORRICK, HERRINGTON & SUTLIFFE LLP
8  51 West 52nd Street
   New York, NY 10019
9  Telephone:    (212) 506-5000
   Facsimile:    (212) 506-5151
10 efua@orrick.com

11 *Attorneys for Plaintiff*

12

13                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
14                          OAKLAND DIVISION

15

16 ANIMAL LEGAL DEFENSE FUND,            Case No. 4:19-cv-06812-JST

17              Plaintiff,               Related Cases:  No. 4:19-cv-06013-JST
                                                         No. 4:19-cv-06812-JST
18      v.
                                         **FIRST AMENDED COMPLAINT**
19 DAVID BERNHARDT, U.S. Secretary of the **FOR DECLARATORY AND**
   Interior; U.S. FISH AND WILDLIFE     **INJUNCTIVE RELIEF**
20 SERVICE; WILBUR ROSS, U.S. Secretary of
   Commerce; and NATIONAL MARINE        (Administrative Procedure Act, 5 U.S.C.
21 FISHERIES SERVICE,                    § 551, et seq.)

22              Defendants.

23

24

25

26

27

28

INTRODUCTION

1.      Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in 1973 to provide a program for the conservation of the nation's endangered and threatened species, and their ecosystems.  Congress defined "conservation" expansively to include the use of all methods and procedures necessary to recover threatened and endangered species to the point that their survival is not reliant upon the ESA's protections.  16 U.S.C. § 1532(3).  The ESA promotes conservation by prioritizing the survival and recovery of these species and their habitats.

2.      For over 40 years, the Department of the Interior and the Department of Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"), have administered the ESA through duly promulgated joint regulations, and to great success:  their efforts have effectively conserved 99% of species listed under the law.

3.      This action challenges recent regulatory revisions promulgated by FWS and NMFS on August 12, 2019, which amend the regulations that implement ESA Sections 4 and 7, 16 U.S.C. §§ 1533, 1536.  The rules were published in the Federal Register on August 27, 2019 and became effective on September 26, 2019.  *See* Regulations for Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019); Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27, 2019); Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44753 (Aug. 27, 2019) (collectively, the "2019 Revised ESA Regulations").

4.      Defendants issued the challenged regulatory revisions to deregulate protections for threatened and endangered species in several key respects.  One of the rules repeals the long-established FWS regulation implementing ESA Section 4(d), often referred to as the "Blanket 4(d) Rule," which automatically extended certain protections to threatened animals and plants upon listing, 50 C.F.R. §§ 17.31, 17.71.  Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44753 (Aug. 27, 2019).  Another rule makes several

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   fundamental changes to Section 4 review, severely restricting its scope and, for the first time,

2   subjugating conservation to economic considerations.  Regulations for Listing Species and

3   Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27, 2019).  And the remaining rule

4   similarly cabins Section 7 review to a degree that wholly thwarts its purpose.  Regulations for

5   Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019).

6   5.   The Services claim that revising these longstanding and fundamental regulations

7   increases clarity and encourages transparency; on the contrary, the regulatory revisions are

8   contrary to the plain language of the ESA, lack any reasoned basis, and are arbitrary and

9   capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

10   6.   The regulatory revisions also contradict the clear conservation mandate of the

11   ESA, which is "to provide a means whereby the ecosystems upon which endangered species and

12   threatened species depend may be conserved, [and] to provide a program for the conservation of

13   such endangered species and threatened species ...."  16 U.S.C. § 1531(b).  Without the Blanket

14   4(d) Rule, for example, animals listed as "threatened" will not be extended protection upon

15   listing, but instead will have to wait for an indeterminate and historically lengthy amount of time

16   for the Services to issue species-specific protections—if the Services choose to act, at all.

17   Animals downgraded from endangered to threatened status will lose their protections against

18   "take" and will be subject to the same delay in regaining their protections, as well.  This change

19   does nothing to promote clarity or transparency—it just makes it easier to "take" threatened

20   wildlife for longer periods of time, thereby undermining the very purpose of the ESA.  The same

21   is true for the two accompanying regulations.

22   7.   In enacting the regulatory revisions, the Services also failed to consider and

23   disclose the significant environmental impacts of the proposed revisions, thereby violating the

24   National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  The final regulatory

25   revisions require NEPA review as they constitute major federal action that does not qualify for a

26   categorical exclusion.

27

28

8.      For these violations of law, Plaintiff seeks an order (1) declaring the revised ESA regulations invalid, (2) vacating the revised ESA regulations, (3) enjoining reliance on the revised ESA regulations, and (4) reinstating the prior ESA regulations.

JURISDICTION AND VENUE

9.      This action is brought pursuant to the APA, 5 U.S.C. §§ 702, 706.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e), as the Plaintiff resides in this district, Plaintiff has members and offices in this district, and many of the consequences of the Defendants' violations of the law giving rise to the claims occurred or will occur in this district.  For example, as set forth more fully below, Defendants' action injures the aesthetic, conservation, recreational, and organizational interests of Plaintiff and its members residing in this district because it subjects imperiled species to "take" as prohibited by Section 9 of the ESA.

INTRADISTRICT ASSIGNMENT

11.     This case is properly assigned to the Oakland Division under Civil L.R. 3-2(c) because the Plaintiff and many of its members are located in counties within this district.

PARTIES

12.     Plaintiff Animal Legal Defense Fund ("ALDF") is a national nonprofit organization headquartered in Cotati, California, with over 200,000 members and supporters nationwide.  ALDF pursues its mission of protecting the lives and advancing the interests of animals through the legal system by persistently advocating for the protection of animals used and sold in commercial enterprises, as well as their wild counterparts.

13.     One of ALDF's cornerstone issues is protecting members of threatened and endangered species from illegally inadequate housing, treatment, and conditions at commercial facilities such as fur farms and roadside zoos.  Using the ESA, ALDF regularly engages in significant advocacy and public education efforts to raise awareness about the conditions in which threatened and endangered species are held in captivity, to improve their physical and

1  mental well-being, and to relocate animals to sanctuaries where they can recover and flourish.

2  ALDF also regularly uses the standards for threatened and endangered animals set forth in the

3  ESA to inform civil cruelty and nuisance suits against captive animal facilities that fail to

4  adequately care for the threatened and endangered animals they exhibit.  ALDF's legal advocacy

5  and ability to carry out its mission relies extensively upon the ESA to ensure imperiled species

6  receive the protections they need to thrive, and thus is impeded by the Services' action.

7       14.    ALDF also advocates for threatened and endangered species in the wild,

8  promotes the humane treatment of wildlife, and campaigns for the preservation of wilderness

9  and wildlife habitat, including by persistently advocating for government adherence to wildlife

10  protection laws such as the ESA and NEPA.  ALDF has successfully used legal action to protect

11  threatened and endangered species in California by forcing county governments to halt their

12  wildlife killing programs unless or until they study their environmental impacts.  ALDF also

13  engages on the federal level, bringing lawsuits against the United States Department of

14  Agriculture's ("USDA") Wildlife Services to compel study of the impacts of its regional wildlife

15  killing programs; to protect and conserve wild lands, specifically from the effects of climate

16  change; and to force federal agencies to consider threatened and endangered species, as well as

17  the impacts of climate change, in their decision making.  ALDF further advocates for threatened

18  and endangered species directly to government agencies.  ALDF recently submitted comments to

19  the FWS opposing the delisting of the grey wolf, for example, and, in addition to submitting its

20  own comments, was part of the coalition that delivered over 800,000 comments to the Services

21  opposing the regulations at issue here.  ALDF's separate comments opposing the regulations at

22  issue detailed the effects the proposed rules would have on threatened and endangered species in

23  captivity, an issue that is of the utmost concern to ALDF and its members.  Declaration of Mark

24  Walden ("Walden Decl.") (Ex. A) ¶¶ 10-12.[1]

25  _____

26  [1] Mr. Walden's declaration, along with four others, are attached as exhibits to this complaint and
    are incorporated by reference in full.  These declarations were originally filed with ALDF's
27  opposition to motion to dismiss and are being re-filed in their original form with this complaint.
    The status of certain of the pending lawsuits mentioned in Mr. Walden's declaration has changed
28  in the interim.

