STEVE MARSHALL
*Attorney General of Alabama*
Edmund G. LaCour Jr. (*pro hac vice*)
*Solicitor General*
James W. Davis (*pro hac vice*)
*Assistant Attorney General*
A. Barrett Bowdre (*pro hac vice*)
*Deputy Solicitor General*
OFFICE OF THE ALABAMA ATTORNEY GENERAL
    501 Washington Ave.
    P.O. Box 300152
    Montgomery, AL 36130
    Telephone: (334) 353-2196
    Fax: (334) 353-8400
    E-mail: edmund.lacour@AlabamaAG.gov
        jim.davis@AlabamaAG.gov
        barrett.bowdre@AlabamaAG.gov

*Counsel for Defendant-Intervenor State of Alabama*

Paul Beard II (SBN 210563)
FISHER BROYLES LLP
    5670 Wilshire Blvd., Ste. 1800
    Los Angeles, CA 90036-5653
    Telephone: (818) 216-3988
    Fax: (213) 402-5034
    E-mail:
    paul.beard@fisherbroyles.com

*Counsel for Intervening States*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEB HAALAND, U.S. Secretary of the Interior, *et al.*,<br><br>    Defendants,<br><br>    and<br><br>STATE OF ALABAMA, *et al.*,<br><br>    Defendant-Intervenors. | Case No. 4:19-cv-06812-JST<br><br>Related Cases: No. 4:19-cv-05206-JST<br>                       No. 4:19-cv-06013-JST<br><br>**STATE INTERVENORS' RESPONSE TO FEDERAL DEFENDANTS' MOTION FOR VOLUNTARY REMAND WITHOUT VACATUR** |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

RESPONSE ................................................................................................................... 1

I.   Under The APA, The Court Cannot "Set Aside Agency Action" When It Has Not Found The Action To Be "Unlawful." ................................................................. 2

II.  Even If The Court Could Consider The Equities Of Vacatur, The Equities Favor Remand Without Vacatur ...................................................................................... 4

    A.   Vacatur is Improper Because the Services Could Lawfully Enact the Challenged Regulations on Remand ........................................................ 5

       1. The Section 4 Rules ...................................................................... 5

       2. The Section 4(d) Rule ................................................................. 10

       3. The Section 7 Rule ..................................................................... 11

    B.   Vacatur Would Harm State Intervenors Immensely ......................... 15

CONCLUSION ............................................................................................................ 18

CERTIFICATE OF SERVICE .................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*Ala. ex rel. Steven T. Marshall v. Nat'l Marine Fisheries Serv.*,
    No. 1:16-cv-00593-CG-MU (S.D. Ala. Feb. 2, 2017) ...................................................... 2, 6

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..................................................................................... 4, 5, 15

*Ariz. Cattle Growers' Ass'n v. Salazar*,
    606 F.3d 1160 (9th Cir. 2010) ............................................................................................... 6

*Boudette v. Barnette*,
    923 F.2d 754 (9th Cir. 1991) ................................................................................................. 3

*California Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................................................. 1, 4

*California v. Regan*,
    No. 20-CV-03005-RS, 2021 WL 4221583 (N.D. Cal. Sept. 16, 2021) ................................ 2

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ............................................................................................. 13

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ............................................................................................................... 1

*In re Clean Water Act Rulemaking*, No. C 20-04636 WHA,
    2021 WL 4924844  (N.D. Cal. Oct. 21, 2021), *appeal docketed*,
    No. 16958 (9th Cir. Nov. 22, 2021) ...................................................................................... 2

*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*,
    709 F.3d 1 (D.C. Cir. 2013) ................................................................................................... 8

*Int'l Union, UMW v. FMSHA*,
    920 F.2d 960 (D.C. Cir. 1990) ............................................................................................... 4

*Invenergy Renewables LLC v. United States*,
    476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ...................................................................... 16

*Markle Ints., LLC v. U.S. Fish &  Wildlife Serv.*,
    827 F.3d 452 (5th Cir. 2016) ............................................................................................... 16

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................................. 4

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .................................................................................. 8

*Nat'l Family Farm Coal. v. United States*,
966 F.3d 893 (9th Cir. 2020) ............................................ 2, 4, 5, 18

*Nat'l Parks Conservation Ass'n v. Salazar*,
660 F. Supp. 2d 3 (D.D.C. 2009) ........................................................ 2

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ............................................................ 15

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ............................................................................... 4

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .............................................................. 5

*San Luis & Delta-Mendota Water Auth.*,
747 F.3d 581 (9th Cir. 2014) ............................................................ 14

*Silvers v. Sony Pictures Entm't, Inc.*,
402 F.3d 881 (9th Cir. 2005) .............................................................. 3

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v.
Fed. R.R. Admin.*,
988 F.3d 1170 (9th Cir. 2021) .......................................................... 16

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018) ....................................................... 6, 12, 16

**UNITED STATES CODE**

5 U.S.C. § 706(2) ................................................................................. 2, 3

16 U.S.C. § 1532(2) .................................................................................. 7

16 U.S.C. § 1532(5)(A)(i) ................................................................... 6, 11

16 U.S.C. § 1532(5)(A)(ii) ........................................................................ 5

16 U.S.C. § 1532(6) .................................................................................. 7

16 U.S.C. § 1532(20) ................................................................................ 8

16 U.S.C. § 1533(a)(1) .............................................................................. 7

16 U.S.C. § 1533(a)(3)(A) ........................................................................ 8

State Intervenors' Resp. to Fed. Defs.' Mot.
for Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