15.     ALDF and its members and supporters are concerned about protecting threatened and endangered captive species from exploitation and extinction.  ALDF and its members and supporters derive recreational, aesthetic, and conservation benefits and enjoyment from the proper treatment and conservation of threatened and endangered species and species that may be listed as threatened or endangered.  ALDF also has members and supporters who reside near and visit facilities that exhibit members of threatened and endangered species and species that may be listed as threatened or endangered species.  ALDF and its members and supporters have been, are being, and will continue to be irreparably harmed by defendants' disregard of their statutory duties and by the unlawful injuries imposed on imperiled species and their critical habitat by the defendants' actions.

16.     For example, Ashley Fetters, a resident of Norwalk, Iowa, and member of ALDF, relies on local zoos to provide wildlife viewing opportunities and to educate her daughter about the natural world.  Declaration of Ashley Fetters ("Fetters Decl.") (Ex. B) ¶ 3.  She and her daughter frequently visit the nearby Henry Doorley Zoo in Omaha, Nebraska, and the Blank Park Zoo in Des Moines, Iowa to see threatened and endangered animals.  *Id.* ¶ 4.  At the Henry Doorley Zoo, Fetters visits threatened and endangered animals (amur tigers, red pandas, African elephants, and white rhinos, among others), as well as the giraffes, which are proposed threatened.  Similarly, at the Blank Park Zoo, Fetters visits the threatened and endangered animals (African lions, Aldabra tortoises, amur tigers, red pandas, and Eastern Black rhinos) and the giraffes.  She plans to return to both of these zoos in 2020.  She also travels to zoos and sanctuaries in other states.  *Id.* ¶ 5.

17.     Fetters and her daughter have a particular affinity for savannah animals such as elephants, lions, giraffes, and rhinos, all of which are either endangered, threatened, or proposed threatened.  *Id.* ¶ 6.  It is very important to Fetters to know they are being conserved.  *Id.* ¶ 7.  Some animals already have nowhere to go to continue their survival, and it terrifies her to think of species that are displaced from the areas they're adapted to.  *Id.*  Because of these values, the ESA and strong enforcement of it by the FWS and groups like ALDF are incredibly important to

her.  *Id.* ¶ 8.  Under the FWS's new regulations, however, it will be more difficult for species like the giraffe to be listed under the ESA, which makes it more difficult for ALDF and concerned citizens like Fetters to act on behalf of animals that deserve the strongest legal protections.  *Id.* ¶ 9.  Even the threatened and endangered species that Fetters visits in zoos are at risk of prematurely losing protections due to the FWS's changes to its ESA regulation, jeopardizing the strong emotional, aesthetic, and personal interests Fetters has in these animals.  *Id.* ¶¶ 10, 11.  In addition, the FWS's new regulations also allow the agency to delist species that are not actually recovering, eliminate the requirement that the scientific and commercial data "substantiate" a species' delisting, consider economic impacts of listing decisions—which Fetters finds abhorrent—and impede the designation of critical habitat essential for species survival.  *Id.* ¶ 10.  This puts species that Fetters cares about at risk of premature delisting.

18.     Similar to Fetters, Lisa Garner is another ALDF member who is concerned about the effects these new regulations will have on endangered, threatened, and proposed threatened species located in zoos.  Declaration of Lisa Garner ("Garner Decl.") (Ex. C) ¶¶ 2-3.  Specifically, Garner has visited Zooworld, a roadside zoo in Panama City Beach, Florida, several times, to view lemurs and mandrills, which are both endangered, as well as giraffes, which are currently under consideration for listing by the FWS.  *Id.* ¶ 4.  She plans to visit this zoo again in the future to monitor and document the condition of its animals.  *Id.*  Garner is especially concerned about giraffes exhibited at the Zooworld.  *Id.* ¶¶ 3, 8.  Under the previous FWS regulations, giraffes would enjoy automatic protections as soon as they are listed as threatened; under the new regulations, they will not be protected until FWS issues species-specific regulations, and even then, may not receive the full range of protections they would have automatically received under the prior regulations.  *Id.* ¶ 10.  FWS has also specifically identified climate change as one of the "natural or manmade factors" contributing to the giraffes' decline.  *Id.*  Under FWS's new regulations, the agency can decline to designate a habitat as critical if the threats to the habitat are ones the agency cannot address.  These changes make it more difficult for species like the giraffe to be listed under the ESA, which makes it more

difficult for ALDF and concerned citizens like Garner to act on behalf of animals that deserve the strongest legal protections.  *Id.*  Even listed animals like lemurs and wolves at Zooworld are at risk of prematurely losing protections due to the FWS's changes to its ESA regulations.  *Id.* ¶ 11.  A return to FWS's previous regulations would redress Garner's injury by providing animals under consideration for listing now and in the future, and those already listed, with significantly stronger protections.  *See also* Declaration of Mary Delmoro ("Delmoro Decl.") (Ex. D) ¶¶ 4-14 (alleging similar injuries to her aesthetic interests in giraffes housed at zoo in Harpursville, New York, which she monitors via live feed on a daily basis).

19.     ALDF's members, staff, and supporters also frequent natural areas for the purposes of observing threatened and endangered species and other recreational and professional pursuits.  Plaintiffs' members and staff enjoy observing, attempting to observe, photographing, and studying these species, including signs of the species' presence in the areas.  The opportunity to possibly view these species or signs of species in these areas is of significant interest and value to Plaintiffs' members and staff and increases the use and enjoyment of public lands and ecosystems in the United States.  Plaintiff's members also derive recreational, aesthetic, and conservation benefits and enjoyment from the conservation of threatened and endangered species and species that may be listed as threatened or endangered, as well as their critical habitat; they have an interest in the health and humane treatment of wild animals.

20.     For example, Leslie Patten, a member of ALDF residing in northwest Wyoming, has been visiting Shoshone National Forest since the 1990s, a forest which has the most wilderness land of any National Forest in the United States.  Declaration of Leslie Patten ("Patten Decl.") (Ex. E) ¶ 3.  She also lives very close to Yellowstone National Park.  *Id.*  These areas comprise habitats for many threatened and endangered species, including gray wolves, grizzly bears, and Canada lynx, as well as species that are under consideration for listing or delisting such as the North American wolverine.  *Id.* ¶ 4.  She also lives among critical habitat for the Canada lynx and proposed critical habitats for the wolverine.  *Id.*  The Greater

Yellowstone Ecosystem is also home to pikas, which are particularly vulnerable to loss of habitat related to climate change.  *Id.*

21.     Patten spends a considerable amount of time daily in nature.  *Id.* at ¶ 5.  She spends this time outdoors specifically to feel closer to the natural world and to observe and enjoy wildlife, including threatened and endangered species.  *Id.*  Patten is extremely concerned about, and regularly witnesses, the effects of climate change on the Greater Yellowstone Ecosystem. *Id.* ¶ 8.  For example, ninety percent of Whitepark pine trees, which are the main fall food for grizzly bears, are considered functionally dead due to the effects of climate change.  Watching her local forest die has caused her mental and physical health to suffer.  *Id.*  Specifically, Patten is deeply concerned about the FWS's new regulations under the ESA.  Under the new regulations, the FWS can decline to designate a habitat as critical if the threats to the habitat are ones the agency cannot address, like climate change; the FWS is limited in its ability to designate habitat where a species does not currently live, which ignores animals like pikas who have no place to retreat to, or grizzly bears in the Greater Yellowstone Ecosystem who are losing their critical foods due to climate change; and the FWS is further limited in considering future effects of climate change  *Id.* ¶ 11.  Each of these changes make it more difficult for species to be listed under the ESA, which makes it more difficult for ALDF and concerned citizens like Patten to act on behalf of animals that deserve the strongest legal protections.  *Id.*  These vulnerable animals and the people like Patten who are deeply invested in their health and happiness are being harmed by the FWS's decision to weaken the ESA's protections.  *Id.* ¶ 13.