16 U.S.C. § 1533(b)(1)(A) ................................................................................. 10

16 U.S.C. § 1533(c)(1) ........................................................................................ 7

16 U.S.C. § 1533(c)(2) ........................................................................................ 7

16 U.S.C. § 1533(d) ............................................................................................ 10

16 U.S.C. § 1536(a) ............................................................................................ 11

16 U.S.C. § 1536(a)(1) ........................................................................................ 13

16 U.S.C. § 1536(a)(2) ........................................................................................ 11

16 U.S.C. § 1536(a)(3) ........................................................................................ 13

16 U.S.C. § 1538(a) ............................................................................................ 10

**FEDERAL REGISTER**

43 Fed. Reg. 18,180 (Apr. 28, 1978) .................................................................. 11

49 Fed. Reg. 38,900 (Oct. 1, 1984) ................................................................. 5, 8

77 Fed. Reg. 76,740 (Dec. 28, 2012) .................................................................. 18

81 Fed. Reg. 7214 (Feb. 11, 2016) .......................................................... 5, 6, 12, 13

81 Fed. Reg. 8663 (Feb. 22, 2016) ...................................................................... 17

83 Fed. Reg. 35,193 (Jul. 25, 2018) ..................................................................... 9

84 Fed. Reg. 45,020 (Aug. 27, 2019) .................................................................. 10

**CODE OF FEDERAL REGULATIONS**

50 C.F.R. § 17.31(a) ............................................................................................ 11

50 C.F.R. § 17.71(a) ............................................................................................ 11

50 C.F.R. § 402.01 et seq. ................................................................................... 13

50 C.F.R. § 402.02 .................................................................................... 12, 13, 14

50 C.F.R. § 402.14(c) .......................................................................................... 15

50 C.F.R. § 402.14(g) .......................................................................................... 15

50 C.F.R. § 402.14(h) .......................................................................................... 15

50 C.F.R. § 402.14(h)(4) .................................................................................... 15

50 C.F.R. § 402.14(l) ......................................................................................... 15

50 C.F.R. § 402.17 (a) ....................................................................................... 14

50 C.F.R. § 402.17 (b). ...................................................................................... 14

50 C.F.R. § 424.11(b) ........................................................................................ 10

50 C.F.R. § 424.11(d) .......................................................................................... 8

50 C.F.R. § 424.11(e) ........................................................................................... 7

50 C.F.R. § 424.12(a) ........................................................................................... 9

50 C.F.R. § 424.12(a)(1) ....................................................................................... 9

50 C.F.R. § 424.12(b)(2) ....................................................................................... 7

**OTHER AUTHORITY**

Supp. Br. for State Respondent-Intervenors States of Cal. et al., *North Dakota v. EPA*, No. 15-1456 (D.C. Cir. May 15, 2017) ......................................................... 1

# RESPONSE

Given the lenient standard for voluntary remand in this circuit, the State Defendant-Intervenors do not oppose the Federal Defendants' motion for voluntary remand without vacatur.[1] Although the challenged regulations are lawful and were lawfully promulgated, the current administration has expressed a desire to review the actions taken by the prior administration. *See* ECF 165 at 22 (noting that remand is requested to comply with Executive Order 13990, which "directed Federal agencies to review all actions taken during the past four years and consider whether to take additional action to fulfill" the administration's policy objectives). Accordingly, while the State Defendant-Intervenors do not believe such a remand is necessary or warranted, they nevertheless recognize that, in the absence of frivolousness or bad faith, courts often defer to the agency and grant remand without vacatur in such contexts. *See California v. Regan*, No. 20-CV-03005-RS, 2021 WL 4221583, at *1 (N.D. Cal. Sept. 16, 2021) ("While it is within [federal] defendants' discretion to modify their policies and regulatory approaches, and it may ultimately resolve some or all of plaintiffs' objections to the current rule, there has been no evaluation of the merits—or concession by defendants—that would support a finding that the rule should be vacated.").

With this said, if the Court grants remand, it should do so without vacatur, as the Federal Defendants request. This is so for at least two reasons. First, as many of the State Plaintiffs once recognized, "[v]actur would be improper here when this Court has issued no ruling on the merits at all—let alone a decision finding the Rule[s] to be invalid." Supp. Br. for State Respondent-Intervenors States of Cal. et al., at 5 n.5, *North Dakota v. EPA*, No. 15-1456 (D.C. Cir. May 15, 2017) (citations omitted). The APA requires such a ruling before the Court may "set aside agency action." 5 U.S.C. § 706(2). Second, even if the Court could proceed to weighing "how

---

[1] On December 10, 2021, Federal Defendants filed an identical motion for voluntary remand in the three related cases: *California v. Haaland*, No. 19-cv-06013, ECF 165; *Center for Biological Diversity v. Haaland*, No. 19-cv-05206, ECF 146; and *Animal Legal Defense Fund v. Haaland*, No. 19-cv-06812, ECF 109. This response will cite to the ECF number in the *California* case— ECF 165—to refer to the Federal Defendants' motion, but the page numbering is the same in all three cases.

serious the agency's errors are"—begging the question whether there was error to begin with—
"and the disruptive consequences of an interim change that may itself be changed," *Nat'l Family Farm Coal. v. United States*, 966 F.3d 893, 929 (9th Cir. 2020) (citation omitted), both factors weigh heavily in favor of not vacating the Rules on remand. Because the challenged provisions comport with the ESA, the Services could (and should) reenact the Rules on remand even if Plaintiffs' allegations of procedural deficiencies are assumed true. And vacatur would impose serious harms because it would restore the unlawful regulations that many of the State Intervenors suffered from and challenged in 2016. *See* First Am. Compl., *Ala. ex rel. Steven T. Marshall v. Nat'l Marine Fisheries Serv.*, No. 1:16-cv-00593-CG-MU (S.D. Ala. Feb. 2, 2017), ECF 30. That litigation ended when the Services agreed to reconsider the regulations. *See California*, ECF 53-4 at 23. Restoring those regulations now would impose great and unlawful costs on the 20 States that were part of the settlement.

## I.     Under The APA, The Court Cannot "Set Aside Agency Action" When It Has Not Found The Action To Be "Unlawful."

Because there has not been a ruling on the merits—even preliminarily, since Plaintiffs have elected not to seek a preliminary injunction in the 2+ years since they filed suit—"granting vacatur here would allow the Federal [D]efendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits." *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 4 (D.D.C. 2009). To be sure, there is a "split in authority" among the district courts in this circuit "regarding whether a court may order vacatur without first reaching a determination on the merits of the agency's action." *In re Clean Water Act Rulemaking*, No. C 20-04636 WHA, 2021 WL 4924844, at *4 (N.D. Cal. Oct. 21, 2021) (vacating rule on voluntary remand), *appeal docketed*, No. 16958 (9th Cir. Nov. 22, 2021); *see Regan*, 2021 WL 4221583, at *1 (granting remand without vacatur because "there ha[d] been no evaluation of the merits—or concession by defendants—that would support a finding that the rule should be vacated"). But the split is non-meritorious because Congress provided the answer.