22.     The 2019 Revised ESA Regulations directly and adversely impact the aesthetic, conservation, and recreational interests of ALDF and its members in the continued vitality of threatened and endangered species, species that may be listed as threatened or endangered species, and their critical habitat.  Among other things, the 2019 Revised ESA Regulations unequivocally weaken ESA safeguards designed to conserve hundreds of endangered and threatened species, which, at minimum, will result directly in an enhanced and substantial risk of loss in biodiversity and degradation of fish and wildlife natural resources in areas that ALDF and

its members and supporters frequent.  Further, the 2019 Revised ESA Regulations make it increasingly difficult to observe these species in the wild and to ensure they are protected when in captivity.  Declines in species population are difficult to remedy and extinction of species is impossible to remedy.  Should declines or extinction of species populations occur, ALDF and its members would be harmed irreparably and no relief would adequately return them to their original position.  Vacatur of the 2019 Revised ESA Regulations and reinstatement of the prior regulations would eliminate this risk and redress ALDF's and its members' injury.

23.     Finally, Plaintiffs' members, staff, and supporters have a procedural interest in ensuring that the Services comply with all applicable federal statutes and regulations, as well as procedural right to participate in the public processes such statutes and regulations require.  ALDF is entitled to have its concerns addressed by the Services in their final rules, and to participate in a public NEPA process for the significant federal actions the Services undertook here.  Plaintiff and its members, staff, and supporters have suffered a procedural injury by the Services' failure to address these concerns and to provide for a public NEPA process.  Had Federal Defendants properly complied with NEPA, ALDF and its members and supporters would have participated in the NEPA process.  *See, e.g.*, Patten Decl. ¶ 14; Walden Decl. ¶ 10.  Federal Defendants' failure to do so has caused injury to ALDF and its members by depriving them of this procedural right.  The relief requested in this litigation would redress this injury.[2]

24.     Defendant David Bernhardt, U.S. Secretary of the Interior, is sued in his professional capacity.  Mr. Bernhardt has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species.  Mr. Bernhardt signed the final revised ESA regulation at issue;

---

[2] To be clear, ALDF is alleging "associational standing" (*e.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 482-83 (9th Cir. 2011)) based on harm to its individual members and supporters, in addition to its procedural injury in being deprived of a meaningful opportunity to participate in a public notice-and-comment procedure and NEPA process on behalf of its members (*see, e.g.*, *infra* at ¶¶ 59, 88).  ALDF is not alleging "direct" or "organizational standing" (*e.g.*, *Smith v. Pacific Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)).

25.     Defendant U.S. Fish and Wildlife Service is an agency of the U.S. Department of the Interior, charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

26.     Defendant Wilbur Ross, U.S. Secretary of Commerce, is sued in his professional capacity.  Mr. Ross has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to threatened and endangered marine species and anadromous fish species.  Mr. Ross signed the final revised ESA regulation at issue; and

27.     Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce, responsible for administering the ESA with regard to threatened and endangered marine species and anadromous fish species.

BACKGROUND

I.     THE CONSERVATION, PROTECTION, AND RECOVERY OF BOTH WILD AND CAPTIVE ENDANGERED AND THREATENED SPECIES IS A NATIONAL PRIORITY UNDER THE ENDANGERED SPECIES ACT.

28.     Congress passed the ESA in 1973 in recognition of a then-ongoing extinction crisis and the belief that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," and that, through various treaties and covenants, the United States had pledged to the international community "to conserve to the extent practicable various species of fish or wildlife and plants facing extinction."  16 U.S.C. § 1531(a)(3)-(4).

29.     Congress intended the ESA "to provide a program for the conservation of such endangered species and threatened species …."  16 U.S.C. § 1531(b).  The ESA defined "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided pursuant to this act are no longer necessary."  16 U.S.C. § 1532(3).

30.     The ESA seeks to conserve, protect, and recover imperiled species by using the "best scientific and commercial data available," 16 U.S.C. § 1533(b), to determine, based on

enumerated statutory factors, the suitability of species for listing as threatened or endangered. 16 U.S.C. §§ 1533(a)(1)(A)-(E).

31.     The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The ESA defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

32.     Section 7 of the ESA elevates the mandate of species protection over the primary missions of federal agencies.  In adopting this section, Congress effectively charged all federal agencies with the affirmative duty to further the conservation of imperiled species.  16 U.S.C. § 1536(a).

33.     Section 7 of the ESA further requires every federal agency to consult with FWS or NMFS to obtain review and clearance for activities that may affect listed species or their habitat.  If "any action authorized, funded, or carried out by" a federal agency may affect a listed species or its designated critical habitat, that activity cannot go forward until consultation ensures that it will not "jeopardize" the species or result in the "destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

34.     Much like their wild brethren, endangered or threatened animals bred or kept in captivity also benefit from the protections afforded by and the prohibitions enumerated in the ESA.  *See, e.g.*, Final Rule, 80 Fed. Reg. 7380, 7388 (Feb. 10, 2015) ("On its face the ESA does not treat captives differently …. Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."); 50 C.F.R. § 17.3 (defining the "take" definition's term "harass" in the context of captive animals).

35.     The listing of a species as endangered under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take" of species, which is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 17.3 (harass

1   "means an intentional or negligent act or omission which creates the likelihood of injury to

2   wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns

3   which include, but are not limited to, breeding, feeding, or sheltering[.]").

4          36.     Section 9 of the ESA also prohibits the "incidental take" of endangered species,

5   *i.e.*, a take that is not a direct goal of the proposed action.  FWS or NMFS may issue an

6   "Incidental Take Statement" if, during Section 7 consultation, the agency concludes that the

7   incidental take will not jeopardize the species.  The Incidental Take Statement outlines the

8   impacts of the incidental taking on the species, necessary mitigation measures, and any other

9   terms and conditions with which the action agency must comply (including reporting

10  requirements).  16 U.S.C. § 1536(b)(4)(C).

11         37.     Section 10 of the ESA extends the regulation of incidental take to cover the

12  actions of private entities.  FWS or NMFS may permit "any taking otherwise prohibited by

13  [Section 9(a)(1)(B)] if such taking is incidental to, and not the purpose of, the carrying out of an

14  otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).  If FWS or NMFS finds that the "taking

15  will not appreciably reduce the likelihood of the survival and recovery of the species[,]" the

16  agency may issue an Incidental Take Permit.  16 U.S.C. § 1539(a)(2)(B)(iv).

17  II.    THE CONSERVATION, PROTECTION, AND RECOVERY OF BOTH WILD AND
        CAPTIVE ENDANGERED AND THREATENED SPECIES WERE FURTHERED BY
18      THE SERVICES' BLANKET 4(D) RULE.

19         38.     Pursuant to the Congressional command that implementing agencies promulgate

20  regulations they deem "necessary and advisable to provide for the conservation of [threatened]

21  species," 16 U.S.C. § 1533(d), FWS utilized the Blanket 4(d) Rule to prohibit the taking of

22  species listed as threatened under the ESA for the last 40 years.  Until it was recently rescinded,

23  the protections of the Blanket 4(d) Rule remained in effect unless and until FWS finalized a

24  species-specific rule.  *See* 50 C.F.R. § 17.31(a) (2018).

25         39.     The Blanket 4(d) Rule has enabled the Services to focus their resources on listing

26  species without taking additional time and resources to develop simultaneous species-specific

27  regulations, which would further delay listing decisions.

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40.     The ESA's protections can only go into effect once a species is listed.  Delay in a listing determination can cause irreparable harm to a species' chances for survival and reduce the species' population and density.  According to a 2016 study of the amount of time listed species spent undergoing review between 1973 and 2014, the Services wait a median of 12.1 years to provide proposed species with ESA protection.  Puckett, E. E., Kesler, D. C., and Greenwald, D. N., *Taxa, petitioning agency, and lawsuits affect time spent awaiting listing under the US Endangered Species Act*, BIOL. CONSERV. 201, 220-229, 225 (2016).

41.     The Services currently have a backlog of imperiled species that are awaiting a listing decision.  FWS's Environmental Conservation Online System ("ECOS") shows that there are currently 61 ESA listing petitions pending with FWS that are either awaiting findings or have been found to be "warranted" and "not precluded."  *See* 16 U.S.C. § 1533(b)(3).  The oldest of these pending petitions was filed in 2008.  *Endangered Species Act Petitions Received by Fish and Wildlife Service*, U.S. Fish & Wildlife Service Environmental Conservation Online System, *available at* https://bit.ly/2kjTCI2 (last visited Sept. 23, 2019).  Despite this, only 19 species are currently proposed for listing.  *Species Proposed for Listing*, U.S. Fish & Wildlife Service Environmental Conservation Online System, *available at* https://bit.ly/2kQc7Ej (last visited Sept. 23, 2019).  Since the start of 2017, FWS has only listed a total of 17 species as threatened or endangered; specifically, 11 in 2017, five in 2018, and one so far in 2019.  *U.S. Federal Endangered and Threatened Species by Calendar Year*, U.S. Fish & Wildlife Service Environmental Conservation Online System, *available at* https://bit.ly/2ko9rgW (last visited Sept. 23, 2019).