1    In enacting the APA, Congress authorized district courts to "hold unlawful and set aside

2  agency action" when the action is "found to be," as Plaintiffs allege here, "arbitrary, capricious,

3  an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory

4  jurisdiction, authority, or limitations, or short of statutory right," or "without observance of

5  procedure required by law." 5 U.S.C. § 706(2). Congress's inclusion of when a court may "set

6  aside agency action"—when the court holds the agency action unlawful—implies that the court

7  may *not* "set aside agency action" when the court has *not* held the agency action unlawful.

8  *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) ("The

9  statute does not say expressly that *only* a legal or beneficial owner of an exclusive right is

10  entitled to sue. But, under traditional principles of statutory interpretation, Congress' explicit

11  listing of who *may* sue for copyright infringement should be understood as an *exclusion of others*

12  from suing for infringement. The doctrine of *expressio unius est exclusio alterius* 'as applied to

13  statutory interpretation creates a presumption that when a statute designates certain persons,

14  things, or manners of operation, all omissions should be understood as exclusions.'" (quoting

15  *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991)). There is thus no reason that

16  agencies—and plaintiffs—can accomplish through judicial maneuvering what they cannot

17  accomplish through the confines of the APA.

18    The Federal Defendants' expression of "substantial concerns with the 2019 ESA Rules"

19  does not change matters. ECF 165 at 20. For one, the stated "concerns" are not concessions of

20  the unlawfulness of the current Rules, but general concerns of policy or procedure regarding only

21  a subset of the enacted regulations. The Federal Defendants do not concede that the challenged

22  Rules are unlawful or that the Services could not enact them again. For another, even if the

23  Federal Defendants had confessed error, such a confession would not allow the Services to

24  circumvent the notice-and-comment procedures absent a judicial determination on the merits. *Cf.*

25  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (noting that agencies must "use the same

26  procedures when they amend or repeal a rule as they used to issue the rule in the first instance");

27  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("EPA's consent is

28

1   not alone a sufficient basis for us to stay or vacate a rule.… The risk is that an agency could

2   circumvent the rulemaking process through litigation concessions, thereby denying interested

3   parties the opportunity to oppose or otherwise comment on significant changes in regulatory

4   policy. If any agency could engage in rescission by concession, the doctrine requiring agencies to

5   give reasons before they rescind rules would be a dead letter." (citing *Motor Vehicle Mfrs. Ass'n*

6   *of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983))). That is particularly true here,

7   where three sets of defendants have intervened to defend the regulations against Plaintiffs'

8   challenge—and, if need be, any concession of unlawfulness by Federal Defendants.

9   **II.   Even If The Court Could Consider The Equities Of Vacatur, The Equities Favor**
    **Remand Without Vacatur.**

10           Even if vacatur were theoretically on the table in this case, the equities remove it from

11   serious consideration. The Ninth Circuit has adopted the D.C. Circuit's *Allied-Signal* two-prong

12   analysis for determining whether agency action should be vacated on remand once it has been

13   found unlawful. Under this test, "[w]hether agency action should be vacated depends on how

14   serious the agency's errors are and the disruptive consequences of an interim change that may

15   itself be changed." *Nat'l Family Farm Coal.*, 966 F.3d at 929 (quoting *Cal. Cmtys. Against*

16   *Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)); *see Allied-Signal, Inc. v. U.S. Nuclear Regul.*

17   *Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) ("The decision whether to vacate depends on

18   the 'seriousness of the [regulation's] deficiencies (and thus the extent of doubt whether the

19   agency chose correctly) and the disruptive consequences of an interim change that may itself be

20   changed.'" (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)). Of

21   course, to state the rule is to reveal its inapplicability in this case; it assumes the thing that hasn't

22   been proved—that the Services committed error—and asks the Court to determine how serious

23   the (alleged) error was. But even putting aside the question begging, both equitable

24   considerations weigh strongly in favor of remand *without* vacatur.

25

26

27

28

**A.    Vacatur is Improper Because the Services Could Lawfully Enact the Challenged Regulations on Remand.**

For the seriousness-of-the-error factor, courts "look to 'whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Nat'l Family Farm Coal.*, 966 F.3d at 929 (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)); *see Allied-Signal*, 988 F.2d at 203. Here, even assuming the procedural deficiencies alleged by Plaintiffs, the statutory text confirms that the Services could (and should) adopt the same Rules on remand. As a result, vacatur is inappropriate.

**1.    The Section 4 Rules**

*Designating Unoccupied Areas as Critical Habitat*. In 2016, the Services made two significant changes to their procedures for designating critical habitat. One, they abandoned their longstanding two-step approach, which the Services had used for thirty years. Under that approach, the Services looked first to areas a species already occupied and determined whether those areas were adequate to meet the conservation needs of the species. Only if the occupied areas were inadequate did the Services proceed to step two: designating as "critical habitat" unoccupied areas that contained the biological or physical elements "essential to the conservation of the species." 49 Fed. Reg. 38,900, 38,909 (Oct. 1, 1984). In 2016, the Services collapsed the process. *See* 81 Fed. Reg. 7414, 7426-27 (Feb. 11, 2016). Under the new rule, the Services could designate unoccupied areas as critical habitat without regard to whether designating occupied areas alone would be sufficient to meet conservation needs. *See id.*

This was problematic. Not only did the rule change set aside thirty years of agency precedent, but—more importantly—it violated the text of the ESA. Section 3(5)(A)(ii) of the ESA is clear that unoccupied areas may be designated as critical habitat *only* if "such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). "The statute thus differentiates between 'occupied' and 'unoccupied' areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that

1    unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers' Ass'n*

2    *v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). Designating an *unoccupied* area as critical

3    habitat cannot be "essential for the conservation of the species" if designating only *occupied*