42.     NMFS similarly has 13 candidate species that it is currently reviewing to determine whether listing is warranted under the ESA.  The oldest of these candidate species is the cusk, whose potential listing has been under review since 2007.  *Candidate Species Under the Endangered Species Act*, National Oceanic and Atmospheric Administration, *available at* https://bit.ly/2krhs4T (last visited Sept. 23, 2019).

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

43.     The delay in listing decisions and the existing backlog are a threat to imperiled species awaiting the protections of being listed as endangered or threatened.  The time it takes for making a listing determination already falls outside the two-year timeframe Congress mandated when it revised the ESA in 1982.  16 U.S.C. §§ 1533(b)(3), (6).  In fact, the Services have failed to act in the absence of litigation to compel decisions on listing petitions.  *See, e.g.,* United States Government Accountability Office, Environmental Litigation:  Information on Endangered Species Act Deadline Suits, Feb. 2017, available at https://www.gao.gov/assets/690/683058.pdf.

44.     Any agency action that increases the analysis to be made at the time of the listing determination will further dilute the already limited and insufficient resources the Services have available to make listing decisions, and will further thwart Congress's conservational intent when enacting the ESA.

45.     This is especially so given the Services' existing delay and/or failure in issuing species-specific regulations.  FWS has issued special rules for only half (116) of the 238 of the animal species it has listed as threatened, NMFS has issued only 43 rules for 71 animal species, and over 500 species are under consideration for protection.  *See* Defenders of Wildlife White Paper Series, Section 4(d) Rules:  The Peril and the Promise (2017), at 5-6, https://defenders.org/sites/default/files/publications/section-4d-rules-the-peril-and-the-promise-white-paper.pdf.

III.    IN FURTHERANCE OF ITS CONSERVATION MANDATE, FWS PROMULGATED THE BLANKET 4(d) RULE OVER 40 YEARS AGO TO PROTECT THREATENED SPECIES FROM BECOMING ENDANGERED SPECIES.

46.     Pursuant to Section 4(d) of the ESA, Congress required FWS "to provide for the ***conservation***" of threatened species through the issuance of regulations.  16 U.S.C. § 1533(d) (emphasis added); *see also* 16 U.S.C. § 1531(c)(1) ("It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.").

47.     In 1975, two years after the ESA was enacted, FWS exercised its authority under Section 4(d) to issue a regulation extending the "take" prohibitions in Section 9 of the ESA applicable to endangered species, 16 U.S.C. § 1538(a)(1), to all threatened species.  50 C.F.R. § 17.31(a) (2018); Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44411, 44425 (Sept. 26, 1975) ("Except as provided in Subpart A of this Part, or in a permit issued under this Subpart, all of the provisions in § 17.21 shall apply to threatened wildlife."); *see* 50 C.F.R. § 17.21 (setting forth prohibited activities in respect of "endangered wildlife").

48.     This regulation, the Blanket 4(d) Rule, provided significant protections to threatened species, furthering FWS's conservation efforts, as it provided threatened species with the same "take" protections applicable to endangered species, unless and until FWS modified those protections through a species-specific rule.  *See, e.g.*, Protection for Threatened Species of Wildlife, 42 Fed. Reg. 46539 (Sept. 16, 1977) (stating that, under the Blanket 4(d) Rule, FWS "determined that as a general rule, all of the prohibitions applying to endangered species would apply to threatened species, unless otherwise provided for in a special rule.").  These protections allowed FWS to work towards its conservation mandate by applying a well-defined set of default protections to threatened species while FWS considered species-specific regulations.

49.     FWS itself stated that the status quo created by the Blanket 4(d) Rule of complete and presumptive protection, and FWS's ability to tailor species-specific protections at a later date if necessary, constituted "the cornerstone of the system for regulating threatened wildlife." 40 Fed. Reg. 44414.

50.     Indeed, FWS and the Secretary of the Interior *defended* the Blanket 4(d) Rule in a lawsuit challenging the rule as contrary to the language in Section 4(d), *ultra vires*, and violative of the ESA—and won.  In 1993, the Court of Appeals for the D.C. Circuit held that the rule constituted a "reasonable interpretation of [Section 4(d) of the ESA]."  *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 1 F.3d 1, 6 (D.C. Cir. 1993), *altered on other grounds in reh'g*, 17 F.3d 1463 (D.C. Cir. 1994); *id.* at 7 ("[Section 4(d)] arguably grants the

FWS the discretion to extend maximum protection to all threatened species at once if, guided by its expertise in the field of wildlife protection, it finds it expeditious to do so.").

51.     Since promulgating the Blanket 4(d) Rule in 1975, FWS has listed over 300 species as "threatened," providing each of them with the same "take" protections applicable to endangered species as a default.  FWS has modified these protections with species-specific rules for fewer than a quarter of these animals.  Historically, FWS has "finalized an average of 2 species-specific 4(d) rules per year," despite adding approximately four species to the threatened list per year.  Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, *available at* https://bit.ly/2lY29kh, at 10 (Aug. 12, 2019).

IV.     THE   BLANKET   4(d)   RULE   PROVIDED   CRITICAL   PROTECTIONS   TO THREATENED CAPTIVE ANIMALS.

52.     The prohibitions of the ESA apply to endangered or threatened animals bred and kept in captivity as well as those found in the wild.  *See, e.g.*, Listing Endangered or Threatened Species, 79 Fed. Reg. 4313, 4317 (Jan. 24, 2017) ("On its face the ESA does not treat captives differently ….  Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."); Listing Endangered or Threatened Species, 80 Fed. Reg. 7380, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status"); Final Interpretation, 79 Fed. Reg. 37578, 37597 (July 1, 2014) ("Captive members have the same legal status as the species as a whole."); *see also* 50 C.F.R. § 17.3 (defining prohibited act of "harass[ment]" under ESA in context of captive animals).

53.     Accordingly, the Blanket 4(d) Rule served to protect threatened captive animals by providing them with the same protections against "take" under Section 9 of the ESA as endangered animals.

54.     Captive animals are subjected to abuse across the country in numerous settings, including at roadside and other types of zoos, fur farms, and "canned hunting" ranches.  For example, in *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845

(8th Cir. 2018), the court held that zoo owners violated the "take" prohibitions of the ESA due to their mistreatment of threatened and endangered tigers and lemurs through, *inter alia*, inadequate veterinary care, inadequate sanitation, social isolation, and lack of environmental enrichment. *Id.* at 718.  Pursuant to the ESA, the court ordered the zoo owners to transfer the animals to a USDA-licensed facility capable of meeting the animals' needs.  *Id.*; *see also, e.g.*, *Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 751-52 (W.D. Tex. 2017) (holding there was genuine issue of material fact as to whether ground surface in endangered elephant's zoo enclosure caused the elephant foot injuries).

55.     The Blanket 4(d) Rule protections were critical in ensuring the protection of threatened captive animals and in giving government agencies, as well as organizations such as ALDF, means to protect such animals from mistreatment—or worse—through enforcement actions.  *See, e.g.*, *Animal Legal Defense Fund v. Olympic Game Farm, Inc.*, No. 3:18-cv-06025, Dkt. 1 (W.D. Wash. Dec. 18, 2018) (alleging inhumane treatment and confinement of endangered gray wolves, lions, and tigers, and threatened brown bears and Canada lynx at roadside zoo, and seeking injunctive relief under the ESA); *Animal Legal Defense Fund v. Lucas*, No. 2:19-cv-40, Dkt. 37 (W.D. Penn. Mar. 20, 2019) (alleging inhumane and unsanitary conditions for endangered ring-tailed lemur, black leopard, and gray wolf, and threatened hyacinth macaw at so-called "wildlife zoo" and "petting zoo," and seeking injunctive relief under the ESA).