4    areas would meet conservation needs. Thus, the ESA itself necessitates a two-step inquiry of the

5    kind abandoned by the Services in 2016. *See Ala. ex rel. Steven T. Marshall*, No. 1:16-cv-00593-

6    CG-MU (S.D. Ala. Nov. 29, 2016) (challenging 2016 regulations as unlawful).

7        The second change in 2016 concerned whether unoccupied areas designated as "critical

8    habitat" had to be "habitat" for the species. The Services answered the question in the negative:

9    "The presence of physical or biological features [essential to the conservation of the species[2]] is

10   not required by the statute for the inclusion of unoccupied areas in a designation of critical

11   habitat." 81 Fed. Reg. at 7420. Two years later, the Supreme Court resolved the question the

12   other way: "Even if an area otherwise meets the statutory definition of unoccupied critical habitat

13   because the Secretary finds the area essential for the conservation of the species, Section

14   4(a)(3)(i) [of the ESA] does not authorize the Secretary to designate the area as *critical* habitat

15   unless it is also *habitat* for the species." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S.

16   Ct. 361, 368 (2018). Of course, an area cannot be "habitat for the species" unless it has the

17   physical or biological features necessary for the species to survive there; common sense dictates

18   that a desert cannot be unoccupied critical "habitat" for an alligator if there is no water available

19   for the alligator to live.

20       The Services promulgated the provisions at issue in this case to realign their regulations

21   with the text of the ESA and Supreme Court precedent. First, the Services restored the two-step

22   designation process from the 1984 rule: "[T]he Secretary will first evaluate areas occupied by the

23   species" and "will only consider unoccupied areas to be essential where a critical habitat

24   designation limited to geographical areas occupied would be inadequate to ensure the

25   conservation of the species." 50 C.F.R. § 424.12(b)(2). Second, they complied with the Supreme

26

---

27   [2] The bracketed text comes from the ESA's definition of occupied critical habitat, which is "the specific areas within the geographical area occupied by the species … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i).

28

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

1  Court's *Weyerhaeuser* decision by ensuring that unoccupied "critical habitat" is, first and

2  foremost, habitat: "[F]or an unoccupied area to be considered essential, the Secretary must

3  determine that there is a reasonably certainty both that the area will contribute to the

4  conservation of the species and that the area contains one or more of those physical or biological

5  features essential to the conservation of the species." *Id.* Given the commands from the ESA

6  (and the Supreme Court), it is clear the Services could enact these rules again on remand—and,

7  indeed, that they would likely be required to do so.

8        *Delisting Standards.* In section 4(c) of the ESA, Congress tasked the Secretary with

9  listing endangered and threatened species and "revis[ing] each list … to reflect recent

10 determinations, designations, and revisions made in accordance with subsections (a) and (b)" of

11 section 4. 16 U.S.C. § 1533(c)(1); *see also id.* § 1533(c)(2). Subsection (a), in turn, provides five

12 criteria by which the Secretary is to determine whether a species is endangered or threatened, in

13 conjunction with the definitions of "endangered" and "threatened" in section 3. *Id.* §§ 1532(6),

14 (2), 1533(a)(1). The regulation Plaintiffs challenge simply makes clear that these statutory

15 definitions govern both listing *and* de-listing decisions. *See* 50 C.F.R. § 424.11(e) ("The

16 Secretary shall delist a species if the Secretary finds that, after conducting a status review based

17 on the best scientific and commercial data available … [t]he species does not meet the definition

18 of an endangered species or a threatened species," "consider[ing] the same factors and apply[ing]

19 the same standards set forth in" section 4(a) of the ESA). This makes perfect sense under the

20 ESA because a species that has recovered such that it would not be classified as threatened or

21 endangered—and thus no longer meets the definitions of threatened or endangered—should not

22 remain on a "threatened" or "endangered" list under the Act. Accordingly, the Services could

23 enact this provision on remand—and, again, may be compelled by statute to do so.[3]

24        *Defining "Foreseeable Future."* The ESA defines the term "endangered species" as "any

25 species which is in danger of extinction," 16 U.S.C. § 1532(6), and the term "threatened species"

---

26 [3] For this reason, even if the Court determines that vacatur is appropriate for some of the
   regulations, it should at least sever the delisting standard and the critical habitat provision and
27 either decide those challenges on the merits or remand those portions of the Rule without
   vacatur.
28

State Intervenors' Resp. to Fed. Defs.' Mot. for
                                                                               Voluntary Remand Without Vacatur
                                                                               No. 4:19-cv-06812-JST

as "any species which is likely to become an endangered species within the foreseeable future,"

*id.* § 1532(20). The challenged provision defines what "foreseeable future" means: "The term

foreseeable future extends only so far into the future as the Services can reasonably determine

that both the future threats and the species' responses to those threats are likely." 50 C.F.R.

§ 424.11(d). The Rule also provides that "[t]he Services will describe the foreseeable future on a

case-by-case basis, using the best available data and taking into account considerations such as

the species' life-history characteristics, threat-projecting timeframes, and environmental

liability." *Id.* Plaintiffs' concern that the Rule conflicts with the text of the ESA because "the Act

requires that 'the best scientific and commercial data available' drive listing decisions,"

*California*, ECF 162 at 21, thus ignores the text of the Rule, which itself mandates use of "the

best available data." Accordingly, while not mandated by the text of the statute, the Rule is

certainly allowed by it. *See In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule*

*Litig.*, 709 F.3d 1, 15 (D.C. Cir. 2013) ("The term 'foreseeable' is not defined by statute or

regulation. FWS determines what constitutes the 'foreseeable' future on a case-by-case basis in

each listing decision."); *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet*

*Servs.,* 545 U.S. 967, 980, (2005) (noting that "ambiguities in statutes within an agency's

jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in

reasonable fashion").