V.     THE ELIMINATION OF THE BLANKET 4(d) RULE ABANDONS 40 YEARS OF PROTECTIONS FOR THREATENED ANIMALS.

56.     On January 30, 2017, President Donald J. Trump signed Executive Order 13771, which states "that for every one new regulation issued, at least two prior regulations be identified for elimination."  Executive Order 13711 § 1 (Jan. 30, 2017); *see also id.* § 2(a) ("Unless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed.").  The stated purpose of this Executive Order was to

1    eliminate allegedly "unnecessary regulatory burdens."  Enforcing the Regulatory Reform

2    Agenda, 82 Fed. Reg. 12285 (Mar. 1, 2017).

3          57.     On July 25, 2018, FWS proposed the three rules at issue here to carry out the

4    Executive Order.  *See* Revision of the Regulations for Prohibitions to Threatened Wildlife and

5    Plants, 83 Fed. Reg. 35174, 35175 (July 25, 2018).  In the proposed rule eliminating the

6    Blanket 4(d) Rule, FWS proposed to amend 50 C.F.R. § 17.31 to limit its application "only to

7    species listed as threatened species on or before the effective date of this rule."  *Id.*  Stated

8    differently, FWS proposed to eliminate the presumptive protections against "take" for all newly

9    listed threatened species and those downgraded from endangered to threatened species.  Under

10   the proposed rule, such animals "would have protective regulations ***only if*** the Service

11   promulgates a species-specific rule" at some time in the future.  *Id.* (emphasis added).  Thus, the

12   proposal flipped the regulatory framework on its head, exposing threatened animals—wild and

13   captive alike—to conduct that would be prohibited as to endangered animals unless and until

14   FWS both chose to and got around to creating a species-specific regulation.

15         58.     In proposing to eliminate the Blanket 4(d) Rule prospectively, FWS

16   acknowledged that the prior rule constituted a "reasonable approach" to fulfilling its regulatory

17   duties, citing the D.C. Circuit's opinion in *Sweet Home*, *supra*.  83 Fed. Reg. 35175.

18   Nevertheless, FWS proposed to reverse its prior position.

19         59.     Embedded within the revised regulations, FWS solicited public comment on a

20   barely defined and unfocused swath of over two dozen regulations, not including subparts.  *See*

21   83 Fed. Reg. 35194 (seeking comment on "any provisions in part 424 of the regulations");

22   83 Fed. Reg. 35179 (seeking comment on "any provisions in part 402 of the regulations").  The

23   Services also indicated that the final rules "may include" additional, undefined revisions to "any

24   provisions in part 424 [and 402]"; though FWS failed to provide notice of such revisions as

25   required by the APA, it nonetheless assured the public that any such revisions would meet the

26   APA's legal standard of being "a logical outgrowth of [these] proposed rule[s]."  83 Fed Reg. at

27   35179, 35194.  These violations of APA notice-and-comment procedure under 5 U.S.C. § 553 by

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FWS deprived ALDF, its members and supporters, and the public of a meaningful opportunity to comment on several aspects of the final rules that were not included in, and were not logical outgrowths of, the proposed rules.  For example:  (i) the "Listing Species and Designating Critical Habitat" rule's requirement that the Secretary determine there is a "reasonable certainty" that an unoccupied area will contribute to the conservation of the species and that the area currently contains one or more of those physical or biological features essential to the conservation of the species in order to be designated as "critical habitat"; (ii) the Interagency Cooperation Rule's new definition of "activities that are reasonably certain to occur," which requires that such a conclusion be based on "clear and substantial information"; and (iii) the Interagency Cooperation Rule's expansion of the "environmental baseline" to include "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency failures that are not within the agency's discretion to modify."  Moreover, despite ALDF's submission of separate comments detailing the effects the rules would have on threatened and endangered species in captivity – a cornerstone issue for ALDF – FWS did not even mention this issue in the final rule or its preamble.  Walden Decl. ¶ 12.

60.     The Services further stated they likely would not undertake any environmental assessment or draft any environmental impact statement under NEPA in connection with the elimination of the Blanket 4(d) Rule, due to their conclusion that the proposed elimination "would not … have a significant effect on the human environment" and would be "categorically excluded" from such requirements due to being merely "of an administrative, financial, legal, technical or procedural nature."  83 Fed. Reg. 35177.

61.     The Services accepted comments on each of their proposed revisions to ESA regulations, including elimination of the Blanket 4(d) Rule, through September 24, 2018.  The proposed revisions sparked tremendous concern and controversy:  over 800,000 comments were submitted to the Services opposing the revisions.

VI.     FWS REPEALED THE BLANKET 4(d) RULE ON AUGUST 12, 2019.

62.     On August 12, 2019, FWS issued a final rule amending 50 C.F.R. §§ 17.31 and

17.71, eliminating the Blanket 4(d) Rule as an "Executive Order 13771 deregulatory action." *See* Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, at 20, *available at* https://bit.ly/2lY29kh; *see also* http://www.regulations.gov (Docket ID. FWS-HQ-ES-2018-0007).  As a result, for the first time in over 40 years, FWS has exposed all captive and wild animals (and plants) that may, now or in the future, be listed or reclassified as "threatened" species to harm in the form of "take" prohibited by Section 9 of the ESA, creating a new status quo utterly contrary to the ESA's conservation mandate.

63.     The final rule states:  "We, the [FWS], revise our regulations related to threatened species to remove the prior default extension of most of the prohibitions for activities involving endangered species to threatened species."  *Id.* at 1.  It continues:  "Species listed or reclassified as threatened species after the effective date of this rule would have protective regulations ***only if*** the Service promulgates a species-specific rule."  *Id.* at 3 (emphasis added); *id.* at 8-9.

64.     The final rule, however, is not accompanied by any requirement that FWS promulgate any such species-specific rule, let alone any semblance of a timetable for doing so.  Rather, in the final rule, FWS maintains it has "discretion to revise or promulgate species-specific rules ***at any time*** after the final listing or reclassification determination."  *Id.* at 3 (emphasis added).  FWS also expressly refuses in the final rule to impose any timetable on itself for finalizing any species-specific rule.  *Id.* at 18 ("We considered including a regulatory timeframe to reflect our intention to promulgate 4(d) rules at the time of listing, but ultimately determined that creating a binding requirement was not needed.").  Thus, whereas for the last 40 years, a threatened species would enjoy the protections against "take" under Section 9 of the ESA unless and until FWS finalized a species-specific rule, all newly listed species will now enjoy no such protections unless and until FWS finalizes a species-specific rule.  Critically, even if the FWS finalizes a species-specific rule, it is under no obligation to extend ***any*** particular protection to a threatened species in that rule, let alone the full range of protections the species would have enjoyed under the Blanket 4(d) Rule.  Furthermore, even if a species-specific rule extends some protections to the threatened species, such protections would be of an uncertain

1    duration, given that the new rule gives the FWS discretion to revise such rules at any time.  *Id.* at

2    3.  The elimination of the Blanket 4(d) Rule therefore accelerates a threatened species' descent

3    into endangered status, and leaves the most vulnerable of captive and wild animals at further

4    risk, instead of promoting their conservation.  The new rule therefore threatens irreparable injury

5    to ALDF and its members and supporters given their recreational, conservation, and aesthetic

6    interest in these animals.

7            65.     FWS suggests it may draft and finalize species-specific 4(d) rules concurrently

8    with determining whether to list or reclassify an animal as "threatened," introducing further lag

9    into an already backlogged system that would delay the time at which an animal could be

10   classified as "threatened" in the first place.  *Id.* at 3.  FWS, however, qualifies its purported

11   intention to follow through on this idea by stating, "we do not read the Act to require that we

12   promulgate a 4(d) rule whenever we listed a species as a threatened species," ultimately

13   rendering any redeeming qualities of the proposal hollow.  *Id.* at 16.

14           66.     In the final rule, FWS also confirms that, despite several requests, it did not hold

15   any public hearings or extend the public comment period.  *Id.* at 7.