*Not Prudent Designations*. Under the ESA, the "Secretary, by regulation … and to the

maximum extent prudent and determinable," shall designate critical habitat for endangered

species. 16 U.S.C. § 1533(a)(3)(A). The text thus provides that the Secretary may choose *not* to

designate critical habitat when it would not be "prudent" to do so. The Services' prior regulation

listed only two situations in which designating critical habitat would not be prudent: when "[t]he

species is threatened by taking or other human activity, and identification of critical habitat can

be expected to increase the degree of such threat to the species," or when "[s]uch designation of

critical habitat would not be beneficial to the species." 49 Fed. Reg. at 38,909. With the 2019

revisions, the Services "set forth a non-exhaustive list of circumstances in which the Services

may find it is not prudent to designate critical habitat." 83 Fed. Reg. 35,193, 35,196 (Jul. 25, 2018). As before, designating critical habitat remains the norm, *see* 50 C.F.R. § 424.12(a)); not-prudent designations still must be based "on the best scientific data available," *id.*; and "[i]f designation of critical habitat is not prudent …, the Secretary will state the reasons for not designating critical habitat in the publication of the proposed and final rules listing a species," *id.* The new provision simply identifies circumstances that should be considered when making a not-prudent designation. Under the Rule, the "Secretary may, but is not required to, determine that a designation would not be prudent" when:

> (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;

> (ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;

> (iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

> (iv) No areas meet the definition of critical habitat; or

> (v) The Secretary otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.

50 C.F.R. § 424.12(a)(1).

Given the discretion Congress afforded the Services to make not-prudent designations, and given that any such designation will continue to be based on the best scientific evidence available, explained in writing, and judicially reviewable, it is hard to reconcile the text of the provision and the statute with Plaintiffs' broadside that the Rule "turns the narrow statutory 'not prudent' exception into the new norm with an amorphous, unlawful list." *California*, ECF 162 at 23. As with the other regulations in the Services' Section 4 Rule, this one could be enacted again on remand consistent with Congress's statutory command.

State Intervenors' Resp. to Fed. Defs.' Mot. for
                           Voluntary Remand Without Vacatur
                           No. 4:19-cv-06812-JST

1    *Public Disclosure of (Though Not Reliance On) Economic Impacts in Listing Decisions*.

2    Under the former version of 50 C.F.R. § 424.11(b), the decision to list a species as endangered or

3    threatened could be made "solely on the basis of the best available scientific and commercial

4    information regarding a species' status, without reference to possible economic or other impacts

5    of such determination." Under the challenged regulation, the scientific and commercial

6    information concerning the species' status will still be the "sole" basis for the agency's decision,

7    but the agency may now provide the public information regarding the economic impacts of the

8    listing determination. *See* 50 C.F.R. § 424.11(b). Plaintiffs contend that the rule change is "an

9    end run around Congress's express command" to make listing decisions "'solely on the basis of

10   the best scientific and commercial data available.'" *CBD*, ECF 142 at 16 (quoting 16 U.S.C.

11   § 1533(b)(1)(A)). But as the Services explained in enacting the regulation, "listing

12   determinations [will continue to be] made solely on the basis of the best scientific and

13   commercial data available." 84 Fed. Reg. 45,020, 45,024 (Aug. 27, 2019). The only difference is

14   that the Services may now compile economic information. Because nothing in the ESA prohibits

15   them from doing that, the Services could also enact this rule again on remand.

16   **2. The Section 4(d) Rule**

17   Under the ESA, species listed as endangered receive automatic protections, including

18   against any "take" by a private or public entity. 16 U.S.C. § 1538(a). The Act does not afford the

19   same statutory protections to threatened species. Rather, "[w]henever any species is listed as a

20   threatened species ... the Secretary shall issue such regulations as he deems necessary and

21   advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The Act also

22   specifies that the Secretary "may" extend to threatened species the protections afforded to

23   endangered species. *Id.*

24   Since 1978, the FWS has extended those protections by blanket rule. Instead of issuing

25   species-specific regulations to protect a threatened species, FWS promulgated a rule that

26   automatically extended to all threatened species the same statutory protections applicable to

27   endangered species. *See* Protection for Threatened Species of Wildlife, 43 Fed. Reg. 18,180,

28

10    State Intervenors' Resp. to Fed. Defs.' Mot. for
      Voluntary Remand Without Vacatur
      No. 4:19-cv-06812-JST

1    18,181 (Apr. 28, 1978). The challenged section 4(d) Rule repeals that blanket extension,

2    allowing FWS to take a more tailored approach to the protection of newly listed threatened

3    species by promulgating species-specific prohibitions, protections, or restrictions when a species

4    is listed as threatened. *See* 50 C.F.R. §§ 17.31(a) (threatened wildlife), 17.71(a) (threatened

5    plants). This is the approach the NMFS has always taken. Given the language of the statute and

6    the approach taken by the NMFS—which Plaintiffs do not challenge—the FWS could

7    undoubtedly enact the 4(d) Rule again on remand.

8            **3. The Section 7 Rule**

9            The Services' Section 7 Rule concerns interagency consultation. Section 7 of the ESA

10   requires federal agencies to consult with the Secretaries of the Interior and Commerce to ensure

11   that any action authorized, funded, or carried out by the agencies is not likely to jeopardize the

12   continued existence of endangered or threatened species or result in the destruction or adverse

13   modification of critical habitat for those species. *See* 16 U.S.C. § 1536(a). The activities by the

14   "action agencies" could include, *inter alia*, a decision whether to issue permits to States or

15   private parties to engage in economic development. The Rule adopts several procedural changes

16   to the informal and formal consultation processes and amends the definitions of some of the

17   terms defining those processes.

18           *Amending Definition of "Destruction or Adverse Modification."* As noted above, the

19   ESA empowers the Services to declare as critical habitat areas "on which are found those

20   physical or biological features (I) essential to the conservation of the species and (II) which may

21   require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Under

22   Section 7 of the ESA, federal agencies must consult with the Services to ensure that their actions

23   do not "result in the destruction or adverse modification of habitat of such species." 16 U.S.C.

24   § 1536(a)(2). That is, federal agencies must not act in a way that makes "essential" habitable

25   land or water uninhabitable for a listed species. "Destruction or adverse modification" is not

26   defined by the statute.