16           67.     FWS also confirms that it did not undertake any environmental assessment or

17   environmental impact statement in connection with the rule change due to its conclusion that the

18   change was "fundamentally administrative, technical, or procedural in nature."  *Id.* at 27

19   (invoking two categorical exclusions under 43 C.F.R. § 46.210(i)).

20           68.     In justifying the elimination of the Blanket 4(d) Rule, FWS mentions reducing

21   permitting requirements nearly a dozen times in its first 15 pages.  *See, e.g.*, *id.* at 5 ("removing

22   redundant permitting requirements"), 11 ("reducing the need for section 10 permits"),

23   13 ("reduce unneeded permitting"), 14 ("do not require an incidental take permit"); 15 ("would

24   not require a Federal permit").  FWS's congressional mandate under Section 4 of the ESA, of

25   course, is to conserve threatened and endangered species—not to cater to its leadership's

26

27

28

constituents that stand to profit from adversely impacting animals and the environment without government permits.[3]

69.     FWS also provides pretextual justifications for eliminating the Blanket 4(d) Rule. First, it states that eliminating the Blanket 4(d) Rule better aligns it with NMFS, which has never had a comparable rule. *Id.* at 4.  However, nowhere does FWS explain why NMFS is a model agency in this regard and should be emulated.  Indeed, despite designating 20 species of coral as threatened in 2014, NMFS has not issued a 4(d) rule to protect any of them from harm. Moreover, FWS omits that NMFS manages far fewer threatened species than FWS—67 species as opposed to 328 species—which materially distinguishes NMFS from FWS.

70.     Second, FWS cites its supposed "considerable experience in developing species-specific rules over the years," and suggests that it can speed up the process of finalizing species-specific rules—not by allocating additional funding or staffing to the process—but by "review[ing] existing species-specific 4(d) rules that could be used as a model or applied to the species in question." *Id.* at 5, 12.  This assertion is not credible.  The ability to look to prior species-specific 4(d) rules is not a novel invention.  Nor is it an option that has been unavailable to prior FWS administrations, which have managed to finalize ***only two*** species-specific rules per year on average, despite adding approximately four species to the threatened list per year. *See id.* at 10; *see also id.* at 13 ("The Service has finalized 22 species-specific 4(d) rules in the last decade (2009-2018) … [and] 13 species-specific rules in the 12 years prior (1997-2008)."). Furthermore, the notion that existing species-specific 4(d) rules will serve as useful precedent going forward assumes without any factual basis that newly listed or reclassified threatened species will be sufficiently similar to the few threatened species that already have species-

---

[3] *See, e.g.*, Lisa Friedman, *U.S. Significantly Weakens Endangered Species Act*, THE NEW YORK TIMES, *available at* https://www.nytimes.com/2019/08/12/climate/endangered-species-act-changes.html (Aug. 12, 2019) ("Republicans have long sought to narrow the scope of the [ESA], saying that it burdens landowners, hampers industry and hinders economic growth.  [Defendant Interior Secretary David] Bernhardt, ***a former oil and gas lobbyist***, wrote in an op-ed last summer that the act places an 'unnecessary regulatory burden' on companies. … The Trump administration's revisions to the [ESA] regulations that guide the implementation of the [ESA], … mean opponents of the [ESA] are … poised to claim their biggest victory in decades." (emphasis added)).

specific 4(d) rules.  More fundamentally, however, a naked assertion that FWS can probably churn out species-specific rules more quickly than its predecessors is not a sufficient reason to eliminate a 40-year-old rule that plainly furthered FWS's conservational mandate by protecting threatened species from becoming endangered species.  Nor is it a reason to assert that entities such as ALDF lack standing to challenge the new rule.  *See Central Delta Water Agency v. U.S.*, 306 F.3d 938, 950 (9th Cir. 2002) ("It would be inequitable in the extreme for us to permit one party to create a significantly increased risk of harm to another, and then avoid the aggrieved party from trying to prevent the potential harm because the party that created the risk promises that it will ensure that the harm is avoided, yet offers no specific or concrete plan of action for doing so").

71.     Indeed, FWS's action is even less justifiable given its context; FWS must provide more than a logical explanation when reversing a prior position.  Because the consistency of an agency's interpretation of a statute is relevant to the determination of whether its interpretation is permissible, FWS's position here is entitled to considerably less deference.  *Natural Resources Defense Council v. Envtl. Protection Agency*, 526 F.3d 591, 602 (9th Cir. 2008).  For its regulations to stand, FWS must show not only that new rule itself is reasonable, but also that there is a reasonable rationale to support its departure from prior practice—something it has failed to do.  *Seldovia Native Assoc., Inc. v. Lujan*, 904 F.2d 1335, 1345 (9th Cir. 1990).

72.     More than just reversing long-established agency practice, the regulatory revisions promulgated by the Services directly contradict the conservation goals of the ESA by further jeopardizing imperiled species.  Under the new rule, FWS will either (1) continue acting on listing petitions at its current rate without issuing species-specific regulations, leaving listed species just as unprotected as if they had not been listed; or (2) delay its listing decisions until it has also created species-specific rules to promulgate simultaneously with the listing, where such species-specific rules may provide no protections at all or fewer protections than under the prior Blanket 4(d) Rule.  Under either scenario, imperiled species are at an increased risk of take, and in some cases, extinction.  This contradicts the conservation principles mandated by the ESA and

directly injures the recreational, conservation, and aesthetic interests of ALDF and its members and supporters.

VII.   THE RULES GOVERNING LISTING AND CRITICAL HABITAT AND INTERAGENCY COOPERATION SIMILARLY REVERSE THE SERVICES' LONG-STANDING PRACTICE WITH REGARD TO CLIMATE CHANGE.

73.     The "Listing Species and Designating Critical Habitat" rule suffers the same critical conflicts with the language and purpose of the ESA.  The ESA requires that listing decisions be made "*solely* on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).  And under the Services' original regulations, decisions about whether a species should be listed as endangered or threatened were made "solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination."  50 C.F.R. § 424.11(b). Put differently, listing determinations were driven by scientific analysis.  The revised rule removes the phrase "without reference to possible economic or other impacts of such determination."  Now the government can consider whether the decision to list a species as endangered will hurt a company's bottom line—which is not permitted by, and directly contravenes, the plain language, structure, and purpose of the ESA.

74.     Similarly, the Services' original regulations provided that "recovery" of the species should be considered in determining whether a species should continue to be listed.  Yet recovery is ***not*** a criteria for consideration in the new regulations, meaning a species could be delisted even if it is not recovering.  This risk is of grave concern to ALDF and its members. Patten Decl. ¶ 12; Fetters Decl. ¶ 10; Garner Decl. ¶ 11.  The new rule also eliminates the requirement that the scientific and commercial data "substantiate" a species' delisting.  This puts species at risk of premature delisting.

75.     Further, it is now more difficult to designate an area as "critical habitat," which is crucial to protect a threatened or endangered species.  The revised rules state the government may decline to designate a habitat as critical if the threats to the habitat are ones that the agency cannot address, like the climate crisis.  As was made clear to the Services during the comment

period, this wholly ignores that the climate crisis is the biggest long-term threat facing animals—and that habitat loss, fueled by human development and the climate crisis, is the primary cause of species extinction. *See, e.g.*, Patten Decl. ¶ 11; Fetters Decl. ¶ 9; Garner Decl. ¶ 10; Delmoro Decl. ¶ 13.

76.     The new rule also limits the designation of habitats that have features a species needs to thrive if the species does not *currently* live there.  However, as was pointed out to the Services during the comment period, many animals will need to expand or shift their ranges in order to survive as their original habitats are destroyed or fundamentally altered by the climate crisis.  *Id.*  For example, the plight of the Key deer, a subspecies of the North American white-tailed deer, underscores the importance of protecting habitats threatened by climate change beyond where a species currently lives.  Key deer (currently classified as endangered, though the government recently stated it intends to delist the species) live on only a few dozen islands in the Florida Keys.  They face numerous threats, including disease and human encroachment.  But rising sea levels and hurricanes—which are becoming increasingly destructive due to the climate crisis—are two of their biggest threats.  As sea levels continue to rise, their habitat will shrink.  Their extinction is almost certain unless both their remaining habitat and new habitats that they don't currently occupy are protected.