27

28

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

In 2016, the Services expanded the regulatory definition of "destruction or adverse modification" so that it read:

> Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

81 Fed. Reg. 7214, 7226 (Feb. 11, 2016).

By including alterations that "preclude or significantly delay development" of physical or biological features, the 2016 rule unlawfully gave the Services power that the ESA never contemplated: to consider whether an alteration would adversely modify or destroy features that *did not exist*. This overreach was particularly problematic when combined with the Services' 2016 rule change for designating critical habitat (discussed above). The combination meant that the Services could (1) declare as critical habitat areas that did not have and may never have the physical or biological features necessary to support a species, and (2) then prohibit an activity that might prevent the development of those features that did not and may never exist. For instance, the regulation would thus allow the Services to prevent a landowner from planting loblolly pine trees in a barren field if having longleaf pine trees there might one day be more beneficial to a species, even though the species could not survive in the field as it existed since it was barren.

The 2019 rule change corrected this statutory overreach and ensured that the Services will comply with the Supreme Court's teaching that "critical habitat" must, first and foremost, be "habitat for the species." *Weyerhaeuser*, 139 S. Ct. at 368 (emphasis omitted). First, the Services deleted the unlawful addition from 2016 that extended "destruction or adverse modification" to alterations that "preclude or significantly delay development" of physical or biological features. Second, the Services added the phrase "as a whole" to the regulatory definition: "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat *as a whole* for the conservation of a listed species." 50 C.F.R. § 402.02 (emphasis added). This addition simply codified the Services' prior approach, as explained in the

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

1   2016 rulemaking: "[T]he determination of 'destruction or adverse modification' will be based on

2   the effect to the value of critical habitat for the conservation of a listed species. In other words,

3   the question is whether the action will appreciably diminish the value of the critical habitat *as a*

4   *whole*, not just in the action area." 81 Fed. Reg. at 7221 (emphasis added)

5      Given that the ESA does not define "destruction or adverse modification," and that the

6   Services' prior definition was unlawful, the Services could enact these changes on remand.

7      *Defining "Effects of the Action," Measuring "Effects of the Action" from the*

8   *"Environmental Baseline," and Defining "Reasonably Certain to Occur."* As already noted,

9   Section 7 of the ESA mandates interagency consultation to ensure that any agency action "is not

10  likely to jeopardize the continued existence of any endangered species or threatened species or

11  result in the destruction or adverse modification of habitat of such species." 16 U.S.C.

12  § 1536(a)(1); *see also id.* § 1536(a)(3) (noting that agencies must consult with the Services when

13  a permit applicant "has reason to believe that an endangered species or a threatened species may

14  be present in the area affected by his project and that implementation of such action will likely

15  affect such species"). The ESA does not provide statutory definitions or standards for

16  determining what qualifies as an effect of agency action, or whether such an action will "likely

17  affect" a species, or against what baseline to measure such an effect, so the Services fill these

18  gaps by rulemaking. *See generally* 50 C.F.R. § 402.01 *et seq.*

19     The 2019 Rule clarifies a number of regulatory definitions and applications in the

20  interagency consultation process. For instance, it simplifies the standard the Services apply when

21  determining the "effects of the action" being considered. *See Ctr. for Biological Diversity v. U.S.*

22  *Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012). "Effects of the action" is now

23  defined as "all consequences to listed species or critical habitat that are caused by the proposed

24  action," with the limitation that "[a] consequence is caused by the proposed action if it would not

25  occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02.

26     "Reasonably certain to occur" and "consequences caused by the proposed action" are also

27  now defined:

28

13   State Intervenors' Resp. to Fed. Defs.' Mot. for
     Voluntary Remand Without Vacatur
     No. 4:19-cv-06812-JST

(a) Activities that are reasonably certain to occur. A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Factors to consider when evaluating whether activities caused by the proposed action (but not part of the proposed action) or activities reviewed under cumulative effects are reasonably certain to occur include, but are not limited to:

(1) Past experiences with activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action;

(2) Existing plans for the activity; and

(3) Any remaining economic, administrative, and legal requirements necessary for the activity to go forward.

(b) Consequences caused by the proposed action. To be considered an effect of a proposed action, a consequence must be caused by the proposed action (i.e., the consequence would not occur but for the proposed action and is reasonably certain to occur). A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Considerations for determining that a consequence to the species or critical habitat is not caused by the proposed action include, but are not limited to:

(1) The consequence is so remote in time from the action under consultation that it is not reasonably certain to occur; or

(2) The consequence is so geographically remote from the immediate area involved in the action that it is not reasonably certain to occur; or

(3) The consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur.

50 C.F.R. § 402.17 (a), (b).

The Services also defined what constitutes the "environmental baseline," which is used in determining the effects an agency's proposed actions are likely to have for listed species or critical habit. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d 581, 638 (9th Cir. 2014). The Rule defines "environmental baseline" as "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action." 50 C.F.R. § 402.02.

1    Plaintiffs contest these revisions mainly on policy grounds, contending that the

2    amendments go against "the ESA's overriding conservation purpose." *California*, ECF 162 at

3    28. But they have not shown that the *text* of the ESA prohibits the amendments. As a result, the

4    Services could enact these revisions again on remand.

5        *Revisions to the Formal Consultation Process*. Finally, the Section 7 Rule also revises the

6    formal consultation process by describing what information is needed for an agency to initiate

7    the formal consultation process, 50 C.F.R. § 402.14(c); clarifying the responsibilities of each of

8    the States and the steps it will take in determining whether a proposed action may affect a listed

9    species or its critical habitat, *id.* § 402.14(g); and allowing the Services to adopt an agency's

10   initiation package as their own biological opinion, *id.* § 402.14(h). The new Rule also provides a

11   method for expedited consultations, which are appropriate for "[c]onservation actions whose

12   primary purpose is to have beneficial effects on listed species." *Id.* § 402.14(l). Plaintiffs do not

13   challenge some of these changes as unlawful under the ESA, so at the very least those provisions

14   should remain intact. *See California*, ECF 162 at 25-32; *CBD*, ECF 142 at 30-36; *ADF*, ECF 107

15   at 40-44. The unchallenged provisions include: 50 C.F.R. § 402.14(c) (initiation of formal

16   consultation); 50 C.F.R. § 402.14(h)(4) (collaborative process); and 50 C.F.R. § 402.14(l)

17   (expedited consultations).[4] As for the remainder, suffice it to say that Plaintiffs have not shown a

18   conflict with the *text* of the ESA that would limit the Services' discretion in this area such that

19   they could not enact these provisions on remand.