77.     The rule further severely restricts the Services' ability to consider the effects of climate change by limiting the meaning of "foreseeable future."  H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  When deciding whether a species is threatened, the government considers whether the animal is likely to become endangered within the "foreseeable future."  The new rule limits "foreseeable future" to "only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely."  H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  This allows the Services to ignore the longer-term impacts of the climate crisis when making decisions, especially when predicting events that may not occur until years or decades into the future.

78.     For example, the pika (a small furry animal related to rabbits) lives in cool and moist mountainous areas.  Pikas need snowpack in the winter and mild summers to survive. Frustratingly, the FWS has declined to list the pika twice in the last ten years despite scientists' warnings that pikas will likely be extinct within the next 100 years due to warming temperatures. The new rule makes it even harder to list species like the pika moving forward.

79.     The new "Interagency Cooperation Rule" fares no better.  Section 7(a)(2) of the ESA requires every federal agency to consult with the Services to "insure" that the agency's actions are not likely "to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of critical habitat.  The Services' original rules implementing this requirement were congruent with the language of the statute.  They broadly defined agency action to include "all activities or programs of any kind authorized, funded or carried out … by federal agencies," including the granting of permits and "actions directly *or indirectly* causing modifications to the land, water or air."

80.     The new rule again undoes this regulatory scheme in several respects.  For example,  it (1) limits the circumstances under which an agency is deemed to destroy or adversely modify critical habitat by requiring such action to affect the habitat "as a whole" and ignoring harm from "global processes," *i.e.*, climate change; (2) limits the nature and scope of the analysis of the effects of agency action by revising the definitions of "effects of the action" and "environmental baseline" and narrowing causation standards; (3) limits the instances in which changed circumstances affecting listed species or critical habitat require re-initiation of consultation; (4) limits agencies' duties to insure mitigation of the adverse effects of their proposals and delegating to agencies the ability to make certain biological determinations; (5) allows broad-based "programmatic" and "expedited" consultations lacking site-specific, in-depth analysis of proposed agency action; and (6) imposes hasty deadlines on informal consultations.

81.     During the comment period on these proposed rules, ALDF and its coalition partners alerted the Services to the above issues with the Services' proposal to enact these

changes.  Despite this, and without meaningfully addressing public comments, the Services codified these changes in final rules on August 27, 2019.

## VIII. THE SERVICES FAILED TO COMPLY WITH NEPA CONSULTATION REQUIREMENTS.

82.     NEPA requires federal agencies to analyze the environmental impacts of a particular action before the proposed action may proceed.  42 U.S.C. § 4332(2)(C).  Federal agencies must notify the public of proposed actions and allow the public to comment on the fully disclosed environmental impacts of the proposed project.  Thus, NEPA is action-forcing in that it requires "agencies to consider all environmental consequences of choosing one course of action over another *before making a final decision*."  *Nat'l Park and Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 24 (D.D.C. 1999) (emphasis added); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989) ("NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct").  This ensures that the public is made aware of all environmental effects of an agency's actions and thus allows the public to participate in the process of preparing environmental reviews.  42 U.S.C. §§ 4321-4332; 40 C.F.R. §§ 1502.1, 1503.1.

83.     An Environmental Impact Statement ("EIS") is required under NEPA for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "The primary purpose of an environmental impact statement is to serve as an action-forcing device to ensure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.  An EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

84.     The trigger for NEPA compliance and use of the NEPA process to "prevent or eliminate damage" to the environment is a "federal action."  42 U.S.C. § 4332(2)(C).  "Major Federal Actions" include, among other things, "adoption of formal plans, such as official

documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based," 40 C.F.R. § 1508.18(b)(2); and "actions with effects that may be major and which are potentially subject to Federal control and responsibility" and "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 C.F.R. § 1508.18.  The "human environment" to be analyzed "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment….  When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment."  40 C.F.R. § 1508.14.

85.     Accordingly, an EIS must analyze:  "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action (including no action), (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332(2)(C).

86.     When an EIS is not prepared, or the agency is uncertain whether or not the significance threshold has been met, an Environmental Assessment ("EA") is the NEPA process that must be used.  40 C.F.R. § 1508.27.  This inquiry must include an analysis "in several contexts, such as a whole (human, national), the affected region, the affected interests and the locality."  40 C.F.R. § 1508.27(a).  In addition, the agency must analyze the severity of the action, such as whether impacts "may be both beneficial and adverse," "the degree to which the proposed action affects public health or safety," "unique characteristics of the geographic area," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. §§ 1508.27(b)(1)-(5).

87.     Here, the Services wholly failed to provide either an EIS or an EA in connection with their revised regulations.  Rather, the Services invoked two categorical exclusions under 43 C.F.R. § 46.210(i).  In essence, the Services argued that because the revisions were legal, technical, or procedural in nature, and because the revised regulations' potential impacts were too broad and speculative for a meaningful analysis, the revised regulations were exempt from NEPA consultation requirements.  These revisions, however, are anything but "legal, technical, or procedural in nature."  As addressed above, the revocation and/or reversal of key protections and practices for listed species leaves these species in great peril and without any meaningful protections.  The revised regulations will have a direct and immediate impact on all future species designated as threatened or endangered, as well as the habitats in which they do or will reside.

88.     The Services failure to comply with NEPA consultation requirements improperly foreclosed on ALDF and its members' ability to meaningfully participate in the environmental review preparation process.  Walden Decl. ¶ 12.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act:**
**Issuance of Regulations that are Arbitrary, Capricious, and Not in Accordance With Law**

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or not in accordance with law.  This includes actions that are "contrary to governing law." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007)

91.     Each of the three rules is contrary to the explicit requirements and conservation mandates of the ESA, *see, e.g.,* 16 U.S.C. §§ 1531(b) & (c), 1533(b)(1)(A), 1536(a)(1), which

governs the Services' regulatory actions.  Each of the rules further imperils—rather than protects and conserves—vulnerable species.

92.     Each of the three rules comprising the Services' regulatory revisions also constitute arbitrary and capricious agency action insofar as the Services:  (1) relied on factors which Congress has not intended them to consider, including economic interests that are not within the Services' purview under the ESA; (2) entirely failed to consider important aspects of the problem, including the substantial concerns raised in the numerous comments to the Services on its proposal; and (3) offered an explanation for its decision that runs counter to the evidence before the agency, and indeed finds no reasonable or rational connection to the facts presented in the rulemaking record.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

93.     The Regulations for Prohibitions to Threatened Wildlife and Plants indefinitely deprive proposed or newly-designated threatened species from the ESA's protections against take that were otherwise automatically afforded to these species for the last 40 years.

94.     The Regulations for Listing Species and Designating Critical Habitat unlawfully and arbitrarily:  (1) delete the restriction on referencing economic impacts in making listing determinations; (2) limit the circumstances under which species can be listed as threatened based on the likelihood that they will become endangered in the "foreseeable future" by codifying an unreasonably narrow definition of "foreseeable future"; (3) eliminate the requirement for data that "substantiate[s]" delisting determinations and eliminate species "recovery" as a consideration in delisting determinations; (4) expand the Services' ability to decline to designate habitat as "critical habitat" by expanding the "not prudent" exemption, automatically exempting some habitats from designation, and ignoring indirect threats; and (5) limit the circumstances for designating unoccupied habitat as "critical habitat."

95.     The Regulations for Interagency Cooperation unlawfully and arbitrarily:  (1) limit the circumstances under which an agency is deemed to destroy or adversely modify critical habitat by requiring such action to affect the habitat "as a whole" and ignoring harm from

"global processes," *i.e.*, climate change; (2) limit the nature and scope of the analysis of the effects of agency action by revising the definitions of "effects of the action" and "environmental baseline" and narrowing causation standards; (3) limit the instances in which changed circumstances affecting listed species or critical habitat require re-initiation of consultation; (4) limit agencies' duties to insure mitigation of the adverse effects of their proposals and delegating to agencies the ability to make certain biological determinations; (5) allow broad-based "programmatic" and "expedited" consultations lacking site-specific, in-depth analysis of proposed agency action; and (6) impose hasty deadlines on informal consultations.