20       **B.    Vacatur Would Harm State Intervenors Immensely.**

21       The other *Allied-Signal* factor—the disruptive consequences of vacatur—also counsels in

22   favor of remand without vacatur.

23       *First*, because "[t]he effect of invalidating an agency rule is to reinstate the rule

24   previously in force," *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005), vacatur would

---

[4] Plaintiffs do challenge certain of these provisions for alleged procedural deficiencies under the APA, but not as unlawful under the ESA itself. And while ADF challenges the expedited consultation regulation as arbitrary and capricious under the APA, it's unclear what the basis of the challenge is—that is, whether ADF contends that the rule is unlawful under the ESA or is arbitrary and capricious for a different reason, such as (as ADF alleges) the Services' purported failure to respond adequately to comments. *See ADF*, ECF 107 at 43-44.

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

resurrect the unlawful 2016 regulations that the State Intervenors challenged in court and settled with the Federal Defendants based on their promise to reconsider the rules. *See California*, ECF 53-4 at 20-26. As explained above, the 2016 regulations concerning the designation of critical habitat and the definition of "destruction or adverse modification" violated the ESA by ignoring Congress's distinction between unoccupied and occupied areas, disregarded the statute's requirement that "critical habitat" be "habitat," and allowed the Services to designate as "critical habitat" unoccupied areas in which a species could not survive—all at great cost to stakeholders and with no benefit to speak of on the other side of the ledger. Indeed, under the 2016 regulations, "virtually any part of the United States could be designated as 'critical habitat' for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it." *Markle Ints., LLC v. U.S. Fish &  Wildlife Serv.*, 827 F.3d 452, 483 (5th Cir. 2016) (Owen, J., dissenting), *vacated and remanded sub nom. Weyerhaeuser*, 139 S. Ct. 361. Resurrecting these unlawful rules would fly in the face of the Supreme Court's holding in *Weyerhaeuser*, 139 S. Ct. at 368.

*Second*, vacatur would violate the statutory rights of the State Intervenors. Many of the State Intervenors challenged the 2016 regulations as unlawful and settled with the Federal Defendants based on their representation that they would reconsider the rules. *See California*, ECF 53-4 at 25. Then the States participated in notice-and-comment and secured enactment of the Rules. *See id.* at 28. Vacatur would thus deprive the Intervenor States of their statutory rights under the APA, resulting in an irreparable procedural harm. *See Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1180 (9th Cir. 2021) (noting that notice and comment are "the most fundamental of the APA's procedural requirements"); *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1352-53 (Ct. Int'l Trade 2020) (recognizing that "a procedural injury can itself constitute irreparable harm" (citation omitted)).

*Third*, vacatur would result in significant real-world harm to the Intervenor States, who have "primary authority and responsibility for protection and management of fish, wildlife, and

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

plants and their habitats." 81 Fed. Reg. at 8663. The 2019 Rules were enacted at least in part to respond to the needs of States to work with stakeholders in ways that allowed landowners to view the presence of threatened or endangered species as assets, not liabilities. The FWS's repeal of the blanket 4(d) rule, for instance, allowed States to engage landowners in creative conservation efforts. Such conservation efforts that align the incentives of all stakeholders are very much needed in States like Alabama, as the Commissioner of the Alabama Department of Conservation and Natural Resources has explained:

> The gopher tortoise has been listed as a federally threatened species in west Alabama, and FWS is expected to decide whether to list the tortoise as a threatened species in other parts of Alabama by 2022. Because 95% of gopher tortoise habitat is owned by private landowners, enlisting the landowners' help in protecting habitat and identifying where the gopher tortoise currently lives is crucial to protecting the tortoise. But, upon information and belief, landowners are understandably reticent about reporting whether they have tortoises on their land because of the attendant regulatory burdens that could come if the tortoise is listed as threatened throughout Alabama. Fortunately, under the new Rules promulgated by FWS, those fears may be eased because threatened species would not necessarily be treated the same as endangered species. Instead, a more tailored approach will be taken, allowing additional room for the State to creatively engage landowners in the protection of the gopher tortoise while also serving the needs of the landowners.

Decl. of Christopher M. Blankenship, *California*, ECF 53-4 at 3 (citations omitted); *see also* Decl. of Jim DeVos, *California*, ECF 53-6 at 3 (explaining how the distinction between threatened and endangered species has benefitted the Apache trout and Gila trout in Arizona through managed sport fishing); Decl. of James N. Douglas, *California*, ECF 53-9 at 5 (noting that the repeal of the blanket 4(d) rule "will allow a more nuanced development of restrictions that do not conflict with [Nebraska's] ongoing management programs to improve wetland habitat for other species if the eastern black rail is ultimately listed as a threatened species," as the Services have proposed).

Similar real-world harms would attend judicial repeal of other portions of the challenged Rules. Alaska would once more be subject to the uncertainty involved in listing decisions based on models forecasting out a hundred years or more—like the decision the NMFS made when listing bearded seals as threatened species. *See* Threatened Status for the Beringia and Okhotsk

1   Distinct Population Segments of the Erignathus barbatus nauticus Subspecies of the Bearded

2   Seal, 77 Fed. Reg. 76,740 (Dec. 28, 2012). States would lose the benefit of regulating species

3   that no longer qualify as threatened or endangered under the ESA yet remain listed as such due

4   to the Services' prior regulations. *See* Decl. of Melissa Schlichting, *California*, ECF 53-3 at 2-3

5   (noting that Montana has been able to keep its Rocky Mountain Grey Wolf population at "five to

6   six times above the federally required amount" by licensing limited hunting—resulting in $3.4

7   million in revenue for wolf management—and establishing a livestock loss board to reimburse

8   rangers whose livestock are killed by wolves). And setting aside the interagency cooperation

9   regulations would make decisions concerning federal land use even more cumbersome (with no

10  attendant benefit to the species), thus directly harming States like Idaho, where over 60% of the

11  land is federally managed. *See* Decl. of Scott Pugrud, *California*, ECF 53-7 at 5. Then there are

12  the harms to State sovereignty caused by the overreach of the 2016 rules, and the significant

13  costs to all stakeholders caused by a constantly shifting regulatory environment. *See* Decl. of

14  Angela Bruce, *California*, ECF 53-11 at 4 (attesting that vacatur would harm Wyoming's

15  "interest[] in exercising the full extent of its state law and regulatory authority to successfully

16  manage wildlife and related natural resources within its jurisdiction, and to maintain its

17  sovereign interests"); Decl. of Douglas Vincent-Lang, *California*, ECF 53-5 at 8 (stating that

18  vacatur would "create an environment of regulatory unpredictability" in Alaska that "will

19  ultimately result in revenue losses and associated impacts to Alaska and its citizens").