96.     In finalizing these actions, the Services failed to consider and justify their actions in light of FWS's history of delay or failure to issue species-specific rules; the established significance of the threat that climate change poses to threatened and endangered species; the efficacy of the Services' previous regulations; and numerous other issues raised to the Services during the comment period on the proposed rules.  FWS further wholly failed to respond to ALDF's concerns about the effects of repealing the Blanket 4(d) Rule on captive animals.

97.     The Services also failed to supply reasoned explanations for their actions, especially insofar as they reverse long-standing agency positions.

98.     Finally, the Services' rulemaking process violated APA requirements by failing to provide notice of further potential revisions, beyond a simple assertion that any such revisions would meet the APA's legal standard of being "a logical outgrowth of [these] proposed rule[s]." Such failures deprive ALDF, its members, and the public a meaningful opportunity to comment on several aspects of the final rules in violation of 5 U.S.C. § 553.

## SECOND CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act
and the Administrative Procedure Act:
Failure to Prepare an Adequate Environmental Impact Statement**

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.     Congress enacted the NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4331.  The NEPA ensures that federal agencies properly consider the environmental impacts of, and the alternatives to, their activities. 42 U.S.C. § 4332.  Today, NEPA is the Nation's "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1(a).

101.     NEPA and its implementing regulations, including well-settled NEPA caselaw, require federal agencies to take a "hard look" at environmental impacts of proposed projects, measures to mitigate these environmental impacts, the purpose and need for the proposed action, alternatives to a proposal, including a "no action alternative," and the environmental and social impacts of a reasonable range of alternatives, including no action.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989).  NEPA further requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of their analysis.  40 C.F.R. §§ 1500.1(b), 1502.24.  Accordingly, they must take a hard look at the direct, indirect, and cumulative effects of their actions on the environment and disclose those effects for informed public comment.  *See* 40 C.F.R. §§ 1508.7, 1508.8, 1508.25.  An adequate EIS must analyze the proposed agency action in different contexts.  *See* 40 C.F.R. § 1508.27.  Specifically, "context" means that "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality ….  Both short- and long-term effects are relevant."  40 C.F.R. § 1508.27(a).

102.     An EIS must analyze the intensity, or the "severity" of the impacts of the proposed agency action.  40 C.F.R. § 1508.27(b).  This requires an agency to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  An agency must also discuss "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5), and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7). Analysis of the intensity of the proposed action must also discuss the extent to which the

1   proposed agency action "may cause loss or destruction of significant scientific, cultural or

2   historical resources," 40 C.F.R. § 1508.27(b)(8), and "[t]he degree to which the action may

3   adversely affect an endangered or threatened species or its habitat that has been determined to be

4   critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).

5       103.   NEPA also requires agencies to disclose and analyze measures to mitigate the

6   impacts of proposed actions.  40 C.F.R. §§ 1502.14(f), 1502.16(h).  Mitigation must "be

7   discussed in sufficient detail to ensure that environmental consequences have been fairly

8   evaluated."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

9       104.   Finally, NEPA requires that an EIS contain a thorough discussion of the

10  "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii), (E).  The discussion of

11  alternatives is "the heart" of the NEPA process and is intended to provide a "clear basis for

12  choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14; *see also*

13  42 U.S.C. § 4332(2)(C)(iii), (E).  The agency must "[r]igorously explore and objectively

14  evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).  As such, "[a]n agency may not

15  define the objectives of its action in terms so unreasonably narrow that only one alternative from

16  among the environmentally benign ones in the agency's power would accomplish the goals of

17  the agency's action, and the EIS would become a foreordained formality."  *Citizens Against*

18  *Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir.1991) (citation omitted).

19      105.   The Council on Environmental Quality ("CEQ") provides that each federal

20  agency shall identify in its NEPA procedures those classes of actions that normally do not

21  require either an EIS or an EAS.  40 C.F.R. § 1507.3(b)(2)(ii).  These "categorical exclusions"

22  are actions that do not individually or cumulatively have a significant effect on the human

23  environment.  If an agency action falls within one of the defined categorical exclusions, then no

24  EIS or EA is required, unless one or more exceptions apply, which are also defined by the

25  agency's NEPA procedures.  FWS defines categorical exclusions as "policies, directives,

26  regulations, and guidelines:  that are an administrative, financial, legal, technical, or procedural

27  nature; or whose environmental effects are too broad, speculative, or conjectural to lend

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."  43 C.F.R. § 46.210(i).  Similarly, NMFS defines categorical exclusions in NOAA Administrative Order 216-6A and Companion Manual, Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities (Jan. 13, 2017), Appendix E.

106.    In promulgating the revised regulations, the Services failed to undertake either an EIS or an EA, in direct violation of NEPA.  In fact, the Services did not issue a draft environmental assessment or draft environmental impact statement for the proposed rules.  The Services also did not propose any alternatives to their proposed actions.  Rather, they erroneously argued that the regulatory revisions were categorically excluded from NEPA.  Both FWS and NMFS have stated that the regulatory revisions are categorically excluded from NEPA review because the revisions' environmental impacts are "fundamentally administrative, legal, technical, or procedural in nature" that "would not individually or cumulatively have a significant effect on the human environment."

107.    This is incorrect.  The Services' regulatory revisions substantively alter the protections afforded to vulnerable species under the law, and have individually and cumulatively significant effects on the human environment.  Both individually and taken as a whole, the rules have the purpose and effect of leaving threatened and endangered species vulnerable to take under the ESA—namely by reducing their available habitat, leaving them susceptible to climate change, removing blanket protections, and severely restricting the scope of agency review.

108.    Even if the revisions could be covered by a categorical exclusion, extraordinary circumstances require the preparation of an EIS or an EA.  The revised regulations will adversely affect threatened species and their habitats pursuant to 40 C.F.R. § 1508.27(b)(9).  The effects of the revised ESA regulations on the quality of the human environment are clearly "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4), as indicated by the public outcry and volume of public comments received in response to the proposed rules.  The possible effects on the human environment involve "unique [and] unknown risks" within the

1   meaning of 40 C.F.R. § 1508.27(b)(5).  The revisions "may establish a precedent for future

2   actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6).  Finally, the

3   revisions threaten a violation of federal law imposed for the protection of the environment,

4   namely the ESA, within the meaning of 40 C.F.R. § 1508.27(b)(10).

5         109.    As a result, the Services' failure to conduct a lawful NEPA process based on the

6   significant impacts of the revised regulations violated NEPA and its implementing regulations,

7   was arbitrary and capricious, an abuse of discretion, and a failure to act in accordance with the

8   law, and, therefore, violated the NEPA, the CEQ regulations, and the FWS and NMFS

9   guidelines implementing NEPA.

10   **REQUEST FOR RELIEF**

11       WHEREFORE, Plaintiffs request this Court to find for Plaintiffs and to enter a judgment

12   and order:

13       a.   Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to the

14           ESA, in violation of the APA;

15       b.   Hold unlawful and vacate the 2019 Revised ESA Regulations;

16       c.   Enjoin the FWS from applying or otherwise relying upon the 2019 Revised ESA

17           Regulations;

18       d.   Reinstate the predecessors to the 2019 Revised ESA Regulations;

19       e.   Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees;

20           and

21       f.   Grant Plaintiff such further and additional relief as the Court may deem just and

22           proper.

23

24

25

26

27

28

1    Dated: June 8, 2020                ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                          By:   *s/ Clement Roberts*

4                                              CLEMENT ROBERTS (CSBA # 209203)
      DANIEL S. GUERRA (CSBA # 267559)

5                                              KOUROSH JAHANSOUZ (CSBA # 292559)

6                                              ORRICK, HERRINGTON & SUTCLIFFE LLP
      405 Howard Street

7                                              San Francisco, CA 94105
      Telephone:      (415) 773-5700

8                                              Facsimile:      (415) 773-5759
      croberts@orrick.com

9                                              dguerra@orrick.com
      kjahansouz@orrick.com

10

11                                              EMMANUEL FUA (CSBA # 284563)
      ORRICK, HERRINGTON & SUTLIFFE LLP

12                                              51 West 52nd Street
      New York, NY 10019

13                                              Telephone:      (212) 506-5000
      Facsimile:      (212) 506-5151

14                                              efua@orrick.com

15                                              *Attorneys for Plaintiff*
      *ANIMAL LEGAL DEFENSE FUND*

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SAN FRANCISCO