20    Immense harm would thus result if this Court vacates the 2019 Rules and resurrects the

21  2016 Rules, all while the Services are engaged in further rulemaking that cause even more

22  changes. The disruptive whipsaw effect of such a ruling cannot be overstated. *See Nat'l Family*

23  *Farm Coal.*, 966 F.3d at 929 (noting the "disruptive consequences of an interim change that may

24  itself be changed" (citation omitted)).

25  **CONCLUSION**

26    For the above reasons, remand with vacatur would be improper. The Court should thus

27  either grant remand without vacatur or deny the motion.

28

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

1

2          In compliance with Local Rule 5-1, the filer of this document attests that all signatories

3    listed have concurred in the filing of this document.

4          Respectfully submitted this 27th day of December, 2021.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

State Intervenors' Resp. to Fed. Defs.' Mot. for
                Voluntary Remand Without Vacatur
                No. 4:19-cv-06812-JST

1   STEVE MARSHALL
    Attorney General of Alabama

2   s/ Edmund G. LaCour Jr.                          s/ Paul Beard II
    Edmund G. LaCour Jr. (*pro hac vice*)            Paul Beard II (SBN 210563)
3   *Solicitor General*                             FISHERBROYLES LLP
    James W. Davis (*pro hac vice*)                  5670 Wilshire Blvd., Ste. 1800
4   *Deputy Attorney General*                        Los Angeles, CA 90036-5653
    A. Barrett Bowdre (*pro hac vice*)               Telephone: (818) 216-3988
5   *Deputy Solicitor General*                       Fax: (213) 402-5034
    OFFICE OF THE ALABAMA ATTORNEY                   E-mail: paul.beard@fisherbroyles.com
6   GENERAL
    501 Washington Ave.                              *Counsel for Intervening States*
7   Montgomery, AL 36130
    Telephone: (334) 353-2196                        AUSTEN KNUDSEN
8   Fax: (334) 353-8400                              Attorney General of Montana
    E-mail: edmund.lacour@AlabamaAG.gov
9   jim.davis@AlabamaAG.gov                          s/ Jeremiah Langston
    barrett.bowdre@AlabamaAG.gov                     David Dewhirst (*pro hac vice*)
10                                                   *Solicitor General*
    *Counsel for Defendant-Intervenor*              Jeremiah Langston (*pro hac vice*)
11  *State of Alabama*                               *Assistant Attorney General*
                                                     MONTANA DEPARTMENT OF JUSTICE
12  MARK BRNOVICH                                    215 N. Sanders St., P.O. Box 201401
    Attorney General of Arizona                      Helena, MT 59620-1401
13                                                   Telephone: (406) 444-3602
    s/ L. John LeSueur                               Fax: (406) 444-2026
14  L. John LeSueur (*pro hac vice*)                 E-mail: david.dewhirst@mt.gov
    *Assistant Attorney General*                     jeremiah.langston@mt.gov
15  OFFICE OF THE ARIZONA ATTORNEY GENERAL
    2005 N. Central Avenue                           *Counsel for Defendant-Intervenor*
16  Phoenix, Arizona 85004                           *State of Montana*
    Telephone: (602) 542-0640
17  E-mail: John.LeSueur@azag.gov                    DOUGLAS J. PETERSON
                                                     Attorney General of Nebraska
18  *Counsel for Defendant-Intervenor*
    *State of Arizona ex rel. Ariz. Game & Fish*     s/ Justin D. Lavene
19  *Commission*                                     Justin D. Lavene (*pro hac vice*)
                                                     *Assistant Attorney General*
20  DEREK SCHMIDT                                    Carlton Wiggam (*pro hac vice*)
    Attorney General of Kansas                       *Assistant Attorney General*
21                                                   2115 State Capitol
    s/ Jeffrey A. Chanay                             Lincoln, NE 68509
22  Jeffrey A. Chanay (*pro hac vice*)               Telephone: (402) 471-2682
    *Chief Deputy Attorney General*                  E-mail: justin.lavene@nebraska.gov
23  OFFICE OF THE KANSAS ATTORNEY GENERAL            carlton.wiggam@nebraska.gov
    120 SW Tenth Avenue
24  Topeka, KS 66612-1597                            *Counsel for Defendant-Intervenor*
    Telephone: (785) 296-2215                        *State of Nebraska*
25  Fax: (785) 291-3767
    E-mail: jeff.chanay@ag.ks.gov
26                                                   *[Additional counsel listed on next page]*

27  *Counsel for Defendant-Intervenor*
    *State of Kansas*

28

TREG. R. TAYLOR
Attorney General of Alaska

LESLIE RUTLEDGE
Attorney General of Arkansas

LAWRENCE G. WASDEN
Attorney General of Idaho

ERIC S. SCHMITT
Attorney General of Missouri

WAYNE STENEHJEM
Attorney General of North Dakota

SEAN D. REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia

BRIDGET HILL
Attorney General of Wyoming

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

DATED:  December 27, 2021                    Respectfully submitted,

<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr. (*pro hac vice*)
*Counsel for Defendant-Intervenor State of Alabama*

State Intervenors' Resp. to Fed. Defs.' Mot. for
Voluntary Remand Without Vacatur
No. 4:19-cv-06812-JST